2025-2120

IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**AUXIN SOLAR INC., CONCEPT CLEAN ENERGY, INC.,**

*Plaintiffs-Appellees*,

v.

**UNITED STATES, DEPARTMENT OF COMMERCE, HOWARD LUTNICK, Secretary of Commerce, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, Commissioner of U.S. Customs and Border Protection,**

*Defendants*,

**AMERICAN CLEAN POWER ASSOCIATION, CANADIAN SOLAR (USA), INC., CANADIAN SOLAR INTERNATIONAL LIMITED, SOLAR ENERGY INDUSTRIES ASSOCIATION, JA SOLAR USA, INC., JA SOLAR VIETNAM COMPANY LTD., JA SOLAR MALAYSIA SDN. BHD., JA SOLAR INTERNATIONAL LTD., NEXTERA ENERGY, INC., BYD (H.K.) CO., LTD., BYD AMERICA LLC, INVENERGY RENEWABLES LLC, INVENERGY SOLAR EQUIPMENT MANAGEMENT LLC, TRINA SOLAR (U.S.) INC., TRINA SOLAR (VIETNAM) SCIENCE & TECHNOLOGY CO., LTD., TRINA SOLAR ENERGY DEVELOPMENT CO. LTD., TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD., RISEN SOLAR TECHNOLOGY SDN. BHD., BOVIET SOLAR TECHNOLOGY CO., LTD., BOVIET SOLAR USA., LTD., JINKO SOLAR (U.S.) INDUSTRIES INC., JINKOSOLAR (U.S.) INC., JINKO SOLAR TECHNOLOGY SDN. BHD., JINKO SOLAR (MALAYSIA) SDN. BHD., JINKOSOLAR (VIETNAM) CO., LTD., JINKOSOLAR HOLDING CO., LTD., JINKOSOLAR MIDDLE EAST DMCC, JINKOSOLAR (VIETNAM) INDUSTRIES CO. LTD., JINKOSOLAR INVESTMENT LTD., fka Jinkosolar Technology Ltd.,**

*Defendants-Appellants*.

Appeal from the United States Court of International Trade in
Case No. 1:23-CV-00274-TMR, Judge Timothy M. Reif

**BRIEF OF DEFENDANTS-APPELLANTS
<u>AMERICAN CLEAN POWER ASSOCIATION, ET AL.</u>**

Matthew R. Nicely
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4046
mnicely@akingump.com

*Counsel to NextEra Energy, Inc. and Solar Energy Industries Association*

Jonathan T. Stoel
**HOGAN LOVELLS US LLP**
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hoganlovells.com

*Counsel to Canadian Solar (USA) Inc. and Canadian Solar International Limited*

Craig A. Lewis
**HOGAN LOVELLS US LLP**
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-8613
craig.lewis@hoganlovells.com

*Counsel to BYD (H.K.) Co., Ltd. and BYD America LLC*

Jonathan M. Freed
**TRADE PACIFIC PLLC**
700 Pennsylvania Ave, SE
Washington, DC 20003
(202) 223-3760
jfreed@tradepacificlaw.com

*Counsel for Trina Solar (U.S.), Inc., Trina Solar Science & Technology (Thailand) Ltd., Trina Solar Energy Development Company Limited, and Trina Solar (Vietnam) Science & Technology Co., Ltd.*

Amanda Shafer Berman
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2908
aberman@crowell.com

*Counsel to Invenergy Renewables LLC and Invenergy Solar Equipment Management LLC*

Jeffrey S. Grimson
**MOWRY & GRIMSON, PLLC**
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
(202) 688-3610
jsg@mowrygrimson.com

*Counsel to JA Solar USA, Inc., JA Solar Vietnam Company Limited, JA Solar Malaysia Sdn. Bhd., JA Solar International Limited, and the American Clean Power Association*

C. Kevin Marshall
**JONES DAY**
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3851
ckmarshall@jonesday.com

*Counsel to Boviet Solar Technology Co., Ltd., and Boviet Solar USA, Ltd.*

Gregory S. Menegaz
**THE INTER-GLOBAL TRADE LAW GROUP, PLLC**
1156 Fifteenth Street, N.W., Suite 1101
Washington, D.C. 20005
(202) 868-0300
gmenegaz@igtlaw.com

*Counsel to Risen Solar Technology Sdn. Bhd. and Co-Counsel to Boviet Solar Technology Co., Ltd. and Boviet Solar USA, Ltd.*

Ned H. Marshak
**GRUNFELD DESIDERIO LEBOWITZ SILVERMAN & KLESTADT LLP**
599 Lexington Avenue FL 36
New York, NY 10022-7648
(212) 557-4000

*Counsel to Jinko Solar (U.S.) Industries Inc., JinkoSolar (U.S.) Inc., Jinko Solar Technology Sdn. Bhd., Jinko Solar (Malaysia) Sdn. Bhd., JinkoSolar (Vietnam) Co., Ltd., JinkoSolar Holding Co., Ltd., Jinkosolar Middle East DMCC, JINKOSOLAR INVESTMENT LIMITED (f/k/a/ Jinkosolar Technology Limited), and Jinkosolar (Vietnam) Industries*

Dated: March 30, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

**Case Number** 2025-2120

**Short Case Caption** Auxin Solar Inc. v. US

**Filing Party/Entity** Defendants-Appellants NextEra Energy, Inc. and Solar Energy Industries Association

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date:  3/30/2026

Signature:  /s/ Matthew R. Nicely

Name:  Matthew R. Nicely

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| NextEra Energy, Inc. | Not applicable | The Vanguard Group, Inc. owns more than 10% of NextEra Energy, Inc.'s oustanding common stock |
| Solar Energy Industries Association | Not applicable | Not applicable |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐      Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| James E. Tysse (Akin Gump Strauss Hauer & Feld LLP) | Sydney L. Stringer (Akin Gump Strauss Hauer & Feld LLP) | Yujin Kim McNamara (Akin Gump Strauss Hauer & Feld LLP) |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-2120

**Short Case Caption** Auxin Solar Inc. v. US

**Filing Party/Entity** Canadian Solar (USA) Inc.; Canadian Solar International Limited

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 3/30/2026

Signature: /s/ Jonathan T. Stoel

Name: Jonathan T. Stoel

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Canadian Solar (USA) Inc. | | CSI Solar Co., Ltd.; Canadian Solar Inc. |
| Canadian Solar International Limited | | CSI Solar Co., Ltd.; Canadian Solar Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable  ☐ Additional pages attached

| | | |
|---|---|---|
| Gregory M.A. Hawkins (Hogan Lovells US LLP) | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)  ☐ No  ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable  ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

I, Nicholas R. Sparks, have entered an appearance as counsel to Canadian Solar (USA) Inc. and Canadian Solar International Limited in this proceeding and certify that I have authority to file this document.

/s/ Nicholas R. Sparks

Nicholas R. Sparks

3/30/2026

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-2120

**Short Case Caption** Auxin Solar Inc. v. US

**Filing Party/Entity** BYD (H.K.) Co., Ltd.; BYD America, LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 3/30/2026

Signature: /s/ Craig A. Lewis

Name: Craig A. Lewis

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| BYD (H.K.) Co., Ltd. | | BYD Company Limited |
| BYD America, LLC | | BYD Company Limited |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Gregory M.A. Hawkins (Hogan Lovells US LLP) | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-2120

**Short Case Caption** Auxin Solar Inc. v. United States

**Filing Party/Entity** Trina Solar (U.S.) Inc., Trina Solar (Vietnam) Sci. & Tech. Co., Ltd., Trina Solar Sci. & Tech. (Thailand) Ltd., and Trina Solar Energy Dev. Co. Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 3/30/2026

Signature: /s/ Jonathan Freed

Name: Jonathan Freed

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Trina Solar Science & Technology (Thailand) Ltd. | | Trina Solar Co., Ltd. |
| Trina Solar (U.S.) Inc. | | Trina Solar Co., Ltd. |
| Trina Solar (Vietnam) Science & Technology Co., Ltd. | | Trina Solar Co., Ltd. |
| Trina Solar Energy Development Co. Ltd. | | Trina Solar Co., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)   ☐  No   ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-2120

**Short Case Caption** Auxin Solar Inc. v. US

**Filing Party/Entity** Invenergy Renewables LLC and Invenergy Solar Equipment Management LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 3/30/2026

Signature: /s/ Amanda Shafer Berman

Name: Amanda Shafer Berman

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Invenergy Renewables LLC | | |
| Invenergy Solar Equipment Management LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable        ☐     Additional pages attached

|  |  |  |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)    ☐ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable        ☐     Additional pages attached

|  |  |  |
| --- | --- | --- |
|  |  |  |
|  |  |  |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**  2025-2120, 2026-1072

**Short Case Caption**  Auxin Solar Inc. v. US

**Filing Party/Entity**  See Attachment

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date:  3/30/2026

Signature:  /s/ Jeffrey S. Grimson

Name:  Jeffrey S. Grimson

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| JA Solar USA, Inc. | N/A | JA Solar Investment (Hong Kong) Limited, JingAo Solar Co., Ltd., JA Solar Technology Co., Ltd., Dongtai City Jing Tai Fu Technology Co., Ltd. |
| JA Solar International Ltd. | N/A | JingAo Solar Co., Ltd., JA Solar Technology Co., Ltd., Dongtai City Jing Tai Fu Technology Co., Ltd. |
| JA Solar Vietnam Company Ltd. | N/A | JA Solar Investment (Hong Kong) Limited, JingAo Solar Co., Ltd., JA Solar Technology Co., Ltd., Dongtai City Jing Tai Fu Technology Co., Ltd. |
| JA Solar Malaysia Sdn. Bhd. | N/A | JA Solar Investment (Hong Kong) Limited, JingAo Solar Co., Ltd., JA Solar Technology Co., Ltd., Dongtai City Jing Tai Fu Technology Co., Ltd. |
| American Clean Power Association | N/A | N/A |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐　　None/Not Applicable　　　　☐　　Additional pages attached

| | | |
|---|---|---|
| Jeffrey S. Grimson | Kristin H. Mowry | Bryan P. Cenko |
| Clemence D. Kim | Evan P. Drake | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)　☐ No　☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑　　None/Not Applicable　　　　☐　　Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# <u>ATTACHMENT</u>

**Filing Party/Entity:** JA Solar USA, Inc., JA Solar International Ltd., JA Solar Vietnam Company Ltd., JA Solar Malaysia Sdn. Bhd. and American Clean Power Association

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-2120

**Short Case Caption** Auxin Solar Inc. v. US

**Filing Party/Entity** Defendant-Appellants Jinko Solar (U.S.) Industries Inc. et al.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 3/30/2026

Signature: /s/ Jordan C. Kahn

Name: Jordan C. Kahn

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Jinko Solar (U.S.) Industries Inc. | | More than 10% owned by Jinko Solar Co., Ltd., which is more than 10% owned by JinkoSolar Holding Co., Ltd. |
| JinkoSolar (U.S.) Inc. | | More than 10% owned by Jinko Solar Co., Ltd., which is more than 10% owned by JinkoSolar Holding Co., Ltd. |
| Jinko Solar Technology Sdn. Bhd. | | More than 10% owned by Jinko Solar Co., Ltd., which is more than 10% owned by JinkoSolar Holding Co., Ltd. |
| Jinko Solar (Malaysia) Sdn. Bhd. | | More than 10% owned by Jinko Solar Co., Ltd., which is more than 10% owned by JinkoSolar Holding Co., Ltd. |
| JinkoSolar (Vietnam) Co., Ltd. | | More than 10% owned by Jinko Solar Co., Ltd., which is more than 10% owned by JinkoSolar Holding Co., Ltd. |
| JinkoSolar Holding Co., Ltd. | | More than 10% owned by Jinko Solar Co., Ltd., which is more than 10% owned by JinkoSolar Holding Co., Ltd. |
| Jinkosolar Middle East DMCC | | More than 10% owned by Jinko Solar Co., Ltd., which is more than 10% owned by JinkoSolar Holding Co., Ltd. |
| JINKOSOLAR INVESTMENT LIMITED (f/k/a Jinkosolar Technology Limited) | | More than 10% owned by Jinko Solar Co., Ltd., which is more than 10% owned by JinkoSolar Holding Co., Ltd. |
| Jinkosolar (Vietnam) Industries Company Limited | | More than 10% owned by Jinko Solar Co., Ltd., which is more than 10% owned by JinkoSolar Holding Co., Ltd. |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Brandon M. Petelin | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-2120

**Short Case Caption** Auxin Solar Inc. v. US

**Filing Party/Entity** Boviet Solar Technology Co., Ltd. and Boviet Solar USA, Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 3/30/2026

Signature: /s/ Gregory S. Menegaz

Name: Gregory S. Menegaz

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Boviet Solar Technology Co., Ltd. | | Ningbo Boway Alloy |
| Boviet Solar USA, Ltd. | | Ningbo Boway Alloy |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| David M. Morrell | | |
| James Kevin Horgan | | |
| Vivien Jinghui Wang | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-2120

**Short Case Caption** Auxin Solar Inc. v. US

**Filing Party/Entity** Risen Solar Technology Sdn. Bhd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 3/30/2026

Signature: /s/ Gregory S. Menegaz

Name: Gregory S. Menegaz

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Risen Solar Technology Sdn. Bhd. | | Risen Energy Co., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Vivien Jinghui Wang | | |
| James Kevin Horgan | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)   ☐ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ................................................................1

INTRODUCTION ........................................................................................1

STATEMENT OF THE CASE.......................................................................5

SUMMARY OF THE ARGUMENT .............................................................11

ARGUMENT ..............................................................................................13

I.     STANDARD OF REVIEW ................................................................13

II.    THE CIT LACKED SUBJECT MATTER JURISDICTION UNDER
       SECTION 1581(i).............................................................................14

       A.     Section 1581(c) Jurisdiction Encompasses Any Aspect of a
              Final Determination, While Section 1581(i) Is Strictly Limited ........15

       B.     Section 1581(i) Jurisdiction Is Unavailable Because Plaintiffs-
              Appellees Could Have Brought This Action Under Section 1581(c).18

       C.     The Trial Court Employed an Incorrect Analysis to Conclude That
              Jurisdiction Was Unavailable Under Section 1581(c)........................26

       D.     The Remedies Available to Plaintiffs-Appellees Under Section
              1581(c) Were Not Manifestly Inadequate .........................................30

III.   TEXT, HISTORICAL CONTEXT, AND LONGTIME PRACTICE
       CONFIRM SECTION 1318 AUTHORIZED THE PRESIDENT TO
       RELIEVE THE EMERGENCY HE VALIDLY DECLARED......................32

       A.     The Phrase "Other Supplies for Use in Emergency Relief Work"
              Authorizes the Suspension of Duties on Solar Products to Relieve
              the Validly Declared Electricity-Generation Emergency ....................35

       B.     The CIT Misread Section 1318, Groundlessly Subverting the
              President's Authority to Relieve a Validly Declared Emergency........46

i

IV.     IN THE ALTERNATIVE, THE FINAL RULE IS AUTHORIZED
        BY 19 U.S.C. § 1677j.................................................................................51

V.      THE BROAD RETROACTIVE RELIEF THAT THE CIT ORDERED
        IS UNLAWFUL........................................................................................56

        A.      Plaintiffs-Appellees Failed to Demonstrate That an Injunction
                Was Necessary to Prevent Irreparable Harm.......................................57

        B.      The CIT Clearly Misapplied the Balance of Hardships and
                Public Interest Factors.........................................................................61

        C.      The CIT's Reliquidation Order Is Unlawful .......................................68

CONCLUSION ...................................................................................................75

Page

**CASES**

*Al Ghurair Iron & Steel LLC v. United States*,
  536 F. Supp. 3d 1357, 1364 (Ct. Int'l Trade 2021) ...............................................15

*Am. Signature, Inc. v. United States*,
  598 F.3d 816 (Fed. Cir. 2010).................................................... 27, 72

*AM/NS Calvert LLC v. United States*,
  654 F. Supp. 3d 1324 (Ct. Int'l Trade 2023) ................................. 71, 73

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
  809 F.3d 633 (Fed. Cir. 2015) .................................................57

*Arcadia v. Ohio Power Co.*,
  498 U.S. 73 (1990) ....................................................39

*Arizona v. California*,
  460 U.S. 605 (1983) ...................................................71

*Begay v. United States*,
  553 U.S. 137 (2008) ...................................................36

*Bouarfa v. Mayorkas*,
  604 U.S. 6 (2024) .....................................................52

*Canadian Lumber Trade All. v. United States*,
  517 F.3d 1319 (Fed. Cir. 2008)...........................................60

*Caribbean Marine Servs. Co.,v. Baldridge*,
  844 F.2d 668 (9th Cir. 1988)..............................................61

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ....................................................57

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States,*
535 F. Supp. 3d 1336 (Ct. Int'l Trade 2021) ......................................................58

*Compania Valenciana de Aluminio Baux, S.L.U. v. United States,*
No. 23-00259, 2025 WL 2731823 (Ct. Int'l Trade Sept. 25, 2025) .....................16

*Corus Staal BV v. United States,*
502 F.3d 1370 (Fed. Cir. 2007)..........................................................................30

*Detroit Int'l Bridge Co. v. Gov't of Canada,*
189 F. Supp. 3d 85 (D.D.C. 2016)................................................................. 14, 45

*Dofasco Inc. v. United States,*
326 F. Supp. 2d 1340 (Ct. Int'l Trade 2004) ......................................................31

*Dorbest Ltd. v. United States,*
604 F.3d 1363 (Fed. Cir. 2010)...........................................................................16

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006) ...........................................................................................56

*Erwin Hymer Group N. Am., Inc. v. United States,*
930 F.3d 1370 (Fed. Cir. 2019)................................................................ 13, 17, 18

*Facebook, Inc. v. Duguid,*
592 U.S. 395 (2021) ...........................................................................................48

*FDA v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) ...........................................................................................60

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ...........................................................................................14

*Hartford Fire Ins. Co. v. United States,*
544 F.3d 1289 (Fed. Cir. 2008)...........................................................................18

*Heyman v. Cooper,*
31 F.4th 1315 (11th Cir. 2022)............................................................................48

iv

*Int'l Custom Prods., Inc. v. United States*,
467 F.3d 1324 (Fed. Cir. 2006).......................................................... 15, 30

*Intercontinental Chems., LLC v. United States*,
483 F. Supp. 3d 1232 (Ct. Int'l Trade 2020) .......................................29

*Interspiro USA v. Figgie Int'l*,
18 F.3d 927 (Fed. Cir. 1994).................................................................13

*J.D. Irving, Ltd. v. United States*,
119 F.4th 48 (Fed. Cir. 2024)......................................... 13, 18, 20, 29

*Juancheng Kangtai Chem. Co. v. United States*,
932 F.3d 1321 (Fed. Cir. 2019)................................................ 20, 26, 29

*Koyo Corp. of USA v. United States*,
497 F.3d 1231 (Fed. Cir. 2007)...........................................................70

*Koyo Seiko Co. v. United States*,
715 F. Supp. 1097 (Ct. Int'l Trade 1989) ............................................31

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*,
599 U.S. 382 (2023) ...............................................................................35

*Learning Resources, Inc. v. Trump*,
146 S. Ct. 628, 2026 WL 477534 (Feb. 20, 2026) ...................... *passim*

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .................................................................... 40, 47

*Los Angeles Cnty. v. Davis*,
440 U.S. 625 (1979) ...............................................................................60

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...............................................................................60

*M S Int'l, Inc. v. United States*,
32 F.4th 1145 (Fed. Cir. 2022)...........................................................16

*Marshall Field & Co. v. Clark,*
143 U.S. 649 (1892) ............................................. 32, 33, 46

*Mid Continent Nail Corp. v. United States,*
846 F.3d 1364 (Fed. Cir. 2017)........................................16

*Miller & Co. v. United States,*
824 F.2d 961 (Fed. Cir. 1987)........................................31

*Murthy v. Missouri,*
603 U.S. 43 (2024) ......................................................57

*Nader v. Fed. Election Comm'n,*
725 F.3d 226 (D.C. Cir. 2013).......................................61

*Norcal/Crosetti Foods, Inc. v. United States,*
963 F.2d 356 (Fed. Cir. 1992).......................................15

*Norsk Hydro Can., Inc. v. United States,*
472 F.3d 1347 (Fed. Cir. 2006).................................. 13, 18

*Perrin v. United States,*
444 U.S. 37 (1979) ......................................................35

*PSSI Glob. Servs., LLC v. Fed. Commc'ns Comm'n,*
983 F.3d 1 (D.C. Cir. 2020) .........................................60

*Pugin v. Garland,*
599 U.S. 600 (2023) ....................................................50

*Republic of Iraq v. Beaty,*
556 U.S. 848 (2009) ....................................................35

*Shinyei Corp. of Am. v. United States,*
355 F.3d 1297 (Fed. Cir. 2004)......................... 27, 29, 71, 72

*Silfab Solar, Inc. v. United States,*
892 F.3d 1340 (Fed. Cir. 2018).................................. 14, 67

*SKF USA, Inc. v. United States*,
512 F.3d 1326 (Fed. Cir. 2008)..............................................................69

*Solar Energy Indus. Ass'n v. United States*,
86 F.4th 885 (Fed. Cir. 2023)................................................................47

*Solar Energy Indus. Ass'n v. United States*,
779 F. Supp. 3d 1368 (Ct. Int'l Trade 2025) ................................. 71, 73

*SSAB North American Div. v. Customs*,
571 F. Supp. 2d 1347 (Ct. Int'l Trade 2008) ................................. 58, 68

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ...............................................................................61

*Sunpreme Inc. v. United States*,
892 F.3d 1186 (Fed. Cir. 2018).................................................. 17, 18, 20

*Target Corp. v. United States*,
134 F.4th 1307 (Fed. Cir. 2025)...................................................... 70, 71

*Taylor v. United States*,
579 U.S. 301 (2016) ..............................................................................35

*Ugine and ALZ Belgium v. United States*,
551 F.3d 1339 (Fed. Cir. 2009)........................................................ 27, 29

*United States Steel Corp. v. United States*,
627 F. Supp. 2d 1374 (Ct. Int'l Trade 2009) .......................................16

*United States v. Alaska*,
521 U.S. 1 (1997) ..................................................................................51

*United States v. Alpers*,
338 U.S. 680 (1950) ........................................................................ 49, 50

*United States v. George S. Bush & Co.,*
310 U.S. 371 (1940) ........................................................................ 14, 67

*United States v. Texas,*
   599 U.S. 670 (2023) ....................................................................60

*United States v. Union Pacific Rwy. Co.,*
   91 U.S. 72 (1875) ......................................................................37

*United States v. Yoshida Int'l, Inc.,*
   526 F.2d 560 (C.C.P.A. 1975)...................................................67

*Wanxiang Am. Corp. v. United States,*
   12 F.4th 1369 (Fed. Cir. 2021)..................................................18

*Wanxiang Am. Corp. v. United States,*
   399 F. Supp. 3d 1323 (Ct. Int'l Trade 2019) ...........................29

*Whitman v. Am. Trucking Ass'n,*
   531 U.S. 457 (2001) ..................................................................47

*Williams v. U.S. Fidelity & Guaranty Co.,*
   236 U.S. 549 (1915) ..................................................................37

*Wind Tower Trade Coal. v. United States,*
   741 F.3d 89 (Fed. Cir. 2014)....................................................56

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ........................................................... *passim*

*Yates v. United States,*
   574 U.S. 528 (2015) .......................................................... 48, 51

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ..................................................................32

**STATUTES**

5 U.S.C. § 706.............................................................................14

19 U.S.C. § 1318................................................................ *passim*

19 U.S.C. § 1501.........................................................................69

19 U.S.C. § 1504 ........................................................................... 69, 70

19 U.S.C. § 1514 ........................................................................... 69, 73

19 U.S.C. § 1516a .......................................................................... *passim*

19 U.S.C. § 1677j.......................................................... 4, 28, 52, 53

28 U.S.C. § 1295 .................................................................................1

28 U.S.C. § 1581(c) .................................................... *passim*

28 U.S.C. § 1581(i) ..................................................... *passim*

28 U.S.C. § 2640 ...............................................................................13

**REGULATIONS**

19 C.F.R. § 159.1 .........................................................................4, 69

19 C.F.R. § 351.226 ......................................................... 24, 53, 55

19 C.F.R. § 358 ....................................................................................24

19 C.F.R. § 362 .............................................................................6, 24

19 C.F.R. § 362.102 ..........................................................................57

19 C.F.R. § 362.103 ..........................................................................55

**PRESIDENTIAL PROCLAMATIONS**

*Declaration of Emergency & Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia*, 87 Fed. Reg. 35,067 (E.O.P. June 6, 2022) ................................................ *passim*

*Emergency Due to Drought - Free Importation of Forage for Livestock*, 6 Fed. Reg. 3,715 (July 29, 1941) ..........................................................................41

*Emergency Due to Flood Conditions - Free Importation of Food, Clothing, and Medical, Surgical and Other Supplies for Use In Emergency Work*, 2 Fed. Reg. 273 (Feb. 3, 1937).........................................................................40

*Emergency Due to Housing Shortage - Free Importation of Timber, Lumber, and Lumber Products*, 11 Fed. Reg. 12,695 (Oct. 29, 1946) ................................................. 42, 43, 49

*Emergency Due to State of War - Free Importation by the National Red Cross of Food, Clothing, and Medical, Surgical, and Other Supplies*,
7 Fed. Reg. 3,143 (Apr. 30, 1942) ................................................................. 41, 44

**ADMINISTRATIVE DETERMINATIONS**

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China: Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*,
88 Fed. Reg. 57,419 (Dep't Commerce Aug. 23, 2023).................................8, 19

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*,
87 Fed. Reg. 75,221 (Dep't Commerce Dec. 8, 2022)................................. 5, 8, 19

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from Cambodia, Malaysia, Thailand, and Vietnam*,
Inv Nos. 701-TA-722–725 and 731-TA-1690–1693 (Final),
USITC Pub. 5631 (Int'l Trade Comm'n June 2025).......................................7, 64

*Emergency Due to Flood Conditions - Free Importation of Food, Clothing, and Medical, Surgical and Other Supplies for Use in Emergency* Work,
2 Fed. Reg. 337 (Feb. 11, 1937) ........................................................................40

*Emergency - Free Entry of Relief Supplies Imported by the American National Red Cross*,
7 Fed. Reg. 3,358 (May 6, 1942).......................................................................42

*Importation Free of Duty of Food, Clothing, and Medical, Surgical, and Other Supplies Under Emergency Proclamation of the President*,
11 Fed. Reg. 13,460 (Nov. 14, 1946) ................................................................42

*Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord with Presidential Proclamation 10414*,
87 Fed. Reg. 56,868 (Dep't Commerce Sept. 16, 2022) ............................... *passim*

*Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*,
87 Fed. Reg. 39,426 (Dep't Commerce July 1, 2022) ................................... 54, 66

*Procedures for Importation of Supplies for Use in Emergency Relief*,
71 Fed. Reg. 63,230 (Oct. 30, 2006) ................................................................... 44

*Procedures for Importation of Supplies for Use in Emergency Relief Work*,
71 Fed. Reg. 35,846 (June 22, 2006) ................................................................... 44

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*,
86 Fed. Reg. 52,300 (Dep't Commerce Sept. 20, 2021) ............................... 52, 54

## LEGISLATIVE MATERIALS

Comparative Print of the Tariff Act of 1922 with H.R. 2667, H.R. Doc. No. 15 (May 9, 1929) ....................................................................................................... 33

H.R. No. 77-1483 (Dec. 5, 1941) ........................................................................ 41

H.R. Rep. No. 100-576 (1988), 1988 U.S.C.C.A.N. 1547 ..................................... 53

Pub. L. 79-388, § 2(b)(3), (c), 60 Stat. 207 (May 22, 1946) .................................... 43

## STATEMENT OF RELATED CASES

Counsel for Defendants-Appellants[1] state that, on November 19, 2025, the Court designated Ct. Nos. 25-1937 and 25-1940 as companion cases to this appeal, to be assigned to the same merits panel. No appeal in or from the same proceeding in the lower court was previously before this Court or any other appellate court.

Entries of solar cells and modules affected by this appeal may be subject to U.S. Department of Commerce ("Commerce") administrative reviews of the antidumping and countervailing duty ("AD/CVD") orders on *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China* (A-570-979, C-570-980). Entries made during the period from April 1, 2022, through June 6, 2024, span various Commerce review proceedings, including:

---

[1] "Defendants-Appellants" include the American Clean Power Association; Canadian Solar (USA) Inc.; Canadian Solar International Limited; Solar Energy Industries Association; JA Solar USA, Inc.; JA Solar Vietnam Company Limited; JA Solar Malaysia Sdn. Bhd.; JA Solar International Limited; NextEra Energy, Inc.; BYD (H.K.) Co., Ltd.; BYD America LLC; Invenergy Renewables LLC; Invenergy Solar Equipment Management LLC; Trina Solar (U.S.) Inc.; Trina Solar (Vietnam) Science & Technology Co., Ltd.; Trina Solar Energy Development Company Limited; Trina Solar Science & Technology (Thailand) Ltd.; Risen Solar Technology Sdn. Bhd.; Boviet Solar Technology Co., Ltd.; Boviet Solar USA., Ltd.; Jinko Solar (U.S.) Industries Inc.; JinkoSolar (U.S.) Inc.; Jinko Solar Technology Sdn. Bhd.; Jinko Solar (Malaysia) Sdn. Bhd.; JinkoSolar (Vietnam) Co., Ltd.; JinkoSolar Holding Co., Ltd.; Jinkosolar Middle East DMCC; Jinkosolar (Vietnam) Industries Company Limited; and JinkoSolar Investment Limited.

- AD review for period December 1, 2021, through November 30, 2022 (final results published July 5, 2024, 89 Fed. Reg. 55,562);

- AD review for period December 1, 2022, through November 30, 2023 (final results published December 23, 2025, 90 Fed. Reg. 60,060);

- AD review for period December 1, 2023, through November 30, 2024 (review initiated January 27, 2025, 90 Fed. Reg. 8,187);

- CVD review for calendar year 2022 (final results published January 27, 2026, 91 Fed. Reg. 3,419);

- CVD review for calendar year 2023 (review initiated January 27, 2025, 90 Fed. Reg. 8,187); and

- CVD review for calendar year 2024 (initiated February 20, 2026, 91 Fed. Reg. 8,186).

The outcome of this appeal may affect these Commerce proceedings. In particular, if the trial court's decision is upheld, numerous past entries of solar merchandise may be considered subject to these administrative reviews. This will be the case even though several reviews have concluded without parties affected by the appeal being able to participate.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over Defendants-Appellants' appeal of the Court of International Trade's ("CIT") decision under 28 U.S.C. § 1295(a)(5), which grants parties the right to appeal a final CIT judgment. Defendants-Appellants timely brought this appeal by filing a notice of appeal on September 16, 2025, within 60 days of the court's August 22, 2025 final order and judgment. This appeal is from a final order and judgment that disposes of all parties' claims.

## INTRODUCTION

For two years, the U.S. solar industry relied on an exemption from antidumping and countervailing duty ("AD/CVD") liability proclaimed by the President of the United States and effectuated by the U.S. Department of Commerce ("Commerce") to import very substantial volumes of solar modules to address a declared national emergency. The Government assured the U.S. solar industry that, despite the existence of a Commerce circumvention proceeding threatening massive AD/CVD liability, merchandise entered during the "emergency period" would not be subject to suspension of liquidation or AD/CVD duties. The CIT's August 2025 decision and judgment in this action upend that reliance, and as a result, have enormous consequences for the U.S. solar industry and energy generators.

In 2022, the President determined that importing solar modules was in our country's best interest, and indeed an economic necessity. "Additions of solar

capacity" were "expected to account for over half of the new electric sector capacity in 2022 and 2023," and the President thus explained that solar energy was "critical to the function of major sectors of the economy, including hospitals, schools, public transportation systems, and the defense industrial base." *Declaration of Emergency & Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia*, 87 Fed. Reg. 35,067 (E.O.P. June 6, 2022) ("Proclamation 10414") (Appx233-235). Domestic solar production could not meet this burgeoning demand, making imports vital for "a sufficient supply of solar modules to assist in meeting our electricity generation needs." *Id.* at 35,068.

The President declared an emergency "with respect to the threats to the availability of sufficient electricity generation" and invoked his authority under 19 U.S.C. § 1318(a) to "authorize … the importation free of duty" for a two-year period of Southeast Asian imports needed to relieve this emergency. *Id.* Commerce has been collecting duties on solar imports since the emergency's conclusion.

Relying on the President's emergency declaration effectuated by Commerce —which went unchallenged for 18+ months—Defendants-Appellants imported, sold, and installed substantial volumes of solar products, delivering much-needed capacity to U.S. electricity generators and American consumers that supports thousands of American workers. Defendants-Appellants would not have been able to provide that needed capacity absent the President's and Commerce's actions.

Plaintiffs-Appellees *do not dispute* the President's power to declare the emergency or that the energy crisis he recognized was legitimate. Nonetheless, they sought, and the CIT provided, an order not only invalidating the *remedy the President chose*, but also requiring Commerce to collect very substantial retroactive AD/CVD duties. The CIT's judgment and its extraordinary remedy dramatically alter the situation for Defendants-Appellants—if the decision is implemented by the relevant agencies, Defendants-Appellants will be required to pay billions of dollars in retroactive duties on imports made during the 2022 to 2024 emergency period.

This Court should reverse the CIT's opinion for several reasons.

*First*, the CIT erred by entertaining this action under the residual jurisdiction provisions of 28 U.S.C. § 1581(i) when Plaintiffs-Appellees clearly could have, *and did*, challenge the President's and Commerce's establishment of a duty moratorium in Commerce's underlying circumvention inquiries, and were thus required to pursue their claims under 28 U.S.C. § 1581(c). Therefore, this action was brought improperly and the CIT lacked jurisdiction to adjudicate it.

*Second*, the CIT erred in relying on a cramped reading of the relevant statute, 19 U.S.C. § 1318(a), to preclude the duty moratorium when the statute's text, context, and contemporaneous interpretation all indicate that its broad coverage of "other supplies for use in emergency relief work" includes the solar imports at issue.

3

*Third*, the CIT's decision ignores that Commerce independently retained authority under 19 U.S.C. § 1677j to suspend collection of AD/CVD duties stemming from its circumvention investigation.

*Fourth*, the CIT erred by ordering retroactive injunctive relief that unlawfully imposes massive AD/CVD liability on Defendants-Appellants' good-faith imports made during the moratorium period. This error is exacerbated by the CIT's unprecedented order imposing retroactive duties on entries that finally liquidated.[2]

Several specific harms likely to befall Defendants-Appellants if this Court upholds the CIT's deeply flawed opinion and judgment are detailed in declarations describing its implications. *See* Appx4948-4984. Consequently, this Court should either dismiss this action for lack of subject matter jurisdiction, or alternatively, reverse the CIT's erroneous decision.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether the CIT lacked subject matter jurisdiction to adjudicate this matter pursuant to 28 U.S.C. § 1581(i).

2.    Whether 19 U.S.C. § 1318(a) authorizes the President to waive duties on solar imports to address the energy production emergency that he declared.

---

[2]    "Liquidation" refers to the final calculation by U.S. Customs and Border Protection ("CBP") of the duties, taxes, and fees owed on imported goods, officially closing the customs entry. *See* 19 C.F.R. § 159.1.

3. Whether 19 U.S.C. § 1677j independently authorizes Commerce to suspend the collection of AD/CVD duties resulting from a circumvention finding.

4. Whether the CIT's imposition of expansive retroactive injunctive relief, without thoroughly analyzing the balance of equities, was lawful.

## STATEMENT OF THE CASE

## I.     PROCLAMATION 10414

"Solar energy is among the fastest growing sources of new electric generation," and it plays an important role in remedying "projected electricity supply shortfalls and record electricity demand." Proclamation 10414, 87 Fed. Reg. at 35,067. Yet, in 2022, Commerce was poised to deter imports of "the vast majority of solar modules." *Id.* Prompted by April 2022 allegations brought by Plaintiff-Appellee Auxin Solar Inc. ("Auxin"), Commerce initiated inquiries on whether solar imports from Cambodia, Malaysia, Thailand, and Vietnam circumvented AD/CVD orders on Chinese imports. *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam,* 87 Fed. Reg. 75,221, 75,222 (Dep't Commerce Dec. 8, 2022) ("Preliminary Circumvention Determinations") (Appx487-497).

Imports from these Southeast Asian countries constituted "approximately three-quarters of imported modules in 2020," so the proceedings "abruptly put at risk near-term solar capacity additions that could otherwise have the potential to help ensure the sufficiency of electricity generation to meet customer demand." Proclamation 10414, 87 Fed. Reg. at 35,067.

The domestic solar module industry was demonstrably unable to fill the gap and, coupled with the enormous potential duties, that put numerous clean energy projects at risk without evident mitigation options. The White House deemed the situation critical. The President determined that "{i}mmediate action {was} needed to ensure in the interim that the United States has access to a sufficient supply of solar modules to assist in meeting our electricity generation needs." *Id.* at 35,068.

The President thus issued an emergency proclamation permitting duty-free imports for a two-year period through June 2024. *Id.* The President invoked his authority under 19 U.S.C. § 1318(a) to authorize duty-free importation of "other supplies for use in emergency relief work" with respect to "certain solar cells and modules, exported from {Cambodia, Malaysia, Thailand, and Vietnam.}" *Id.* Commerce then issued a regulation (19 C.F.R. Part 362) pursuant to the President's directive. *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord with Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Dep't Commerce Sept. 16, 2022) (the "Final Rule"). These actions assured importers that

"in the event of an affirmative determination of circumvention, no resulting AD/CVD estimated duties … will be applied" to solar imports entering during the two-year emergency period and used within six months. *Id.* at 56,869.[3]

Based on the assurances from the President and Commerce, Defendants-Appellants imported substantial quantities of merchandise. The U.S. International Trade Commission ("ITC") estimates that solar imports from the four countries covered by the President's proclamation amounted to nearly $5 billion for 2022, $8.5 billion for 2023, and $10.7 billion for 2024. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from Cambodia, Malaysia, Thailand, and Vietnam*, Inv Nos. 701-TA-722–725 and 731-TA-1690–1693 (Final), USITC Pub. 5631 at Tbl. C.1, p. C.4 (U.S. Int'l Trade Comm'n June 2025).

## II.    COMMERCE'S CIRCUMVENTION PROCEEDINGS

Commerce implemented the duty moratorium in *both* the preliminary and final determinations in its circumvention proceedings. Unhappy with the President's emergency declaration, Auxin raised various challenges to the duty moratorium during the circumvention proceedings, including in its administrative case briefs.[4] *E.g.,* Appx705, Appx723-727 (Auxin's Tranche 1 Case Br. (Thailand))

---

[3]    The Final Rule included a Utilization Date requiring covered imports to be used or installed in the U.S. within 180 days of the moratorium's termination. *Id.*

[4]    Commerce invited parties to comment on issues through two tranches of case briefing, each of which allowed for affirmative and rebuttal briefs. Commerce requested that Tranche 1 briefs address, *inter alia*, moratorium certifications and

(arguing that Commerce's actions implementing Presidential Proclamation 10414 and Part 362 of its regulations were contrary to law and unenforceable); Appx719 at n.41 (highlighting that "Auxin has explained in detail in previous submissions" its objections to the duty moratorium); Appx1209 at nn.572-573 (Commerce's decision memo noting Auxin's arguments while declining to adopt them).

In August 2023, Commerce published its Final Circumvention Determinations. *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from China: Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Dep't Commerce Aug. 23, 2023) ("Final Circumvention Determinations") (Appx1433-1447). Alongside circumvention findings, and over Auxin's objections, Commerce continued to implement the duty moratorium. Specifically, Commerce:

- determined not to collect deposits or suspend liquidation for moratorium entries. 88 Fed. Reg. at 57,422; *see also* Preliminary Circumvention Determinations, 87 Fed. Reg. at 75,223 (same); and

- established a detailed certification regime for importers to claim duty-free treatment and confirm utilization. 88 Fed. Reg. at 57,422; *see also* Preliminary Circumvention Determinations, 87 Fed. Reg. at 75,223 (initially implementing certification regime).[5]

---

the scope of the inquiries. Appx647-648. Tranche 2 briefs were to address "all the other issues." *Id.*

[5] The certification regime appears in Appendix IV of Commerce's determinations and is commonly called the "Appendix IV Certification Regime."

## III. CIT PROCEEDINGS

No lawsuit challenged either the President's proclamation or Commerce's Final Rule when they issued in June and September 2022, respectively. Nor did any challenge follow Commerce's December 2022 Preliminary Circumvention Determinations—which first implemented the duty moratorium by declining to collect deposits on relevant imports—or immediately after Commerce's August 2023 Final Circumvention Determinations. In fact, Auxin filed four Section 1581(c) cases challenging Commerce's Final Circumvention Determinations, later dismissing them without litigating the issues it raised before Commerce regarding the duty moratorium and its implementation. CIT Ct. Nos. 23-223 to 23-226.

On December 29, 2023, just months before the emergency period expired, Plaintiffs-Appellees challenged Commerce's September 2022 regulation implementing the President's proclamation. The CIT nonetheless permitted them to proceed with a stand-alone Section 1581(i) action, rather than a challenge under Section 1581(c) to Commerce's rejection of Auxin's contentions in the circumvention inquiries. *Auxin Solar, Inc. v. United States*, Slip Op. 24-58 (Ct. Int'l Trade May 9, 2024), Appx28-72.

In its August 22, 2025 judgment, the CIT ordered Commerce to vacate the (long since-expired) rule as unlawful and, retroactively, to subject entries made during the two-year emergency period to AD/CVD liability. *Auxin Solar, Inc. v.*

9

*United States*, Slip Op. 25-111 (Ct. Int'l Trade Aug. 22, 2025), Appx73-110. Specifically, it ordered Commerce to (a) "promptly liquidate and collect {AD/CVD} duties on any currently unliquidated entries" that entered during the two-year emergency period, and (b) "promptly identify, collect any uncollected {AD/CVD} duties on, and reliquidate all {liquidated} entries." Appx109-110.

The CIT's judgment is likely to have a devastating effect on Defendants-Appellants, who are companies providing billions of dollars in U.S. investments and thousands of U.S. jobs. Declarations, Appx4948-4984. They must suddenly reckon with potentially *billions in duty liability* for years-old imports that the U.S. Government promised would enter duty-free. The applicable AD/CVD rates, in many instances, could be more than twice the value of the imports.

The sheer size of the retroactive duty liability created by the CIT's judgment, impacting long-completed deliveries, will impose irreparable harm on Defendants-Appellants. They anticipate foregoing planned investments in U.S. manufacturing and workers, scaling back or closing facilities, and laying off U.S. employees. *Id.* Indeed, there is a significant risk that some solar development and energy companies will be forced into bankruptcy due to the scale of the retroactive duty liability they face. *Id.* In short, the CIT's judgment and its attendant adverse consequences pose a substantial threat to Defendants-Appellants and their relationships with their customers, partners, employees, and communities.

The CIT's decision is flawed for multiple reasons and should be reversed.

*First,* the CIT improperly asserted Section 1581(i) jurisdiction over this action because Plaintiffs-Appellees could (and should) have brought their claims under Section 1581(c) and the remedies available under that provision would not have been manifestly inadequate. The "true nature" of Plaintiffs-Appellees' action is a challenge to the Final Circumvention Determinations that implemented the duty moratorium by (a) determining not to collect AD/CVD deposits or to suspend liquidation of certain entries, and (b) creating the certification regime whose parameters are central to multiple of Plaintiffs-Appellees' claims. This is apparent both from the counts in Plaintiffs-Appellees' complaint addressing aspects of the Final Circumvention Determinations, and from the fact that Plaintiffs-Appellees *actually did* raise these claims in the circumvention proceedings that they subsequently challenged under Section 1581(c).

The statute requires that challenges to aspects of circumvention proceedings be brought under 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c), and the CIT and this Court routinely review the legality of underlying Commerce policies and regulations in the context of Section 1581(c) challenges. By contrast, the CIT plainly erred by equating this case to Section 1581(i) actions in which erroneous customs instructions have deviated from the terms of Commerce's determination—

11

the opposite of the case here. Nor can Plaintiffs-Appellees claim that Section 1581(c) is manifestly inadequate when they delayed in bringing this action until well after they could have pursued it under Section 1581(c). Therefore, the CIT lacked jurisdiction to adjudicate this action.

*Second*, the CIT ignored the text, pre-enactment context, and contemporary interpretation of 19 U.S.C. § 1318(a). Instead, the court misapplied statutory canons to adopt a self-defeating reading of the statute. Since its enactment, Section 1318(a) has been invoked repeatedly to permit duty-free importation of goods necessary to remedy a crisis—even beyond the food, clothing, and healthcare-related supplies to which the CIT's interpretation restricts it. The CIT's ruling is especially flawed because it was the *President* (not Commerce), in his unchallenged proclamation, who declared the emergency and determined under Section 1318(a) that solar imports constituted supplies needed to relieve it. The CIT's cramped reading would prevent the President from addressing a validly declared emergency.

*Third*, Commerce's Final Rule should be upheld because 19 U.S.C. § 1677j provides alternative authority for Commerce's actions. The CIT erred because it failed entirely to address this independent basis to uphold Commerce's regulation.

*Fourth*, the CIT erred in applying retroactive injunctive relief to solar importers' good faith entries during the emergency period. It committed a "clear error of judgment" in determining that the equities required this extraordinary

12

remedy, despite Plaintiffs-Appellees' lack of irreparable harm, the immense harms it will cause Defendants-Appellants, the President's clear determination that the public interest favored duty-free imports, and Plaintiffs-Appellees' delay in seeking relief. These errors are especially egregious with respect to the CIT's unlawful order requiring retroactive reliquidation (with duties) of finally liquidated entries.

## ARGUMENT

## I.  STANDARD OF REVIEW

"As an appellate body, {the Federal Circuit has} inherent jurisdiction to determine whether a lower tribunal had jurisdiction." *Interspiro USA v. Figgie Int'l*, 18 F.3d 927, 930 (Fed. Cir. 1994) (citation omitted). This Court reviews jurisdictional issues *de novo*. *J.D. Irving, Ltd. v. United States*, 119 F.4th 48, 53 (Fed. Cir. 2024) (citation omitted). A plaintiff bears the burden of establishing subject matter jurisdiction and may not do so by creative pleading. *Norsk Hydro Can., Inc. v. United States*, 472 F.3d 1347, 1355 (Fed. Cir. 2006). Thus, a plaintiff asserting 28 U.S.C. § 1581(i) jurisdiction "bears the burden of showing that another subsection is either unavailable or manifestly inadequate." *Erwin Hymer Group N. Am., Inc. v. United States*, 930 F.3d 1370, 1375 (Fed. Cir. 2019) (citation omitted).

This Court reviews matters of statutory interpretation *de novo*. *J.D. Irving*, 119 F.4th at 53 (citation omitted). For actions challenging agency action under Section 1581(i), 28 U.S.C. § 2640(e) directs the Court to the Administrative

Procedure Act ("APA") standard of review, codified at 5 U.S.C. § 706. Under that standard, "{t}he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.

Actions by the President, however, "are not subject to {the APA's} requirements." *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). Hence, "an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100-01 (D.D.C. 2016) (collecting cases), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018). Further, "{t}he President's findings of fact and the motivations for his action are not subject to review." *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1349 (Fed. Cir. 2018) (citation omitted). Indeed, the President's judgment "on the facts … is no more subject to judicial review … than if Congress itself had exercised that judgment." *Id.* (quoting *United States v. George S. Bush & Co.,* 310 U.S. 371, 379-80 (1940)).

## II. THE CIT LACKED SUBJECT MATTER JURISDICTION UNDER SECTION 1581(i)

The Court should reverse the decision below because the CIT lacked subject matter jurisdiction. Jurisdiction was not available under 28 U.S.C. § 1581(i) because Plaintiffs-Appellees clearly could (and should) have brought their claims

pursuant to 28 U.S.C. § 1581(c), and the relief available under that provision would not have been manifestly inadequate. That is especially so because Commerce's Final Circumvention Determinations, not the Final Rule, implemented the duty moratorium through a certification regime directing that covered solar imports enter free of AD/CVD deposits and without suspension of liquidation. The governing statute, 19 U.S.C. § 1516a(a)(2)(B)(vi), requires challenges to circumvention determinations to be lodged under Section 1581(c). Plaintiffs-Appellees' failure to do so cannot be fixed with a challenge under Section 1581(i). Because the CIT lacked jurisdiction, this case should be dismissed. *See Int'l Custom Prods., Inc. v. United States*, 467 F.3d 1324, 1328 (Fed. Cir. 2006) (appellate court "has no jurisdiction to decide the merits of the case" if trial court lacked jurisdiction).

## A. Section 1581(c) Jurisdiction Encompasses Any Aspect of a Final Determination, While Section 1581(i) Is Strictly Limited

The CIT, like all federal courts, is a "court{} of limited jurisdiction marked out by Congress." *Norcal/Crosetti Foods, Inc. v. United States*, 963 F.2d 356, 358 (Fed. Cir. 1992) (citation omitted). The court's jurisdiction is governed by 28 U.S.C. § 1581, *et seq*. *See id.* Relevant here, Section 1581(c) grants the trial court jurisdiction to review Commerce's circumvention inquiry determinations. 28 U.S.C. § 1581(c); 19 U.S.C. § 1516a(a)(2)(B)(vi); *see also Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357, 1364 (Ct. Int'l Trade 2021), *aff'd*, 65 F.4th 1351 (Fed. Cir. 2023) (reviewing determination under these provisions).

15

Section 1581(c), moreover, provides a mechanism for the trial court to review "*any* factual findings or legal conclusions upon which {Commerce's} determination is based." 19 U.S.C. § 1516a(a)(2)(A) (emphasis added). Reviews of circumvention determinations thus are not limited to examining simple yes-or-no considerations of whether circumvention occurred—they may also cover Commerce's application of a regulation or policy in the final determination.

Indeed, the CIT and this Court routinely consider the lawfulness of Commerce regulations and policies in the context of Section 1581(c) actions. As the CIT has succinctly explained, Section 1581(c) enables it to "address a facial challenge to a general agency practice employed by Commerce, as well as to the final results of an agency proceeding that is subject to judicial review under § 1516a." *United States Steel Corp. v. United States*, 627 F. Supp. 2d 1374, 1382 (Ct. Int'l Trade 2009); *see M S Int'l, Inc. v. United States*, 32 F.4th 1145, 1153 (Fed. Cir. 2022) (reviewing claim that Commerce regulation "contradicts the statute"); *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1386 (Fed. Cir. 2017) (Commerce regulatory repeal failed to comply with APA notice-and-comment); *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1377 (Fed. Cir. 2010) (finding Commerce regulation "facially invalid"); *Compania Valenciana de Aluminio Baux, S.L.U. v. United States*, No. 23-00259, 2025 WL 2731823, at *7 (Ct. Int'l Trade Sept. 25, 2025) (finding Commerce regulation consistent with Tariff Act).

Section 1581(i), in turn, grants the CIT jurisdiction to entertain:

> any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for— … (B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue, … (D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)–(h) of this section.

28 U.S.C. § 1581(i)(1). The provision also directs that this jurisdictional grant "shall not confer jurisdiction over an antidumping or countervailing duty determination which is reviewable by … the Court of International Trade under {19 U.S.C. § 1516a(a)}" (including cases under Section 1581(c)). *Id.* § 1581(i)(2).

Section 1581(i) "embodies a 'residual' grant of jurisdiction{} and may not be invoked when jurisdiction under another subsection of § 1581 *is or could have been available*, unless the remedy provided under that other subsection would be manifestly inadequate." *Sunpreme Inc. v. United States*, 892 F.3d 1186, 1191 (Fed. Cir. 2018) (emphasis added; citation omitted). The scope of CIT jurisdiction under Section 1581(i) is thus "strictly limited." *Erwin Hymer*, 930 F.3d at 1374 (citation omitted). Otherwise, Section 1581(i) would "threaten to swallow the specific grants of jurisdiction contained within the other subsections." *Id.* (citation omitted).

**B.** **Section 1581(i) Jurisdiction Is Unavailable Because Plaintiffs-Appellees Could Have Brought This Action Under Section 1581(c)**

"{A} party may not expand a court's jurisdiction by creative pleading." *Norsk Hydro*, 472 F.3d at 1355. A court thus must "look to the true nature of the action' brought before the CIT under § 1581(i) to determine whether the action could have been brought under another subsection." *Wanxiang Am. Corp. v. United States*, 12 F.4th 1369, 1374-75 (Fed. Cir. 2021) (citation omitted); *see Hartford Fire Ins. Co. v. United States*, 544 F.3d 1289, 1293 (Fed. Cir. 2008) (affirming dismissal because action's "true nature" did not support Section 1581(i) jurisdiction); *Sunpreme,* 892 F.3d at 1193-94 (reversing CIT jurisdictional ruling when "true nature" of claim fell within Section 1581(c)). The "true nature" inquiry requires that the court engage with the "totality" of the allegations and "identify the particular agency action underlying the claimed harm." *J.D. Irving*, 119 F.4th at 54; *Erwin Hymer*, 930 F.3d at 1376.

The true nature of this action addresses matters incorporated in Commerce's Final Circumvention Determinations implementing the duty moratorium. This is apparent from multiple sources ranging from Commerce's administrative record, to Plaintiffs-Appellees' arguments before the agency, to Plaintiffs-Appellees' own complaint, to companion Section 1581(c) litigation in which Plaintiff-Appellees clearly could have challenged the duty moratorium's legality.

*1. Agency Record.* The administrative record reveals that implementation of the duty moratorium is integrally bound-up in the Final Circumvention Determinations. Commerce's decisions to pause collection of cash deposits and suspension of liquidation for moratorium entries—the central grievance uniting Plaintiffs-Appellees' claims—was given effect (over Auxin's objections) through the determination and certification regime established in *both* Commerce's Preliminary and Final Circumvention Determinations. Hence, Commerce documented in the Final Circumvention Determinations that it would "not direct CBP to suspend liquidation, and require cash deposits, of estimated ADs and CVDs" on moratorium entries and announced that "{i}n order to administer these country-wide affirmative determinations of circumvention … and to implement Presidential Proclamation 10414, Commerce has established the following types of certifications …." 88 Fed. Reg. at 57,421-22; *see also* Preliminary Circumvention Determinations, 87 Fed. Reg. at 75,223-24; Appx723-725 (recognizing Commerce "implement{ed}" and "effectuate{d}" the duty moratorium in the proceeding).

It is thus apparent that Plaintiffs-Appellees' challenge to the moratorium's exemption of "Applicable Entries" from suspension and cash deposit requirements focuses on actions enshrined in Commerce's Preliminary and Final Determinations. *See* Appx2523-2524, Appx2556-2557 (complaint quoting determinations). Indeed, before the CIT, Plaintiffs-Appellees' counsel asserted that the complaint was not

19

filed until December 2023 because "although the {Final Rule} came out earlier than that, it was not actually effective until Commerce issued their final determination finding circumvention." Appx4846 (CIT Hearing Tr.). Consequently, the mere fact that Plaintiffs-Appellees style their complaint as a challenge to the Final Rule does not create Section 1581(i) jurisdiction. *See J.D. Irving*, 119 F.4th at 55 (finding "true nature" of plaintiff's challenge was to Commerce final results, not "administration and enforcement" thereof as plaintiff asserted); *Sunpreme,* 892 F.3d at 1191, 1193-94 (plaintiff's "characterization of its appeal … {was} unavailing" given the relief it sought); *Juancheng Kangtai Chem. Co. v. United States*, 932 F.3d 1321, 1328 (Fed. Cir. 2019) (affirming dismissal on similar grounds).

2. *Auxin's Agency Submissions.* Critically, Auxin *did* challenge Commerce's implementation of its Final Rule throughout the circumvention proceedings, while asking Commerce to provide the same relief it seeks in this action. For example, in its October 20, 2022 Pre-Preliminary Determination Comments, Auxin argued that "the Final Rule is contrary to law, antithetical to Commerce's enforcement mission, and unadministrable" and that "Commerce should reconsider its application to these affirmative determinations of circumvention and apply existing regulations to solve for the perceived, but not real, 'emergency.'" Appx412-413, Appx467-468.

Auxin subsequently argued to the agency that "Commerce's certification and CBP instructions implementing Part 362 of its regulations and Presidential

Proclamation 10414 are contrary to law and unenforceable, are contrary to Commerce's enforcement mission, and are, ultimately, unadministrable." Appx705; *see also* Appx719 at n.41 (highlighting that Auxin had challenged the moratorium's legality in the proceeding).

Auxin even dedicated a section of its circumvention proceeding case brief to arguing that "Commerce's Certification and CBP Instructions Implementing Part 362 of its Regulations and Presidential Proclamation 10414 Are Contrary to Law and Unenforceable." Appx723-727. Auxin recognized that Commerce had "implement{ed}" and "effectuate{d}" the duty moratorium in the preliminary results, again urging Commerce to "reconsider" and "reevaluate the legality of its certification and CBP instructions" in the Final Circumvention Determinations. *Id.* Commerce declined. *See* Appx1209 at nn.572-573 (noting Auxin's arguments while declining to adopt them). Likewise, as we detail below, Auxin raised multiple other claims challenging Commerce's implementation of the duty moratorium before the agency that mirror those Plaintiffs-Appellees raise in this action. *Compare* Appx2566-2574, Appx2576 (Counts 2, 3, 4, 5, 7) *with* Appx1194-1200, Appx1209-1218 (considering and rejecting these arguments).[6]

---

[6]     Auxin asserted these arguments in each of its four case briefs. Likewise, Commerce's responses appear in each of its four decision memoranda.

21

In short, as Commerce was deciding the scope of the circumvention remedy, including whether and how the Final Rule would be applied, Auxin repeatedly recognized that the agency's administrative determinations would give effect to Proclamation 10414's duty moratorium. *E.g.*, Appx723-727. Auxin's own agency submissions show that the Final Circumvention Determinations are responsible for the alleged harm at the center of this litigation.

*3. The Complaint.* Plaintiffs-Appellees' complaint further demonstrates that their claims concern matters encompassed in the Final Circumvention Determinations that could (and should) have been brought under Section 1581(c). In its request for judgment and relief, the complaint asks the CIT to order relief specifically reversing Commerce's actions in the Final Circumvention Determinations. Hence, it asks the CIT to:

> Order CBP and its officers to suspend liquidation of entries of CSPV cell and module imports … and collect cash deposits of estimated antidumping and countervailing duties on entries of the same unless and until, with respect to the country in question, Commerce reaches a negative final determination in the ongoing circumvention inquiry concerning CSPV cells and modules from that country.

Appx2577; *see also* Slip Op. 24-58 at 4, Appx31.

Likewise, Plaintiffs-Appellees' claimed harm results from Commerce's decision not to collect cash deposits on entries of solar cells and modules despite Commerce's affirmative circumvention findings in the Final Circumvention

Determinations. Appx2563 ¶ 95 (alleging that Plaintiffs-Appellees were denied "the relief for which Commerce was specifically petitioned"). Congress mandated that the avenue for securing reversal of a Commerce circumvention determination—including all matters decided therein—is Section 1581(c). *See* 28 U.S.C. § 1581(c); 19 U.S.C. §§ 1516a(a)(2)(A), (a)(2)(B)(vi).

Moreover, multiple of the specific claims that Plaintiffs-Appellees raise in this litigation directly reprise ones that Auxin raised in the circumvention proceedings before Commerce. The table below summarizes key CIT claims and the corresponding arguments Auxin made in the circumvention proceedings:

| Table 1 |  |
| --- | --- |
| **Plaintiffs-Appellees' Section 1581(i) Complaint and Corresponding Arguments Before Commerce** | |
| **Section 1581(i) Complaint** | **Arguments Before Commerce** |
| **Count 1**: "19 U.S.C. 1318(a) Does Not Authorize Duty-Free Importation of CSPV Cells and Modules." Appx2564-2566. | **Case Brief Sec. V**: "Commerce's Certification and CBP Instructions Implementing Part 362 of Its Regulations and Presidential Proclamation 10414 Are Contrary to Law and Unenforceable." Appx723; Appx719 n.41; Appx412-413. |
| **Count 2**: "Commerce Acted Arbitrarily and Capriciously by Not Adopting Core Principles from Its Section 318 Regulations" (Alleging: "All that Commerce's certification regime actually requires is a vague promise by the importer that the duty-free CSPV cells or modules will be 'utilized' by Commerce's deadline" while challenging utilization scheme more generally). Appx2566-2567. | **Case Brief Sec. V(B)**: "Commerce's definition of 'utilization and utilized' to mean 'the Southeast Asian-Completed Cells and Modules will be used or installed in the United States' is too vague to be administrable and enforceable." Appx725-727; *see also* Appx414-417; Appx1194-1200 (addressing Auxin's utilization arguments). |

| Table 1 | |
| --- | --- |
| **Plaintiffs-Appellees' Section 1581(i) Complaint and Corresponding Arguments Before Commerce** | |
| **Section 1581(i) Complaint** | **Arguments Before Commerce** |
| **Count 3**: "Commerce Acted Contrary to the Administrative Procedure Act When It Granted Duty-Free Treatment to Products Imported Outside the Period of the Emergency."  Appx2568-2571. | **Case Brief Sec. IV**: "Commerce's determination to apply Presidential Proclamation 10414 retroactively is contrary to law and den{ies} Auxin the relief it is entitled by law" (likewise challenging moratorium dates), Appx718-723; Appx1209-1218 (rejecting retroactivity argument). |
| **Count 4**: "Commerce Acted Contrary to the Administrative Procedure Act by Permitting Duty Free Treatment to Be Determined Long After Importation" (requesting entry-specific mechanism akin to the one established at 19 C.F.R. § 358).  Appx2571-2573. | **Case Brief Sec. V(B)**: Alleging certification regime is "unadministrable" and asserting, "The aforementioned issues could be meaningfully redressed by use of the Part 358 regulations"  Appx725-727; Appx1194-1200 (rejecting Auxin's arguments requesting entry-specific mechanism akin to the one established at 19 C.F.R. § 358). |
| **Count 5**: "Commerce's Definition of 'Utilization' Is Contrary to the Plain Language of the Statute and Finds No Reasonable Justification in Commerce's Rulemaking" (calling the definition of "utilization" inadequate as a matter of law).  Appx2573-2574. | **Pre-Prelim Cmts Sec. III(B)**: "Without any additional elaboration of what is meant or intended by 'used or installed,' the Final Rule provides only an arbitrary standard by which to determine whether products are properly subject to the tariff moratorium."  Appx414-417; *see also* Appx725-727; Appx1194-1200 (addressing Auxin's arguments regarding "utilization" issues). |
| **Count 7**: "Because Commerce's Final Solar Duty Holiday Rule Is Unlawful, Commerce's Failure to Follow Its Duty Collection and Suspension of Liquidation Regulations Is Unlawful" (Asserting: "Commerce's refusal to take the actions mandated by 19 C.F.R. § 351.226(l) in reliance upon the Final *Solar Duty Holiday Rule* is an unlawful withholding and unreasonable delay of agency action.").  Appx2576. | **Case Brief Sec. V(A)**: Citing 19 C.F.R. § 351.226(l) and arguing, "Commerce through its certification language and instructions to CBP to effectuate Part 362 of its regulations and Presidential Proclamation 10414 has denied Auxin and other domestic manufacturers of CSPV cells and modules the relief to which they are entitled under law upon a preliminary affirmative finding of circumvention."  Appx724; *see* Appx1218 ("{I}f a conflict arises between 19 CFR 362 and 19 CFR 351.226, the stipulations of 19 CFR 362 prevail."). |

As the table shows, in addition to reprising the claim challenging the duty moratorium's legality, Plaintiffs-Appellees also assert multiple other claims concerning the duty moratorium's implementation and enforcement that Auxin pursued and Commerce addressed in the circumvention inquiries. For example, among their key allegations, Plaintiffs-Appellees fault aspects of the Final Circumvention Determinations' certification regime such as its alleged retroactive application and utilization reporting. Appx2566-2576 (Counts 2, 3, 4, 5, 7). The certification regime, however, was developed in Commerce's Preliminary and Final Circumvention Determinations—not in the Final Rule.

*4. Companion Cases.* This Court need only look to the companion cases to this action to confirm that the Final Circumvention Determinations are reviewable under Section 1581(c). *See* CIT Nos. 23-221, 23-222, 23-227; Fed. Cir. Nos. 25-1937, 25-1940. Filed in October 2023, the companion cases seek revision of the Final Circumvention Determinations to correct alleged legal and factual errors, just as Plaintiffs-Appellees' requested relief asks the CIT to direct revision of the Final Circumvention Determinations to remove the moratorium certifications, direct suspension of liquidation, and impose cash deposits. *See* Appx2577. Victory by plaintiffs in the companion cases would modify the same decisions that Plaintiffs-Appellees seek to revise here—the Final Circumvention Determinations.

Notably, Auxin itself filed Section 1581(c) challenges to the Final Circumvention Determinations with respect to all four countries on October 23, 2023 (later abandoned in May 2024). CIT Ct. Nos. 23-223 to 23-226. One of the counts in those cases even closely resembles Plaintiffs-Appellees' claim here that Commerce's certification regime is unenforceable. *See*, *e.g.*, CIT Ct. No. 23-223, ECF 10, Count 2. Yet more than two months later, on December 29, 2023, Plaintiffs-Appellees filed this action, instead asserting jurisdiction under Section 1581(i). *Cf. Juancheng Kangtai*, 932 F.3d at 1329-30 (observing that plaintiff filed a § 1581(c) action that could have raised claims it sought to pursue under § 1581(i)). In these circumstances, jurisdiction under Section 1581(i) is thus foreclosed.

### C. The Trial Court Employed an Incorrect Analysis to Conclude That Jurisdiction Was Unavailable Under Section 1581(c)

The CIT erroneously found that jurisdiction was available pursuant to Section 1581(i). Slip Op. 24-58, at 17-26, Appx44-53. It reasoned that jurisdiction was not available under Section 1581(c) "because the Duty Suspension Rule relates to the 'administration and enforcement,' 28 U.S.C. § 1581(i)(1)(D), of those determinations—in particular, Commerce's cash deposit and liquidation instructions to {CBP}—rather than the lawfulness of Commerce's Final Determinations{.}" *Id.* at 18. This misidentifies the true nature of Plaintiffs-Appellees' action because the matters they challenge are explicitly incorporated in the Final Circumvention Determinations, not separate issues of administration and

enforcement. *Cf. Am. Signature, Inc. v. United States*, 598 F.3d 816, 824-25 (Fed. Cir. 2010) (matters decided "in connection with" final results subject to § 1581(c)).

The CIT's reliance on *Shinyei Corp. of Am. v. United States*, 355 F.3d 1297 (Fed. Cir. 2004), and *Ugine and ALZ Belgium v. United States*, 551 F.3d 1339 (Fed. Cir. 2009), to guide its analysis of the true nature of the claims is flawed. Slip Op. 24-58 at 23-25, Appx50-52. Both decisions concern instances in which Commerce committed an error in issuing the implementing customs instructions. Specifically, in *Shinyei* and *Ugine*, the plaintiffs did not challenge an aspect of the underlying determinations; rather, they contended that the customs instructions were *inconsistent* with those determinations. *See Ugine*, 551 F.3d at 1347-49 (challenging liquidation instructions issued after final results that were directed at merchandise not covered by AD order); *Shinyei*, 355 F.3d at 1309 ("As we have recently held, a challenge to Commerce instructions on the ground that they do not correctly implement the published, amended administrative review results, is not an action defined under section 516A of the Tariff Act.") (internal quotations omitted).

When there is an error in customs instructions but not the underlying determination by Commerce (*i.e.*, the customs instructions fail to effectuate Commerce's determination in the administrative proceeding), jurisdiction is available under Section 1581(i) because there is no error in an AD/CVD determination reviewable by the CIT under 19 U.S.C. § 1516a. *See* 28 U.S.C.

27

§ 1581(i)(2)(A). Section 1581(c) jurisdiction is unavailable in these distinct circumstances, and absent residual Section 1581(i) jurisdiction, affected parties would not be able to challenge such errors.

This case is different. Though the CIT thought the Final Circumvention Determinations' dual findings of circumvention and implementing the duty moratorium were *logically* inconsistent, that is not so—and in any event not a basis for Section 1581(i) jurisdiction. Through detailed certifications, instructions, and supporting rationale, the Final Circumvention Determinations clearly intended both to render circumvention findings and to temporarily waive cash deposit and suspension requirements through the certification regime. Indeed, the statute governing AD/CVD circumvention provides that Commerce "may" include merchandise found to be circumventing an order within the scope of that order "at any time such order or finding is in effect," meaning that the question of relief based upon an affirmative circumvention finding is also part of Commerce's determination in a circumvention inquiry. 19 U.S.C. § 1677j(b)(2). Moreover, there was no disconnect between the Final Circumvention Determinations, which incorporate a decision memorandum addressing these issues, and the corresponding CBP instructions. *See* U.S. Customs & Border Prot., Message No. 3243401 (Aug. 31, 2023), Appx1448-1485. The CBP instructions *faithfully reflect* Commerce's determinations, meaning the analytical premise of the CIT's ruling is incorrect.

*Shinyei* and *Ugine* did not speak to these circumstances, and the CIT erred by relying on them. *See* Slip Op. 24-58 at 23-24, Appx50-51 (asserting erroneously that "Plaintiffs in this action, as in *Shinyei* and {*Ugine*}, were subject to liquidation instructions that did not reflect Commerce's Final Determinations.").[7]  To the contrary, multiple other cases confirm that when customs instructions faithfully implement Commerce's administrative determination, challenges are properly brought under Section 1581(c). *See, e.g.*, *J.D. Irving*, 119 F.4th at 55 ("{Plaintiff} argues that the 'true nature' of its action is a challenge to Commerce's 'administration and enforcement' of {Final Results} … We are not persuaded."); *Juancheng Kangtai*, 932 F.3d at 1327-29 (denying § 1581(i) jurisdiction when liquidation instructions directly implemented decisions made by Commerce during underlying reviews); *Intercontinental Chems., LLC v. United States,* 483 F. Supp. 3d 1232, 1240 (Ct. Int'l Trade 2020) (dismissing § 1581(i) action when "Commerce did not commit a new error," but rather "issued liquidation instructions based on the Final Results of an administrative review"); *Wanxiang Am. Corp. v. United States*, 399 F. Supp. 3d 1323, 1331-33 & n.11 (Ct. Int'l Trade 2019) (dismissing § 1581(i) action and observing that Commerce guidance "reiterated – {} rather than deviating from – the results of the administrative reviews").

---

[7]  The CIT's statement is also inaccurate because Plaintiffs-Appellees were not "subject" to any liquidation instructions, since they did not import solar products subject to the Final Circumvention Determinations and their certification regime.

Section 1581(i) jurisdiction is thus unavailable.  This does not prevent the CIT from resolving legal challenges to circumvention determinations—including whether Commerce can affirmatively find circumvention and defer collection of duties in the same order.  It just means that such an inquiry would need to be undertaken under Section 1581(c).

**D.    The Remedies Available to Plaintiffs-Appellees Under Section 1581(c) Were Not Manifestly Inadequate**

Nor were the remedies available under Section 1581(c) manifestly inadequate.  As established above, the Federal Circuit and CIT have consistently recognized that agency rulemakings can be challenged in appeals of Commerce determinations reviewable under 19 U.S.C. § 1516a.  *See* Part II.A, *supra*.  It hardly would have been futile to raise such a challenge during the Commerce proceedings—indeed, Plaintiffs-Appellees actually did so.  *See Corus Staal BV v. United States,* 502 F.3d 1370, 1379 (Fed. Cir. 2007) ("The mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies."); *Int'l Custom Prods.*, 467 F.3d at 1328 ("Plaintiff cannot take it upon itself to determine whether it would be futile to protest or not.") (citation omitted).

That Plaintiffs-Appellees believe the agency failed to comply with allegedly required procedures following an affirmative circumvention determination does not render the Section 1581(c) remedy manifestly inadequate.  "{U}nder 28 U.S.C.

§ 1581(c) and 19 U.S.C. § 1516a, the procedural correctness of a {CVD} duty determination, as well as the merits, are subject to judicial review." *Miller & Co. v. United States*, 824 F.2d 961, 964 (Fed. Cir. 1987) (internal citations omitted). In other words, Congress "intended that {Section 1581(i)} should not be used to permit the appeal of a procedural determination, but rather, that all procedural considerations should be decided" as part of the Section 1581(c) review. *See Koyo Seiko Co. v. United States*, 715 F. Supp. 1097, 1100 (Ct. Int'l Trade 1989) (internal citation and quotation marks omitted).

Nor can Plaintiffs-Appellees credibly claim any delay or other harm by having to wait for the Final Circumvention Determinations to file their suit when they delayed for months after that to initiate the appeal. *See Dofasco Inc. v. United States*, 326 F. Supp. 2d 1340, 1346 (Ct. Int'l Trade 2004), *aff'd*, 390 F.3d 1370 (Fed. Cir. 2004) (considering whether agency action "the plaintiff seeks to prevent will have already occurred by the time relief under another provision of section 1581 is available, rendering such relief manifestly inadequate.").

The record shows that Plaintiffs-Appellees could have brought this suit under Section 1581(c) and that doing so was not manifestly inadequate. Consequently, the CIT lacked subject matter jurisdiction and this Court should order dismissal.

**III. TEXT, HISTORICAL CONTEXT, AND LONGTIME PRACTICE CONFIRM SECTION 1318 AUTHORIZED THE PRESIDENT TO RELIEVE THE EMERGENCY HE VALIDLY DECLARED**

The CIT also erred when it held that Section 1318 did not authorize the President to relieve the electricity-generation crisis that he had validly recognized, by empowering Commerce to permit the duty-free importation of solar products.

Coordinated and decisive action is often necessary to resolve a crisis. The Constitution thus allows Congress to give the President discretion to act in an emergency. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 652-53 (1952) (Jackson, J., concurring in judgment). When congressional authorization dovetails with the President's inherent authority over foreign affairs, the President's "authority is at its maximum," and must be afforded "the strongest of presumptions and the widest latitude of judicial interpretation." *Id.* at 635-37.

Since the Founding, Congress has repeatedly authorized the President to suspend duties, tariffs, or other commercial regulations in response to fast-moving circumstances. *Cf. Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 2026 WL 477534, at *10 (Feb. 20, 2026) (discussing such "express{}" delegations). In 1794, Congress authorized President Washington to unilaterally revoke (or impose) any embargo "whenever, in his opinion, the public safety shall so require," if Congress was not in session. *Marshall Field & Co. v. Clark*, 143 U.S. 649, 683-84 (1892) (quoting 1 Stat. 372). A few years later, Congress barred all trade with France, but

32

authorized President Adams to "remit and discontinue the prohibitions," if France relented from its hostilities with the United States. *Id.* at 684 (quoting 1 Stat. 565-66). Cataloguing a dozen such provisions enacted over the 19th century, the Supreme Court affirmed that "invest{ing} the president with large discretion in matters arising out of the execution of statutes relating to trade and commerce" is "often desirable, if not essential, for the protection of the interests of our people." *Id.* at 691; *see also Learning Resources*, 2026 WL 477534, at *31 (Gorsuch, J., concurring) (discussing 1815 statute authorizing the President to repeal duties).

Section 1318 continues this legislative tradition. Congress enacted its immediate predecessor, the Tariff Act of 1922, following the First World War, authorizing the Executive Branch to extend the time to comply with duty obligations during an emergency. Eight years later—in the wake of economic and natural catastrophes—the Tariff Act of 1930 "broadened" this emergency authorization "to permit the free importation of food, clothing and supplies" in connection with wartime or other emergencies. *See* Comparative Print of the Tariff Act of 1922 with H.R. 2667, H.R. Doc. No. 15, at 334 (May 9, 1929), Appx2003. Section 1318 provides that, "{w}henever the President shall by proclamation declare an emergency to exist by reason of a state of war, or otherwise," the President may "authorize the Secretary" to permit importation "free of duty" of

several categories of goods: "food, clothing, and medical, surgical, and other supplies for use in emergency relief work." 19 U.S.C. § 1318(a).

In Proclamation 10414, President Biden declared that several factors had "abruptly" "threaten{ed} the ability of the United States to provide sufficient electricity generation." 87 Fed. Reg. at 35,067. "{T}o ensure electric resource adequacy," the United States needed "new solar installations" and "the vast majority" in recent years had relied on imports, "with those from Southeast Asia making up approximately three-quarters of imported modules in 2020." *Id.* The President thus determined that addressing the country's electricity-generation emergency required waiving duties on solar products imported from Cambodia, Malaysia, Thailand, and Vietnam. *Id.* at 35,068.

Plaintiffs-Appellees *do not challenge* the validity of the President's declaration. *See* 798 F. Supp. 3d at 1335 n.3. Instead, they argued below, and the CIT agreed, that Section 1318 failed to provide the President with the tools necessary to relieve the emergency he had validly declared. Solar modules are, of course, not food, clothing, or medical/surgical goods, and the CIT reasoned that they also are not the types of "other supplies for use in emergency relief work" eligible for suspension of duties. That self-defeating reading of the statute, which would reduce the President to declaring an emergency about which he can do nothing, is incorrect. Section 1318 permits the President to waive duties on any

item that ameliorates a validly declared emergency—including in this case, solar modules—and none of the CIT's reasons for concluding otherwise is sound.

**A. The Phrase "Other Supplies for Use in Emergency Relief Work" Authorizes the Suspension of Duties on Solar Products to Relieve the Validly Declared Electricity-Generation Emergency**

*1. Text.* The "ordinary meaning" of Section 1318 "at the time Congress enacted" it indicates that Congress intended to let the President waive duties on any item necessary to address as-of-yet unknown emergencies. *See Perrin v. United States*, 444 U.S. 37, 42 (1979). The phrase "other supplies for use in emergency relief work" is "unmistakably broad." *Taylor v. United States*, 579 U.S. 301, 305 (2016) (construing similar catchall); *accord Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 389 (2023) (same). It signals Congress's intent to capture "matters not specifically contemplated—known unknowns." *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009).

Indeed, in 1930 as today, the term "other" meant (1) "being the one of two (or more) distinct from the one{s} already mentioned," or (2) "additional," "not the same," or "different." *Other*, Webster's New International Dictionary (1934), Appx2014. And in its plural form "supplies" meant "{p}rovisions, clothing, arms, raw materials, etc., set aside to be dispensed at need," as in "to lay in supplies for the winter; in charge of supplies in a factory." *Supply*, Webster's New International Dictionary, Appx2015. As the "etc." included within this definition makes clear,

many "other things … could be mentioned" as supplies.  *Etcetera*, Webster's New International Dictionary, Appx2016.  Thus, the phrase captures "provisions" and various "other things" useful to "be dispensed at need" in emergency relief that are "different" from the food, clothing, and medical/surgical supplies already listed.

The "evident purpose of the provision," as revealed by surrounding language, confirms as much.  Antonin Scalia & Bryan Garner, *Reading Law* 208 (2012); *see also* William N. Eskridge, Jr., *Interpreting Law* 78 (2016) (explaining that catchall terms should be interpreted "{i}n light of the statutory policy"); *Begay v. United States*, 553 U.S. 137, 146 (2008) ("view{ing}" catchall "in terms of the Act's basic purposes").  The first words of Section 1318 highlight that it applies "*{w}henever* the President shall by proclamation declare an emergency to exist" and to any emergency the President validly identifies: "by reason of a state of war, or *otherwise*."  19 U.S.C. § 1318(a) (emphasis added).  This broad text indicates that Congress gave the President leeway to address "any other" crises that emerged, whether or not Congress had specifically anticipated them.  *Otherwise*, Webster's New International Dictionary (1934), Appx2014.  The subsequent provisions in Section 1318—which authorize various agencies to "respond directly" to *any* "national emergency" or "specific threat to human life or national interests"— further attest to that intent.  19 U.S.C. § 1318(b)(1)-(2).

No interpretive principle is "better settled than that statutes should be sensibly construed, with a view to effectuating the legislative intent." *Williams v. U.S. Fidelity & Guaranty Co.*, 236 U.S. 549, 555 (1915). Here, the only way to further Congress's intent as revealed in the text is to read "other supplies for use in emergency relief work" to cover all products that address a validly declared emergency. A more cramped interpretation would illogically limit the President to providing only partial relief in some emergencies—or perhaps no relief at all. *See Learning Resources*, 2026 WL 477534, at *13 (observing that trade statute's use of "sweeping, discretion-conferring language" conferred broad authority).

*2. Pre-enactment Context.* The immediate historical context of Section 1318's enactment confirms this analysis of its text. *See United States v. Union Pacific Rwy. Co.*, 91 U.S. 72, 79 (1875) ("{C}ourts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it.").

The Congress that enacted Section 1318—and certainly President Hoover who signed it—would have understood that different emergencies would produce varied and unpredictable needs. During the First World War, Hoover led America's relief efforts, which included providing devastated countries with the food, clothing, and medical supplies explicitly enumerated in Section 1318. *See, e.g.*, Nat'l Park

Service, *The Emergence of the Great Humanitarian: Herbert Hoover National Historic Site*, *available at* https://tinyurl.com/47bs9m5c.  But it was not those items alone.  A Red Cross report detailed the wide variety of goods procured for soldiers, refugees, and prisoners of war, including: "{g}ames," "camp things, auto parts, oils, gasoline, blocks, rope bottles," "cement," "earthenware, glass sides, fire extinguishers, enameled goods," "comfort kits," "baseballs," "cutlery, nails, mouth organs," "hammocks, ovens, mattresses, grindstones, razors, rakes, pillow-cases, tree-sprayers," "scales, stoves, pens," "shop tools, wax, threshing-machines," "washing-machines, puzzles and sewing-machines, oil-heaters and moving-picture apparatus," "trench candles, etc."  Henry P. Davison, *The American Red Cross in the Great War* 111 (1919), *available at* https://tinyurl.com/y8m98xk2*; see also* Walter C. Towns, *Goods Needed for War Effort*, Red Cross Society: Australian Branch, (c. 1914), *available at* https://tinyurl.com/2b6av52z (listing "all sorts of clothing, foods, comforts {including towels and washcloths}, books, tobacco").

Several years later, on the eve of being elected President, Hoover oversaw the nation's emergency response to catastrophic Mississippi River flooding that displaced more than 600,000 persons.  Cong. Rsch. Serv., Kevin R. Kosar, *Disaster Response and Appointment of a Recovery Czar: The Executive Branch's Response to the Flood of 1927*, at 7 (2005), *available at* https://tinyurl.com/2tsxmhfv.  The Red Cross temporarily sheltered evacuees, and when the flooding receded, it

"helped citizens rebuild some of their homes, and provided them with seeds, farm implements, basic household furnishings, and other items to help them regain the ability to sustain themselves." *Id.*

The same summer Congress passed and Hoover signed the Tariff Act of 1930, the country was sinking into the Great Depression and "30 states from the Appalachians to the Rockies" were facing severe drought. Spencer Howard, *Herbert Hoover and the 1930 Drought*, Nat'l Archives (Sept. 16, 2020), *available at* https://tinyurl.com/bdfkjr6p. In Arkansas, "the epicenter of the disaster," "{w}ells and streams ran dry, crops failed," and "thousands of farm families in the region faced starvation for themselves and their livestock." *Id.* Relief efforts provided, not just food and clothing, but also feed for livestock, seed, and fertilizer; and the Interstate Commerce Commission reduced shipping rates on hay, feed, and water for the affected areas. *See* Relief Work in the Drought of 1930-31: Official Report of Operations of the American National Red Cross 21-28, 53-54 (Oct. 1931), *available at* https://tinyurl.com/39auumax. In short, anyone reading Section 1318 upon enactment would have understood it to cover a wide range of goods necessary to remedy an emergency, not just food, clothing, and healthcare supplies.

*3. Contemporaneous interpretation.* "{L}ongtime understanding and practice" under Section 1318 tells the same story. *See Arcadia v. Ohio Power Co.*, 498 U.S. 73, 81 (1990); *see also Learning Resources*, 2026 WL 477534, at *9 (op.

of Roberts, C.J.) (explaining that "historical precedent" is relevant to confirm the scope of a congressional delegation); *accord id.* at \*39 (Kagan, J., concurring). Soon after Section 1318's enactment, Presidents invoked it to suspend duties on *any good* needed to resolve a declared emergency, including many that were *not* food, clothing, or healthcare-related. That practice has continued to the present, and Defendants-Appellants are unaware of any prior objection to this practice. Because these interpretations began almost "contemporaneously with the statute" and "have remained consistent over time," they are "especially useful in determining the statute's meaning." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024); *cf. Learning Resources*, 2026 WL 477534, at \*11 (rejecting interpretation that "no President has ever" previously adopted).

For instance, responding to Ohio River flooding in 1937, President Franklin Roosevelt sought to enable "charitable, philanthropic, relief, and other organizations" to "extend aid on a large scale to the flood sufferers." 2 Fed. Reg. 273 (Feb. 3, 1937), Appx2025. He thus instructed the Treasury Secretary to suspend duties "during the continuance of such emergency" on "such food, clothing, and medical, surgical, and *other supplies as he may designate* … when imported for use in such relief work"—*i.e.*, any supplies useful in relieving "such" emergency. *Id.* (emphasis added); *see* 2 Fed. Reg. 337, 339 (Feb. 11, 1937), Appx2029 (Treasury telegram instructing customs to "permit free entry" of supplies imported by a wide

variety of government and charitable entities).  Illustrating the breadth of supplies involved, a Red Cross report declared that "{i}t would be impossible to detail here the variety of relief supplies which the Red Cross procured and moved" in its flood-relief efforts.  *The Ohio-Mississippi Valley Flood Disaster of 1937: Report of Relief Operations of the American Red Cross* 116 (1938), https://tinyurl.com/2xdvtd32. That "variety" of supplies "ranged from baby food to coal stoves," and the largest percentage of relief funds went to "household goods."  *Id.* at 116, 189.

Four years later, Roosevelt exercised his Section 1318 authority to waive duties on "forage for livestock" in response to "an unusual lack of rain in … New York, Vermont, Massachusetts, and New Hampshire."  6 Fed. Reg. 3,715 (July 29, 1941), Appx2030.  Dairy farmers had suffered "the most disastrous losses in dairy feed ever in their farming experience," and waiving duties helped them continue their farming operations by ameliorating "the high prices that they would have {had} to pay … for hay."  H.R. No. 77-1483, at 1 (Dec. 5, 1941), Appx2033.

Then, in the wake of Pearl Harbor, Roosevelt again invoked Section 1318 to waive duties on "food, clothing, and medical, surgical, and other supplies by or directly for account of The American National Red Cross for use" in World War II relief work.  7 Fed. Reg. 3,143 (Apr. 30, 1942), Appx2043.  Implementing this directive, Treasury instructed that all Red Cross goods would be duty-free so long as a Red Cross representative filed "a declaration … that such food, clothing, and

41

medical, surgical, and other supplies … will be used by it in emergency relief work in connection with the emergency declared{.}"  7 Fed. Reg. 3,358 (May 6, 1942), Appx2044.  The available evidence is that this was not limited to food, clothing, and medical supplies.  In a report to the President, the Red Cross stated that the items it procured included "radio equipment, athletic supplies, sunroom furnishings in station hospitals," "cars and clubmobiles for front line service," "10,000,000 books for the armed forces," and "comfort articles for men returning from the combat lines."  Red Cross: Report for the War Period, January 1, 1942, to February 29, 1944, at 4, 6 (1944), *available at* https://tinyurl.com/y8nbwa8t.[8]

When the war ended, President Truman recognized an "unprecedented emergency shortage of housing, particularly for veterans of World War II and their families."  *Emergency Due to Housing Shortage – Free Importation of Timber, Lumber, and Lumber Products*, 11 Fed. Reg. 12,695 (Oct. 29, 1946), Appx155. Deeming it "imperative that immediate action be taken … to increase the available supplies of timber, lumber, and lumber products for housing purposes," he invoked his Section 1318 authority to suspend duties on these imports.  *Id*.; *see also Importation Free of Duty of Food, Clothing, and Medical, Surgical, and Other Supplies Under Emergency Proclamation of the President*, 11 Fed. Reg. 13,460, 13,460-61 (Nov. 14, 1946), Appx2045-2046 (listing lumber products).

---

[8]    Although the Red Cross did not specify which items it imported duty-free, it is clear that these items were not limited to food, clothing, and medical supplies.

The CIT barely engaged with this history, and it incorrectly downplayed and misunderstood it. The CIT declared that "{n}othing in the Roosevelt proclamations" supported a broad reading of Section 1318—without pausing to consider whether the "goods for disaster relief" contemplated in each ranged beyond food, clothing, and healthcare-related supplies. Slip Op. 25-111 at 22-23, Appx94-95 It also brushed off President Truman's waiver of duties on lumber supplies because the proclamation "referenced an additional statute, the Veterans' Emergency Housing Act of 1946." *Id.* at 23, Appx95. But, the Housing Act simply declared the emergency and instructed "{t}he executive agencies of the Government {to} exercise their" existing "emergency powers" to remedy it and to "recommend … the enactment of" any additional "legislation as may be necessary to provide the authority to carry out such plans and programs as are not authorized under existing law." Pub. L. 79-388, § 2(b)(3), (c), 60 Stat. 207 (May 22, 1946). President Truman in his declaration cited the Housing Act simply as "*recogniz{ing}* the … emergency" he was declaring, not as authority for *relieving* it. 11 Fed. Reg. at 12,695 (emphasis added). For authority to ensure "supplies" of housing materials by suspending duties, he invoked Section 1318.[9] *Id.*

---

[9] The CIT was incorrect to suggest that President Truman's proclamation was unique in invoking additional statutory authority. *See* Slip Op. 25-111 at 23-24, Appx95-96. President Roosevelt's proclamation enabling duty-free Red Cross importations in World War II cited not only the declarations of war against the Axis powers, but also the statute enabling the American Red Cross to "carry{} on and administer{} emergency relief." 7 Fed. Reg. at 3,143.

More recently, in the wake of Hurricane Katrina, Commerce promulgated a rule "set{ting} up the process persons would use to request {duty-free} importation of supplies for use in emergency relief work." *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 Fed. Reg. 35,846, 35,847 (June 22, 2006). Rejecting comments recommending a list enumerating "merchandise considered necessary for relief" by the Federal Government, Commerce asserted a need for "maximum flexibility to review waiver requests in the context of a specific emergency and to make waiver determinations on an emergency-by-emergency basis." *Procedures for Importation of Supplies for Use in Emergency Relief*, 71 Fed. Reg. 63,230, 63,233 (Oct. 30, 2006). As experience taught, consistent with the statutory text, "{w}hat supplies might be needed for use in emergency relief work will depend on the circumstances of a specific declared emergency and the particular needs of persons affected by that emergency." *Id.*

*4. Application.* Here, President Biden recognized an electricity-generation crisis threatening "major sectors of the economy, including hospitals, schools, public transportation systems, and the defense industrial base." 87 Fed. Reg. at 35,067. There is no dispute Section 1318(a) authorized him to *recognize* it. But Section 1318(a) also authorized him to *do something about it*: Solar modules (and any "other supplies") qualify, so long as they are appropriate "for use in emergency relief work" for that declared emergency—which they clearly are. As the President

44

himself recognized, waiving duties on solar products fills the need caused by the emergency, just as allowing duty-free importation of lumber, forage, household goods, etc. addressed declared emergencies 80 and 90 years ago.

The CIT additionally ignored that it was the *President* through Proclamation 10414, and not Commerce's Final Rule, that determined solar products constitute needed supplies for purposes of Section 1318(a). 87 Fed. Reg. at 35,068 (stating Section 1318(a) "is invoked and made available" to Commerce to permit duty-free solar imports from Southeast Asia during the emergency period). This is important at one level because the CIT failed to apply appropriate deference to the President's determinations that (1) an electricity-generation emergency existed and (2) solar products were required to relieve it. More fundamentally, the CIT's analysis is flawed because the Proclamation is what defines solar products as "other supplies for use in emergency relief work" and it remains both unchallenged and controlling. *See* Appx2540 (confirming that Plaintiffs-Appellees do not challenge Proclamation 10414); *Detroit Int'l Bridge*, 189 F. Supp. 3d at 100-01 (agency action involving discretionary presidential authority is "presidential" and unreviewable under APA). This Court should thus uphold the Final Rule effectuating President Biden's unchallenged determination.

**B.    The CIT Misread Section 1318, Groundlessly Subverting the President's Authority to Relieve a Validly Declared Emergency**

The CIT rightly acknowledged that the "meaning of 'other supplies' is, on its face, a very broad one that appears to encompass" solar modules because they "are materials that may be dispensed to fill a need, *i.e.*, energy demand."  Slip Op. 25-111 at 14, Appx86.  That should have been the end of the matter.

Instead, the CIT cabined "other supplies" to "items for use in healthcare-related applications," such as "pharmaceuticals, physical therapy equipment, nursing supplies or hospital beds"—thereby limiting the President's emergency suspension power to food, clothing, and these healthcare-related supplies.  *Id.* at 18, Appx90.  Animating the CIT's opinion was a fear that allowing the President to waive duties on any product necessary to address a declared emergency would "potentially" nullify "the entirety of Congress' lengthy and intricate tariff scheme."  *Id.* at 19-20, Appx91-92.  That is doubly wrong.

*First*, the Supreme Court rejected that concern more than a century ago in *Field*.  As it explained, when the President *suspends* enforcement of a statute "upon a named contingency" and *with express congressional authorization*, the President is not nullifying the will of Congress but *effectuating* it.  *Field*, 143 U.S. at 692-94.  Needlessly cabining the President's actions "*rob{s} the legislature* of the power to act wisely for the public welfare" by making provision for future crises.  *Id.* at 694 (emphasis added).  For the same reason, the "elephants in mouseholes" principle

46

does not apply here.  *Contra* Slip Op. 25-111 at 19, Appx91.  An *express* delegation of *emergency power* is hardly an "ancillary provision{}," and reading it to mean what it says preserves, rather than "alter{s}," the "fundamental details of the regulatory scheme."  *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) (citations omitted); *see also Loper Bright*, 603 U.S. at 413 ("{W}hen a particular statute delegates authority to {the executive branch} consistent with constitutional limits, courts must respect the delegation.").  All nine Justices echoed this point in *Learning Resources*, even for the greater power of *imposing* tariffs, and those express delegations are enforced according to their terms.  *See* 2026 WL 477534, at *10; *id.* at *38 (Kagan, J., concurring); *id.* at *51 (Kavanaugh, J., dissenting).

*Second*, longstanding practice belies the CIT's concern.  Section 1318 is 96 years old.  It is "telling" that in that time, no President—including the Roosevelt, Truman, and Bush administrations, none of which shared the CIT's cramped reading—has used it to nullify the tariff scheme.  *See Learning Resources*, 2026 WL 477534, at *9 (op. of Roberts, C.J.) (highlighting longstanding practice); *cf. Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885, 897 (Fed. Cir. 2023), *adhered to on reh'g*, 111 F.4th 1349 (Fed. Cir. 2024) (rejecting argument that President's tariff modification authority created an improper "loophole").  Thus, enforcing Section 1318 according to its terms would be in line with "historical precedent."  *Learning Resources*, 2026 WL 477534, at *9 (op. of Roberts, C.J.).

The CIT's statutory construction was equally flawed. The court first concluded that two statutory canons (*noscitur a sociis* and *ejusdem generis*) required it to limit the phrase "other supplies" to "those supplies that are similar in nature to, or share common attributes with, 'medical' or 'surgical' supplies." Slip Op. 25-111 at 16-19, Appx88-91. Both canons suggest that a commonality among words in a list may "cabin the contextual meaning" of a catchall term at the end. *Yates v. United States*, 574 U.S. 528, 543, 545 (2015); *see also* Antonin Scalia & Bryan Garner, Reading Law 196 (explaining that a court must focus on "the most general quality—the least common denominator, so to speak—relevant to the context").

*Noscitur a sociis* and *ejusdem generis* are "useful tools" that "can help" the court "figure{e} out the meaning of troublesome statutory language" by shedding light on the statutory context. *Facebook, Inc. v. Duguid*, 592 U.S. 395, 412 (2021) (Alito, J., concurring in judgment). But they are just that—tools, which must not be mechanically applied in ways that "supplant rather than supply ordinary meaning." *Heyman v. Cooper*, 31 F.4th 1315, 1319 (11th Cir. 2022) (citing *Duguid*, 592 U.S. at 413 (Alito, J., concurring)). Here, the statute amply indicates that the adjectives "medical" and "surgical" do not limit "other supplies."

For one, Section 1318 is not a healthcare statute. By its terms, it focuses not on healthcare but on emergencies (of all sorts) and relieving them. The provision

opens by highlighting the President's discretion to declare emergencies ("{w}henever" one is identified, due to war "or otherwise"), and it closes the list of duty-free items by clarifying that they are "for use in emergency relief work." Indeed, the list "medical, surgical, and other supplies" is itself part of a longer list that veers beyond the medical context to other items.

If anything, applying *noscitur a sociis* and *ejusdem generis* would "obscure and defeat the intent and purpose of Congress." *United States v. Alpers*, 338 U.S. 680, 682 (1950). Food, clothing, and healthcare-related items do aid in many crises. But as both the immediate pre-enactment history and the post-enactment implementation recounted above show, they are hardly the sum-total of the supplies that even war refugees and disaster victims need—and they may be entirely unhelpful in other situations. Soldiers in both World Wars needed books, towels, and other "comfort articles" to endure the hardships on the front lines. Drought stricken Arkansas farmers needed seeds and fertilizer to plant new crops. Families displaced by the Mississippi and Ohio River floods needed new household goods to refurnish their damaged homes. And returning veterans needed, not food, clothing, and medical/surgical supplies, but "timber, lumber, and lumber products for housing purposes." 11 Fed. Reg. at 12,695.

Likewise, food, clothing, and medical supplies cannot generate electricity to power "major sectors of the economy," which instead require "new solar

49

installations." 87 Fed. Reg. at 35,067. The Court "should not lightly conclude that Congress enacted a self-defeating statute" that fails to allow the emergencies the President declares to be addressed. *Pugin v. Garland*, 599 U.S. 600, 607 (2023). Certainly, it must not arrive at that result "by a mechanical rule of construction." *Alpers*, 338 U.S. at 684.

In addition, *noscitur a sociis* and *ejusdem generis* should not be "employed to render general words meaningless." *Id.* at 682. Yet that is what limiting "other supplies" to the healthcare context would do. As examples of healthcare-related items that might fall outside "medical" or "surgical" supplies but within the catchall, the CIT suggested "pharmaceuticals, physical therapy equipment, nursing supplies or hospital beds." Slip Op. 25-111 at 18, Appx90. But each of these items can be described as "medical"—that is, "of, pert{aining} to, or dealing with the healing art, or the science of medicine" or "{m}edicinal." *Medical*, Webster's New International Dictionary, Appx2010; *see also Pharmacy*, Webster's New International Dictionary, Appx2017 ("A medicinal preparation; a remedy"). Likewise, equipment used by nurses, therapists, or patients themselves "pert{ains}" just as much to "the healing art" as equipment used by doctors. That the CIT could not identify a single non-medical or surgical item that fell within its cramped reading of "other supplies" confirms that its reading is wrong. *See United States v.*

*Alaska*, 521 U.S. 1, 59 (1997) ("avoid{ing} an interpretation of a statute that 'renders some words altogether redundant'").

*Yates v. United States*, which the CIT also invoked, is inapposite to this case. While Section 1318 vests the President with discretion to *suspend* enforcement of potentially crippling tariffs, the provision of the Sarbanes-Oxley Act at issue in *Yates* created a *felony* "punishable by up to 20 years in prison," thereby triggering the rule of lenity that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." 574 U.S. 528, 547-48 (2015). Also, unlike Section 1318, which concerns only supplies relevant to relief work, Sarbanes-Oxley had no built-in limiting principle; broadly read, it would have swept in the destruction of any "tangible object." *Id.* at 531 (quoting 18 U.S.C. § 1519). As a result, a broad reading of Sarbanes-Oxley—far from having legislative analogues stretching back to the Founding, like Section 1318—would have looked unlike anything else in the U.S. Code. Further, though a capacious reading of "other supplies" gives meaning to every part of Section 1318, a broad reading of Sarbanes-Oxley would have left superfluous a separate crime "passed in proximity as part of the same Act." *Id.* at 543. *Yates* therefore provides no justification for constricting Section 1318.

## IV. IN THE ALTERNATIVE, THE FINAL RULE IS AUTHORIZED BY 19 U.S.C. § 1677j

Even if the Court were to conclude that Commerce's Final Rule or certain of its elements are inconsistent with 19 U.S.C. § 1318(a), the Final Rule is

independently valid as a lawful exercise of Commerce's authority under 19 U.S.C. § 1677j to define the scope of relief in circumvention proceedings, and should therefore be upheld in its entirety.[10]

Section 1677j governs when Commerce may consider imports from a third country to be circumventing an AD/CVD order. If five criteria are met, Commerce "*may*" apply the order to the third country's merchandise—but as the discretionary language indicates, it need not do so. 19 U.S.C. § 1677j(b)(1) (emphasis added); *see Bouarfa v. Mayorkas*, 604 U.S. 6, 13 (2024) ("{T}he word 'may' *clearly* connotes discretion.") (citation omitted).

Reinforcing Commerce's discretion, Section 1677j proceeds to explain that Commerce "*may*" include circumventing merchandise within the scope of an order "*at any time* such order … is in effect." 19 U.S.C. § 1677j(b)(1) (emphasis added). And though it "describes certain applicable procedures and standards for circumvention determinations, the Act does not provide direction to Commerce regarding the suspension of liquidation for entries subject to a circumvention inquiry." *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,338 (Sept. 20, 2021).

---

[10] Defendants-Appellants' raised this argument before the CIT, but the court completely failed to address it. *See* CIT ECF No. 96 at 25-29. Because this Court reviews CIT decisions *de novo*, it can sustain the Final Rule on this basis, notwithstanding that failure.

Commerce thus enjoys significant discretion under the law as to whether and how to apply an affirmative circumvention determination. Here, that discretion enabled Commerce to decide not to levy AD/CVD duties on solar products imported from the countries at issue even if it found the five criteria for circumvention had been met—independently authorizing the duty suspension rule.[11]

Plaintiffs-Appellees' only response is to argue that procedural requirements impose restrictions on Commerce that are not in the text. Before the CIT, Plaintiffs-Appellees argued that Commerce should have followed 19 C.F.R. § 351.226(l), which lists procedures for how Commerce normally would exercise its discretion in applying an affirmative circumvention determination. In other words, they claim that Commerce, having found circumvention, was required to suspend liquidation and impose AD/CVD cash deposit requirements with respect to all entries post-dating Commerce's initiation of the circumvention inquiry. This is wrong.

Nothing in the statute mandates the procedures Commerce adopted in Section 351.226(l). Commerce said as much when promulgating Section 351.226,

---

[11]    Section 1677j(a)(1) was added to the statute simultaneously with Section 1677j(b)(1) and uses the same "may" language in permitting the inclusion of circumventing merchandise within an order. The conference report from the Omnibus Trade and Competitiveness Act of 1988 explicitly states that Commerce's authority in Section 1677j(a)(1) "is discretionary (*e.g.*, Commerce may apply the order to the imported parts of components but is not required to do so)." H.R. Rep. No. 100-576, at 599 (1988), 1988 U.S.C.C.A.N. 1547, 1632. This statement logically applies to Section 1677j(b)(1) as well, since both provisions use the same permissive "may" language.

explaining that it was promulgating that regulation "{i}n the absence of any such statutory guidance." 86 Fed. Reg. at 52,338; *see also id.* at 52,344. Because the statute does not compel Section 351.226 procedures, Commerce was free to modify that approach as long as it conducted a new rulemaking through notice-and-comment procedures. *Cf.* Final Rule, 87 Fed. Reg. at 56,876 (explaining that Commerce was free to adopt a different approach from Part 358 of its regulations if it engaged in notice-and-comment rulemaking and determined that revised procedures better addressed the emergency).

And that is what it did. In both the Proposed and Final Rule, Commerce stated that it was "invoking all authorities provided for in the Proclamation, pursuant to section 318(a) of the Act, *as well as Commerce's authority to issue regulations under section 781 of the Act (19 U.S.C. 1677j)*, to take these proposed steps to respond to the emergency declared in the Proclamation." *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 39,426, 39,429 (Dep't Commerce July 1, 2022) ("Proposed Rule") (emphasis added); Final Rule, 87 Fed. Reg. at 56,870 (emphasis added); *see also* Final Rule, 87 Fed. Reg. at 56,878 (explaining that Commerce's circumvention procedures are based in its regulations implementing Section 1677j and that it could "also use notice-and-comment rulemaking to address the declared emergency" by creating exceptions to those

regulations). Indeed, the Final Rule states explicitly that it applies "notwithstanding § 351.226(l)." 19 C.F.R. § 362.103(b)(1).

Likewise, Proclamation 10414 both directed Commerce to "consider taking appropriate action under section 1318(a) of title 19" to address the declared emergency and made clear that "{n}othing in this proclamation shall be construed to impair or otherwise affect … the authority granted by law to an executive department or agency, or the head thereof." 87 Fed. Reg. at 35,068. Commerce already had the authority to issue 19 C.F.R. § 351.226 via notice-and-comment rulemaking to guide its implementation of 19 U.S.C. § 1677j, meaning that Commerce also possessed authority to *amend or create an exception* to 19 C.F.R. § 351.226, regardless of whether the President separately authorized Commerce to act under 19 U.S.C. § 1318. *See* 19 C.F.R. § 362.103(b)(1).

Commerce was free to use its pre-existing authority to issue regulations that guide its exercise of discretion under 19 U.S.C. § 1677j to address the unique problems presented by the circumvention inquiries in this case, and Commerce referenced that authority when promulgating the Final Rule. Plaintiffs-Appellees can point to nothing in Section 1677j precluding the approach Commerce took in this case to address the problem. The Final Rule is therefore lawful because it is authorized by Section 1677j, regardless of whether it was independently authorized under Section 1318.

## V. THE BROAD RETROACTIVE RELIEF THAT THE CIT ORDERED IS UNLAWFUL

The CIT erred by ordering retroactive injunctive relief subjecting all of Defendants-Appellants' imports during the moratorium period—even those that finally liquidated—to massive retroactive liability. An injunction "does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). It constitutes extraordinary relief based on equitable discretion and requires the plaintiff to satisfy a four-factor test: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006).

Appellate courts routinely reverse injunctions when the trial court errs in weighing the injunctive relief factors and thus abuses its discretion. *See*, *e.g.*, *Winter*, 555 U.S. 7; *see also Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 95 (Fed. Cir. 2014) ("An abuse of discretion may be established under Federal Circuit law by showing that the court made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact finding.") (citation and quotation marks omitted). Here, the CIT

"made a clear error of judgment" in finding that the equities justified broad

retroactive relief—including the disfavored remedy of reliquidation.[12]

### A. Plaintiffs-Appellees Failed to Demonstrate That an Injunction Was Necessary to Prevent Irreparable Harm

First, Plaintiffs-Appellees and the CIT failed to articulate how the CIT's

retroactive relief would prevent irreparable harm to Plaintiffs-Appellees. That is

unsurprising because there is none.

When a plaintiff seeks injunctive relief, "past wrongs do not in themselves

amount to that real and immediate threat of injury necessary to make out a case or

controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Injunctive

relief is "forward-looking relief," so "the past is relevant only insofar as it is a

launching pad for a showing of imminent future injury." *Murthy v. Missouri*, 603

U.S. 43, 59 (2024); *see also Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633,

652 (Fed. Cir. 2015) (Reyna, J., concurring).

Yet Plaintiffs-Appellees claim nothing but past harms. The Final Rule

applied to merchandise entered before June 6, 2024, and utilized by December 3,

2024. 19 C.F.R. § 362.102. At the time of the CIT's order, the emergency period

---

[12] There is additional reason to scrutinize the injunction in this case because the CIT entered it without the benefit of full briefing on the equities. After abandoning an initial preliminary injunction motion, Plaintiffs-Appellees' opening merits brief did not address remedy issues—deferring them to reply. *See* CIT ECF 100; CIT ECF 96, at 31 (noting lack of argument). The CIT issued remedy-related hearing questions, CIT ECF 109, but it never authorized full briefing on these issues.

during which the Final Rule allowed imports to enter free of AD/CVD duties and the utilization deadline had both passed. Thus, any competitive impact of the Final Rule's duty waiver for those imports had passed as well. Moreover, Plaintiffs-Appellees have no economic stake in the prior entries because any duties collected would be retained by the Government. *See Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 535 F. Supp. 3d 1336, 1362 (Ct. Int'l Trade 2021) (vacating Commerce CVD regulation only prospectively in part because domestic industry lacked stake in duties that would have been collected on past entries), *rev'd on other grounds*, 66 F.4th 968 (Fed. Cir. 2023).[13]

Plaintiffs-Appellees never demonstrated how the lack of duties on past entries of merchandise that had already been utilized in solar projects would cause Plaintiffs-Appellees *future* harm that the CIT's injunction would prevent. The CIT observed that "Plaintiffs have proffered evidence demonstrating that the massive influx of duty-free CSPV cells and modules depressed prices below plaintiffs' raw material costs," and "plaintiffs have provided evidence of lost business opportunities linked directly to the emergency proclamation." Slip Op. 25-111 at

---

[13] In this regard, *SSAB North American Div. v. Customs*, 571 F. Supp. 2d 1347, 1351-55 (Ct. Int'l Trade 2008), which the CIT cited as support for its conclusions that Plaintiffs-Appellees have an interest in the prior entries, is readily distinguishable. The entries at issue in *SSAB* were subject to the since-repealed Continued Dumping and Subsidy Offset Act ("CDSOA"), which entitled petitioning domestic producers to a portion of the AD/CVD duties collected. *See* Deficit Reduction Act of 2005, P.L. 109-171, § 7601 (2006).

31-32, Appx103-104. One unsubstantiated assertion by counsel at oral argument notwithstanding, however, the actual evidence the CIT cited all pertains to harms that Plaintiffs-Appellees allegedly suffered because of low-priced imports during the emergency period when the Final Rule was still in effect. *Id.* (citing Appx3648-3663; Appx4815-4816).

The Final Rule no longer applied to merchandise imported or sold in the United States at the time of the CIT's order, so any merchandise subject to Commerce's circumvention finding that was being sold in the market was subject to AD/CVD duties. These conditions were completely different from those during the emergency period when duties were not being applied. Plaintiffs-Appellees' evidentiary submissions did not provide a reasonable basis for the CIT to conclude that applying duties on merchandise that had been imported and sold months, or even years, prior to the CIT's order would provide any prospective competitive benefit to Plaintiffs-Appellees, much less prevent irreparable harm. To the extent that Plaintiffs-Appellees allege harm by lost sales or depressed prices during the emergency period, the CIT's order *does not* redress that harm.[14] And Plaintiffs-Appellees cannot simply point to the damage that the injunction will do to their competitors' businesses to assert a right to such relief; they must show that they face

---

[14] This lack of prospective harm also resolves the second injunctive relief factor because there is no irreparable harm to compensate.

irreparable harm without an injunction, not simply that they would benefit from a court order harming their competitors.

The lack of irreparable harm is apparent when one considers related standing principles. Article III of the Constitution requires Plaintiffs-Appellees to establish a redressable injury caused by Defendants' conduct that persists throughout the entire case. *See United States v. Texas,* 599 U.S. 670, 676 (2023); *Los Angeles Cnty. v. Davis*, 440 U.S. 625 (1979). In contrast to suits challenging "Government regulations that require or forbid some action by the plaintiff," Article III standing is "substantially more difficult to establish" when a plaintiff challenges Government "regulation (or lack of regulation) of someone else." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 382 (2024); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (emphasizing plaintiffs bear a substantial burden in such cases).

To the extent a plaintiff invokes the doctrine of "competitor standing," which "relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors," *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008), it "cannot establish competitor standing merely by claiming that a rival's favorable tax treatment has created an unfair competitive atmosphere" or a "skewed playing field." *PSSI Glob. Servs., LLC v. Fed. Commc'ns Comm'n*, 983 F.3d 1, 11 (D.C. Cir. 2020) (internal quotation marks omitted).

Moreover, competitor standing requires that the plaintiff derive *prospective benefit* from the regulation of third parties. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). Thus, a plaintiff cannot leverage competitor-standing principles to demand civil "enforcement against {its competitors} after the {competition} has run its course," because after-the-fact enforcement can neither "reverse the {past} harms" to competition, nor "compensate" for them. *Nader v. Fed. Election Comm'n*, 725 F.3d 226, 228-29 (D.C. Cir. 2013).

Plaintiffs-Appellees bear an even heavier burden to show irreparable harm than to allege standing. *See, e.g.*, *Caribbean Marine Servs. Co.,v. Baldridge*, 844 F.2d 668, 675 (9th Cir. 1988). Thus, the purely retrospective harms they allege are not enough to warrant the extraordinary remedy that the CIT ordered in this case.

**B.    The CIT Clearly Misapplied the Balance of Hardships and Public Interest Factors**

Beyond Plaintiffs-Appellees' failure to allege irreparable harm, the remaining equitable factors cut strongly against the CIT's remedy. *See Winter*, 555 U.S. at 26, 31-32 & n.5 (reversing injunction on this basis alone).

In weighing the balance of hardships, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). As the CIT correctly recognized, "'{e}ach party' includes the interest of intervening

61

parties." Slip Op. 25-111 at 33, Appx105. The CIT acknowledged Defendants-Appellants' assertion that they would suffer "'significant liability' … if forced to pay antidumping and countervailing duties on merchandise that they imported in reliance on the Duty Suspension Rule." *Id.* at 34, Appx106. It made a "clear error of judgment," however, in holding that Plaintiffs-Appellees' hardship of "lost competitive benefit of properly collected antidumping and countervailing duties" outweighed Defendants-Appellants' (and indeed the public's) interest in finality and the harm from ordering massive retroactive relief. *Id.* at 33, Appx105.

In sharp contrast to the absence of a concrete benefit to Plaintiffs-Appellees, Defendants-Appellants will suffer extreme hardship if the CIT's retroactive order is implemented. *See* Appx4948-4984. The billions of dollars in potential retroactive liability created by the CIT's judgment, coupled with the fact that it affects long-completed deliveries back to 2022, will force companies to take drastic measures. *See id.* Defendants-Appellants anticipate foregoing planned U.S. manufacturing investments and hiring, scaling back or closing facilities, and laying off U.S. employees. *See id.* Some companies may even be forced into bankruptcy. *See id.* The devastating impact that the CIT's judgment would have on the U.S. solar industry also merges with the public interest—given the billions in U.S. investments and thousands of U.S. jobs the industry supports. *See id.*

The potential financial consequences of the CIT's injunction are draconian. Defendants-Appellants now face retroactive AD/CVD liability *long after* the normal statutory and regulatory procedures for seeking annual administrative reviews and requesting individual rates before Commerce has passed.[15] Commerce may thus assert that Defendants-Appellants will be forced to pay the "PRC-Wide" AD rate of 234 percent applied to Chinese government-controlled entities, regardless of whether the facts would show that they engaged in dumping. In other words, Defendants-Appellants potentially face worse treatment than Chinese exporters who had normal statutory and regulatory annual administrative review procedures available to them. Contrary to the CIT's claims, this is not a mere "administrative inconvenience" (Slip Op. 25-111 at 33-35, Appx105-107), but a significant hurdle making it difficult to "unscramble the egg" and potentially subjecting Defendants-Appellants to extreme liability, regardless of their pricing activity.

In addition to the devastating impact of the duties themselves, the CIT failed to adequately weigh the harm to Defendants-Appellants from reliance on the U.S.

---

[15] As Commerce explained in the circumvention proceedings, the inquiries did *not* assess whether any merchandise was in fact dumped or subsidized, much less what appropriate AD/CVD rates would be if it was. *See* Appx1191, Appx1221. To demonstrate that their merchandise was not dumped or subsidized, or to otherwise obtain individual rates, companies would need to participate separately in the administrative review process. *See* Appx1221.

Government's assurances that their good faith entries following the President's emergency declaration would be duty-free. The whole point of the moratorium was to encourage solar imports that the President deemed critical until domestic production capacity grew to meet the country's electricity needs. And it worked. Defendants-Appellants and many other companies imported substantial quantities of solar cells and modules during the moratorium period. USITC Pub. 5631 at Tbl. C.1, p. C.4 (estimating billions in solar imports). It is profoundly inequitable to now penalize Defendants-Appellants for heeding the Government's call. Indeed, if the CIT's order stands, it will result in a Government windfall, even while Defendants-Appellants face dire financial circumstances that could severely undermine—or even end—their energy-producing activities.

By contrast, as demonstrated above, Plaintiffs-Appellees have no economic stake in the prior entries because they are not entitled to any duties that might be collected and the moratorium ended long before the trial court's ruling. The inchoate hardship that they claim is focused on past competitive harm that cannot be undone. The imbalance between these hardships is glaring. *Cf. Winter*, 555 U.S. at 26 ("While we do not question the seriousness of these interests, we conclude that the balance of equities and consideration of the overall public interest in this case tip strongly in favor of {defendant}.").

Turning to the public interest, the CIT's cursory analysis flatly contradicts the fact that the President and Commerce each determined as a factual matter that implementing the duty moratorium was strongly in the public interest. The CIT's analysis consisted of a single assertion that "compliance with the trade laws was overridden by the government's promulgation of the Duty Suspension Rule" so that the public interest weighed in the plaintiffs' favor. Slip Op. 25-111 at 36, Appx108; *cf. Winter*, 555 U.S. at 26 (noting "cursory" public interest analysis in vacating injunction). The court did not consider the extensive factual record from the responsible arms of government determining precisely the opposite—*i.e.*, that the public interest favored duty-free imports to combat a national emergency.

The President in Proclamation 10414 specifically found "an emergency to exist with respect to the threats to the availability of sufficient electricity generation capacity to meet expected customer demand." 87 Fed. Reg. at 35,068. He further found that solar energy was "critical to the function of major sectors of the economy," that an "acute shortage" following Commerce's circumvention inquiry "abruptly put at risk near-term solar capacity additions{,}" and that "{i}mmediate action is needed to ensure … that the United States has access to a sufficient supply of solar modules to assist in meeting our electricity generation needs." *Id.* at 35,067-68; *see also id.* (noting shortfalls and warnings from the Federal Energy Regulatory Commission and North American Electric Reliability Corporation);

65

Appx2500-2506 (White House fact sheet re-affirming findings); Appx2508-2509 (Commerce re-affirming that "preventing disruptions to the electric power system, diversifying our energy sources and responding to the climate crisis have never been more urgent, and solar energy is an essential component of meeting those needs").

Commerce made equivalent findings in issuing its Proposed Rule, explaining that "{i}f U.S. entities cannot import sufficient quantities of solar materials for the foreseeable future, the United States will be unable to ensure sufficient electricity grid resources and meet climate and clean energy goals." 87 Fed. Reg. at 39,427. It elaborated that "{r}oughly half of solar deployment that had been anticipated over the next year is currently in jeopardy" and that it was "vital that we address this issue," while highlighting the "strong interest" in removing uncertainty surrounding the circumvention inquiries. *Id.* at 39,429-30. In support of its Final Rule, Commerce also highlighted a U.S. Department of Energy ("DOE") report detailing the need for solar imports to meet U.S. energy needs. 87 Fed. Reg. at 56,872-73; *see also id.* at 56,873-75 (analyzing necessity of moratorium).

Not only did the CIT ignore these findings, it *overrode* the President's determination that the public interest favored duty-free treatment to address a national emergency. *Cf. Winter*, 555 U.S. at 27 (lower courts improperly dismissed senior officials' judgments). By substituting its own findings for those of the President, the CIT made a "clear error of judgment" in violation of the basic

principle that the President's factual judgments are not subject to review.  *Silfab*, 892 F.3d at 1349; *George S. Bush,* 310 U.S. at 379-80.

Importantly, the CIT's decision imposing retroactive liability also undermines Section 1318(a) as a tool to address emergencies because importers will be unable to trust that their goods will ultimately be duty free.  Ordering this relief will thus hamper the President's ability to address future emergencies.  *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 573 (C.C.P.A. 1975) ("{T}the primary implication of an emergency power is that it should be effective to deal with a national emergency successfully.").

Finally, the CIT clearly erred by dismissing the fact that the duty moratorium went unchallenged in court for the first 18+ months it was in effect—including after Commerce first implemented it in the Preliminary Circumvention Determinations. *See* Slip Op. 25-111 at 34-35, Appx106-107.  Indeed, the CIT acknowledged the relevance of how quickly the moving parties "moved to assert their rights once they knew or should have known about the error" and cited 180 days as a typical rule-of-thumb.  *Id.* (citation omitted).  Yet, without explanation, it found that the delay in challenging the duty moratorium did not shift the balance of harms, while repeating Plaintiffs-Appellees' dubious assertion that they lacked the ability to do

so prior to the Final Circumvention Determinations.[16] *Id.* The CIT's accompanying statement that it would not examine "the reasonableness of plaintiffs' legal strategy" misses the point. *Id.* Given the lack of any court challenge for such a long period, it is highly prejudicial to impose retroactive liability on the covered imports. *Cf. SSAB*, 571 F. Supp. 2d at 1354-55 (finding "{w}hatever the reason for the eight month lapse" the delay along with finality interests made reliquidation inequitable).

In sum, the CIT substituted its view of the public interest for that of the President, while improperly prioritizing Plaintiffs-Appellees' inchoate interests over the devastating harm to Defendants-Appellants (and the public) from their good faith reliance on the U.S. Government. This alone requires reversal.

## C.      The CIT's Reliquidation Order Is Unlawful

The CIT also acted unlawfully by ordering *reliquidation* of entries that have finally liquidated. Slip Op. 25-111 at 36-38, Appx108-110. The equitable factors described above apply with special force to these entries because the law recognizes

---

[16]      Plaintiffs-Appellees' specific assertions that Commerce's Final Rule was "a practical nullity *until* Commerce reached affirmative circumvention determinations" and that they "reasonably opted to sue after Commerce's affirmative determinations became final, … filing four months thereafter" also contradicts their jurisdictional argument that this suit could not have been brought as a Section 1581(c) challenge to the Final Circumvention Determinations. *Id.* (citation omitted). Likewise, their claim that they did not suffer sufficient hardship through most of the moratorium period to state a case or controversy under Article III undermines their arguments that the irreparable harm and balance of hardships factors weigh in their favor. *Id.*

liquidation as the final assessment intended to provide importers with certainty as to the duties owed. Critically, the Tariff Act explicitly provides that liquidation is final. Although there are limited circumstances in which this Court recognizes an exception to that mandate, this case does not present one. Hence, the CIT's imposition of the extraordinary remedy of reliquidation was unlawful.

The Tariff Act prioritizes finality by requiring: (1) that entries be liquidated within a specified time period; (2) that reliquidation by CBP is only available for 90 days thereafter; and (3) that any protests by the importer must be filed within 180 days of liquidation. *See* 19 U.S.C. §§ 1501, 1504, 1514. The statutory liquidation scheme ensures certainty because it is the "*final* computation or ascertainment of duties," 19 C.F.R. § 159.1 (emphasis added), that is "designed to close the books on an importer's entries." *SKF USA, Inc. v. United States*, 512 F.3d 1326, 1329 (Fed. Cir. 2008). Indeed, the statutory protest provision states that liquidation "shall be final and conclusive upon all persons (*including the United States and any officer thereof*)" unless a protest is timely filed within 180 days of liquidation. 19 U.S.C. § 1514(a) (emphasis added). It also provides that liquidation may be protested only to challenge an error "adverse to the importer." *Id.* This makes clear that, once final, entries may not be reliquidated for the benefit of the Government—only for the importer. Similarly, Section 1504 of the statute provides certainty by requiring that entries "shall be deemed liquidated" if CBP takes no

action on them within one year.  19 U.S.C. § 1504(a); *see also Koyo Corp. of USA v. United States*, 497 F.3d 1231, 1239-40 (Fed. Cir. 2007).

The CIT acknowledged "importers' interests in the finality of liquidation," but nonetheless ordered reliquidation for entries that have lawfully liquidated duty-free pursuant to Proclamation 10414 and the Final Rule.[17]  Slip Op. 25-111 at 34, Appx106.  That holding frustrates the purpose of the liquidation statute.  It is particularly inappropriate to do so in a case like this, in which a court orders reliquidation to the *detriment* of the importer.  As shown above, Plaintiffs-Appellees have no claim to retroactive duties on the entries at issue.  Rather, Defendants-Appellants, as importers subject to the moratorium, are at risk of paying unexpected duties *years* later in light of the CIT's decision.

In ordering reliquidation, the CIT misconstrued this Court's case law as authorizing blanket authority for reliquidation in Section 1581(i) cases.  This Court, however, has often emphasized liquidation's finality.  *See*, *e.g.*, *Target Corp. v. United States*, 134 F.4th 1307, 1315 (Fed. Cir. 2025) ("Congress has carefully crafted a statutory scheme that specifically articulates grounds for finality and

---

[17]  Notwithstanding the CIT's statements to the contrary, based on the most current information available to Defendants-Appellants, many entries that entered duty-free during the emergency period have already liquidated.  *E.g.*, Appx4902-4903 (CIT Hearing Tr.); Appx4956, Appx4960 (Declarations).  This is important because this Court relied on its erroneous understanding that "no applicable entries have liquidated thus far" in balancing the harms.  Slip Op. 25-111 at 34, Appx106.

certain exceptions to finality.") (citing *Arizona v. California*, 460 U.S. 605, 626 (1983), *decision supplemented*, 466 U.S. 144 (1984) ("Finality principles would become meaningless if an adversarially-determined issue were final only if the equities were against revising it.")).

Nor has this Court recognized an exception to the finality rule for reliquidation to exact *additional*, retroactive duties from an importer. In *Target*, this Court reversed a CIT decision allowing reliquidation in that circumstance while emphasizing liquidation's finality. *See* 134 F.4th at 1316-17. Similarly, in *Solar Energy Industries Association v. United States*, 779 F. Supp. 3d 1368 (Ct. Int'l Trade 2025) (*SEIA*), which was also a Section 1581(i) case, CBP liquidated several entries in violation of an injunction at an incorrect rate and requested that the CIT order reliquidation at a higher one. The CIT found reliquidation inappropriate and noted that "only a thoroughgoing equitable showing will move the court to upset Congressionally-enshrined finality interests by granting retroactive relief." *Id.* at 1380; *see also AM/NS Calvert LLC v. United States*, 654 F. Supp. 3d 1324, 1340-49 (Ct. Int'l Trade 2023) (finding reliquidation potentially available in all § 1581(i) cases, but permitting it to ensure the Government would not argue that it was barred from duty refunds due to the finality of liquidation).

In erroneously concluding that it had reliquidation authority here, the CIT primarily relied on *Shinyei Corp. of America v. United States*. Slip Op. 25-111 at

27 n.15, Appx99; *see* Part II.C, *supra*. However, *Shinyei* is another example of the Court ordering reliquidation to *benefit* an importer that was erroneously charged duties. *Shinyei* involved an APA challenge to Commerce liquidation instructions that failed to reflect the amended final results of an administrative review in violation of 19 U.S.C. § 1675(a)(2)(C). The CIT ruled that it lacked jurisdiction due to liquidation. *Shinyei*, 355 F.3d at 1309. This Court disagreed—reasoning that a challenge to Commerce instructions because they do not correctly implement the published administrative review results "is not an action defined under section {1514} of the Tariff Act" but instead an APA action pursuant to Section 1581(i). *Id.* at 1309 (citation omitted). The Court elaborated that Section 1514 cannot be "fairly construed to prohibit reliquidation in all cases, *particularly when the alleged error is with Commerce instructions as in violation of section 1675(a)(2)(C), not 'decisions of the Customs Service' as to liquidation*." *Id.* at 1311 (emphasis added).

The *Shinyei* court was concerned with scenarios in which importers who had overpaid duties would be left without recourse other than through deployment of an equitable remedy. As this Court has explained, *Shinyei* "held that in an action challenging liquidation instructions under 28 U.S.C. § 1581(i), the Court of International Trade may, *under certain circumstances*, use its equitable powers to compel reliquidation of entries if a preliminary injunction has been sought and denied." *Am. Signature*, 598 F.3d at 828 (emphasis added). The assertion of

72

authority in *Shinyei* is fundamentally different from the CIT's order here, which creates *new liability* for importers years after the fact and frustrates the liquidation statute's core purpose. That cannot be squared with the Tariff Act's explicit limits on reliquidation to ensure finality for importers. *See* 19 U.S.C. § 1514(a)-(b).

At the very least, the reliquidation jurisprudence required the CIT to make a thorough equitable determination while weighing heavily the Trade Act's core policy in favor of finality. *See SEIA*, 779 F. Supp. 3d at 1380 (requiring a "thoroughgoing equitable showing" to "upset Congressionally-enshrined finality interests by granting retroactive relief"); *AM/NS Calvert*, 654 F. Supp. 3d at 1343 ("But to say that equitable relief is available under the APA in all § 1581(i) cases does not mean that such relief is available as of right."). The CIT sidestepped this issue because it was under the erroneous belief that no entries had been liquidated. *See* Slip Op. 25-111 at 34, Appx106. The circumstances of this case, however, strongly implicate the finality interests embodied in the liquidation statute. In combination with the many equitable factors described above, that makes it improper to order reliquidation.

Finally, the CIT relied on a January 2024 stipulation between Plaintiffs-Appellees and the Government that it characterized as recognizing its authority to reliquidate. *Id.* at 27, Appx99 (citing Appx4807-4811). The stipulation states that those parties agreed the CIT has authority to order reliquidation and direct the

73

United States to reliquidate entries "for which liquidation was not suspended and cash deposits were not collected pursuant to" the duty moratorium. Appx4807-4808. It was entered before Defendants-Appellants were granted party status and they did not consent to it. *See* Slip Op. 24-58 at 43-45, Appx70-72 (granting motions to intervene and joint stipulation). Thus, the CIT's statement that the "parties" had "already stipulated that the court has authority to order … reliquidation" is incorrect. *See* Slip Op. 25-111 at 27, Appx99.

Regardless, the stipulation does not provide for court-ordered reliquidation of any and all entries otherwise subject to the duty moratorium, but only "entries that remain unliquidated as of the date when the Court rules on this stipulation" or May 9, 2024. *See* CIT ECF 19 ¶¶ 2-3. Further, the Government in the stipulation explicitly reserved "the right to make arguments regarding whether the {CIT} should order reliquidation as a remedy in the event that plaintiffs prevail on the merits." *Id.* ¶ 2. As a result, the stipulation does not alter the reasons why this Court should reverse the CIT's deeply flawed injunction ruling, especially with respect to the extraordinary remedy of reliquidation.

For all of these reasons, the CIT "made a clear error of judgment" in ordering retroactive relief. This Court should reverse the CIT's decision and hold that the Government *may not* impose retroactive duties under the circumstances.

# CONCLUSION

Accordingly, Defendants-Appellants respectfully request that this Court reverse the CIT's erroneous decision.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4046
mnicely@akingump.com

*Counsel to NextEra Energy, Inc. and Solar Energy Industries Association*

/s/ Craig A. Lewis
Craig A. Lewis
**HOGAN LOVELLS US LLP**
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-8613
craig.lewis@hoganlovells.com

*Counsel to BYD (H.K.) Co., Ltd. and BYD America LLC*

/s/ Jonathan T. Stoel
Jonathan T. Stoel
Nicholas R. Sparks
**HOGAN LOVELLS US LLP**
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hoganlovells.com

*Counsel to Canadian Solar (USA) Inc. and Canadian Solar International Limited*

/s/ Jonathan M. Freed
Jonathan M. Freed
**TRADE PACIFIC PLLC**
700 Pennsylvania Ave, SE
Washington, DC 20003
(202) 223-3760
jfreed@tradepacificlaw.com

*Counsel for Trina Solar (U.S.), Inc., Trina Solar Science & Technology (Thailand) Ltd., Trina Solar Energy Development Company Limited, and Trina Solar (Vietnam) Science & Technology Co., Ltd.*

/s/ Amanda Shafer Berman
Amanda Shafer Berman
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2908
aberman@crowell.com

*Counsel to Invenergy Renewables LLC
and Invenergy Solar Equipment
Management LLC*

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
**MOWRY & GRIMSON, PLLC**
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
(202) 688-3610
jsg@mowrygrimson.com

*Counsel to JA Solar USA, Inc., JA Solar
Vietnam Company Limited, JA Solar
Malaysia Sdn. Bhd., JA Solar
International Limited, and the American
Clean Power Association*

/s/ C. Kevin Marshall
C. Kevin Marshall
Hannah L. Templin
**JONES DAY**
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3851
ckmarshall@jonesday.com

*Counsel to Boviet Solar Technology
Co., Ltd., and Boviet Solar USA, Ltd.*

/s/ Gregory S. Menegaz
Gregory S. Menegaz
**THE INTER-GLOBAL TRADE
LAW GROUP, PLLC**
1156 Fifteenth Street, N.W., Suite 1101
Washington, D.C. 20005
(202) 868-0300
gmenegaz@igtlaw.com

*Counsel to Risen Solar Technology Sdn.
Bhd. and Co-Counsel to Boviet Solar
Technology Co., Ltd. and Boviet Solar
USA, Ltd.*

/s/ Ned H. Marshak  
Ned H. Marshak  
**GRUNFELD DESIDERIO
LEBOWITZ SILVERMAN &
KLESTADT LLP**  
599 Lexington Avenue FL 36  
New York, NY 10022-7648  
(212) 557-4000

*Counsel to Jinko Solar (U.S.) Industries
Inc., JinkoSolar (U.S.) Inc., Jinko Solar
Technology Sdn. Bhd., Jinko Solar
(Malaysia) Sdn. Bhd., JinkoSolar
(Vietnam) Co., Ltd., JinkoSolar Holding
Co., Ltd., Jinkosolar Middle East
DMCC, JINKOSOLAR INVESTMENT
LIMITED (f/k/a/ Jinkosolar Technology
Limited), and Jinkosolar (Vietnam)
Industries*

Dated: March 30, 2026

# STATUTORY ADDENDUM
### (Pursuant to Fed. R. App. P. 28(f))

or in the maintenance or repair of any vessel or aircraft described in subdivision (2) or (3) of section 1309(a) of this title, or for use as ground equipment for any such aircraft, shall be deemed an exportation within the meaning of the customs and internal-revenue laws applicable to the exportation of such merchandise without the payment of duty or internal-revenue tax. With respect to merchandise for use as ground equipment, such shipment or delivery shall not be deemed an exportation within the meaning of the internal-revenue laws relating to taxes other than those imposed upon or by reason of importation.

(June 17, 1930, ch. 497, title III, § 317, 46 Stat. 696; June 25, 1938, ch. 679, § 5(b), 52 Stat. 1081; Aug. 8, 1953, ch. 397, § 11(b), 67 Stat. 514.)

### EDITORIAL NOTES

#### REFERENCES IN TEXT

Section 2197(a) of title 26, referred to in subsec. (a), is a reference to section 2197(a) of the Internal Revenue Code of 1939, which was repealed by section 7851 of Title 26, Internal Revenue Code.

#### AMENDMENTS

1953—Subsec. (b). Act Aug. 8, 1953, extended to foreign vessels the exemption from payment of duty and internal revenue tax theretofore available for supplies used in the maintenance or repair of aircraft; and provided an exemption for ground equipment for foreign-flag aircraft from duties and taxes imposed on, by reason of, importation.

1938—Act June 25, 1938, amended section catchline, designated existing provisions as subsec. (a), and added subsec. (b).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1953 AMENDMENT; SAVINGS PROVISION

Amendment by act Aug. 8, 1953, effective on and after thirtieth day following Aug. 8, 1953, and savings provision, see notes set out under section 1304 of this title.

#### EFFECTIVE DATE OF 1938 AMENDMENT

Amendment by act June 25, 1938, effective on thirtieth day following June 25, 1938, except as otherwise specifically provided, see section 37 of act June 25, 1938, set out as a note under section 1401 of this title.

#### REPEALS

Insofar as subsec. (a) of this section related exclusively to Internal Revenue it was repealed and incorporated as section 2197(b) of the Internal Revenue Code of 1939. See section 4(a) of enacting sections of Internal Revenue Code of 1939. Section 2197(b) of I. R. C. 1939 was replaced by section 5704(b) of Title 26, Internal Revenue Code.

## § 1318. Emergencies

(a) Whenever the President shall by proclamation declare an emergency to exist by reason of a state of war, or otherwise, he may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act, and may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work. The Secretary of the Treasury shall report to the Congress any action taken under the provisions of this section.

(b)(1) Notwithstanding any other provision of law, the Secretary of the Treasury, when necessary to respond to a national emergency declared under the National Emergencies Act (50 U.S.C. 1601 et seq.) or to a specific threat to human life or national interests, is authorized to take the following actions on a temporary basis:

(A) Eliminate, consolidate, or relocate any office or port of entry of the Customs Service.

(B) Modify hours of service, alter services rendered at any location, or reduce the number of employees at any location.

(C) Take any other action that may be necessary to respond directly to the national emergency or specific threat.

(2) Notwithstanding any other provision of law, the Commissioner of U.S. Customs and Border Protection, when necessary to respond to a specific threat to human life or national interests, is authorized to close temporarily any Customs office or port of entry or take any other lesser action that may be necessary to respond to the specific threat.

(3) The Secretary of the Treasury or the Commissioner of U.S. Customs and Border Protection, as the case may be, shall notify the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate not later than 72 hours after taking any action under paragraph (1) or (2).

(June 17, 1930, ch. 497, title III, § 318, 46 Stat. 696; Pub. L. 107–210, div. A, title III, § 342, Aug. 6, 2002, 116 Stat. 981; Pub. L. 114–125, title VIII, § 802(d)(2), Feb. 24, 2016, 130 Stat. 210.)

### EDITORIAL NOTES

#### REFERENCES IN TEXT

The National Emergencies Act, referred to in subsec. (b)(1), is Pub. L. 94–412, Sept. 14, 1976, 90 Stat. 1255, which is classified principally to chapter 34 (§ 1601 et seq.) of Title 50, War and National Defense. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 50 and Tables.

#### PRIOR PROVISIONS

Provisions similar to those in subsec. (a) of this section were contained in act Sept. 21, 1922, ch. 356, title IV, § 622, 42 Stat. 988, which was superseded by section 318 of the Tariff Act of 1930, comprising this section, and repealed by section 651(a)(1) of said 1930 Act.

#### AMENDMENTS

2002—Pub. L. 107–210 designated existing provisions as subsec. (a) and added subsec. (b).

### Statutory Notes and Related Subsidiaries

#### CHANGE OF NAME

''Commissioner of U.S. Customs and Border Protection'' substituted for ''Commissioner of Customs'' in subsec. (b)(2) and (3) on authority of section 802(d)(2) of Pub. L. 114–125, set out as a note under section 211 of Title 6, Domestic Security.

#### EFFECTIVE DATE OF 2002 AMENDMENT

Amendment by Pub. L. 107–210 applicable to petitions for certification filed under part 2 or 3 of subchapter II

i

of chapter 12 of this title on or after the date that is 90 days after Aug. 6, 2002, except as otherwise provided, see section 151 of Pub. L. 107–210, set out as a note preceding section 2271 of this title.

#### TRANSFER OF FUNCTIONS

For transfer of functions, personnel, assets, and liabilities of the United States Customs Service of the Department of the Treasury, including functions of the Secretary of the Treasury relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 203(1), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6. For establishment of U.S. Customs and Border Protection in the Department of Homeland Security, treated as if included in Pub. L. 107–296 as of Nov. 25, 2002, see section 211 of Title 6, as amended generally by Pub. L. 114–125, and section 802(b) of Pub. L. 114–125, set out as a note under section 211 of Title 6.

### Executive Documents

#### TRANSFER OF FUNCTIONS

Functions of Secretary of the Treasury under this section with respect to functions transferred to Secretary of Commerce in sections 1303 and 1671 et seq. of this title by section 5(a)(1)(C) of Reorg. Plan No. 3 of 1979 transferred to Secretary of Commerce pursuant to Reorg. Plan No. 3 of 1979, §5(a)(1)(E), 44 F.R. 69275, 93 Stat. 1381, eff. Jan. 2, 1980, as provided by section 1–107(a) of Ex. Ord. No. 12188, Jan. 2, 1980, 45 F.R. 993, set out as notes under section 2171 of this title, to be exercised in consultation with Secretary of the Treasury.

#### PROC. NO. 2948. MERCHANDISE IN GENERAL-ORDER AND BONDED WAREHOUSES

Proc. No. 2948, Oct. 12, 1951, 16 F.R. 10589, 65 Stat. c41, provided:

##### [Whereas clauses omitted]

NOW, THEREFORE, I, HARRY S. TRUMAN, President of the United States of America, acting under and by virtue of the authority vested in me by the foregoing provision of section 318 of the Tariff Act of 1930 [this section] do hereby authorize the Secretary of the Treasury, until the termination of the national emergency proclaimed on December 16, 1950, or until it shall be determined by the President and declared by his proclamation that such action is no longer necessary, whichever is earlier:

(1) To extend the one-year period prescribed in section 491, *supra*, as amended [section 1491 of this title], for not more than one year from and after the expiration of such one-year period in any case in which such period has already expired or shall hereafter expire during the continuance of the said national emergency;

(2) To extend the three-year period prescribed in sections 557 and 559, *supra*, as amended [sections 1557 and 1559 of this title], for not more than one year from and after the expiration of such three-year period in any case in which such period has already expired or shall hereafter expire during the continuance of the said national emergency; and

(3) To extend further the one-year period prescribed in section 491, *supra*, as amended [section 1491 of this title], and the three-year period prescribed in sections 557 and 559, *supra*, as amended [sections 1557 and 1559 of this title], for additional periods of not more than one year each from and after the expiration of the immediately preceding extension in any case in which such extension shall expire during the continuance of the said national emergency:

*Provided, however*, that in each and every case under numbered paragraphs (1), (2), and (3) above in which the merchandise is charged against an entry bond the Secretary of the Treasury shall require that the principal on such bond, in order to obtain the benefit of any ex-

tension which may be granted under the authority of this proclamation, shall furnish to the collector of customs at the port where the bond is on file either the agreement of the sureties on the bond to remain bound under the terms and conditions of the bond to the same extent as if no extension had been granted, or an additional bond with acceptable sureties to cover the period of extension; and that, in each and every case in which the merchandise remains charged against a carrier's bond the Secretary of the Treasury shall require that the principal on such bond shall agree to the extension and shall furnish to the collector of customs at the port where the charge was made the agreement of the sureties on the bond to remain bound under the terms and conditions of the bond to the same extent as if no extension had been granted; and

*Provided further*, that as a condition to the granting of any extension or further extension of the periods prescribed in sections 491, 557, and 559 of the Tariff Act of 1930, *supra*, as amended [sections 1491, 1557 and 1559 of this title], under numbered paragraphs (1), (2), or (3) above the Secretary of the Treasury may require that there shall be furnished to the collector of customs in the district in which the warehouse is located, in connection with the application for such extension, the consent of the warehouse proprietor to such extension or, in the alternative, proof of payment of all charges or amounts due or owing to such warehouse proprietor for the storage or handling of the imported merchandise; and

*Provided further*, that the extensions of one year authorized by this proclamation shall not apply to any case in which the period sought to be extended expired prior to December 16, 1950, or in which the merchandise in question has been sold by the Government as abandoned.

This proclamation supersedes Proclamation No. 2599 of November 4, 1943, as amended by Proclamation No. 2712 of December 3, 1946, but it shall not be construed (1) as invalidating any action heretofore taken under the provisions of the said Proclamation No. 2599 or under the provisions of that proclamation as amended by the said Proclamation No. 2712, or (2) as imposing the conditions set forth in the second proviso above upon the granting of extensions for which applications are pending on the date of this proclamation.

HARRY S TRUMAN.

#### EX. ORD. NO. 13916. NATIONAL EMERGENCY AUTHORITY TO TEMPORARILY EXTEND DEADLINES FOR CERTAIN ESTIMATED PAYMENTS

Ex. Ord. No. 13916, Apr. 18, 2020, 85 F.R. 22951, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the National Emergencies Act (50 U.S.C. 1601 et seq.), and in furtherance of Proclamation 9994 of March 13, 2020 (Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak) [50 U.S.C. 1621 note], which declared a national emergency by reason of the threat that the novel (new) coronavirus known as SARS–CoV–2 poses to our Nation's healthcare systems, I hereby order as follows:

SECTION 1. *Emergency Authority.* (a) To provide additional authority to the Secretary of the Treasury (Secretary) to respond to the national emergency declared by Proclamation 9994, the authority at section 1318(a) of title 19, United States Code, to extend during the continuance of such emergency the time prescribed therein for the performance of any act is invoked and made available, according to its terms, to the Secretary.

(b) The Secretary shall consider taking appropriate action under section 1318(a) of title 19, United States Code, to temporarily extend deadlines, for importers suffering significant financial hardship because of COVID–19, for the estimated payments described therein, other than those assessed pursuant to sections 1671, 1673, 1862, 2251, and 2411 of title 19, United States Code.

(c) The Secretary shall consult with the Secretary of Homeland Security or his designee before exercising, as invoked and made available under this order, any of the authority set forth in section 1318(a) of title 19, United States Code.

SEC. 2. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP.

### § 1319. Duty on coffee imported into Puerto Rico

The Legislature of Puerto Rico is empowered to impose tariff duties upon coffee imported into Puerto Rico, including coffee grown in a foreign country coming into Puerto Rico from the United States. Such duties shall be collected and accounted for as now provided by law in the case of duties collected in Puerto Rico.

(June 17, 1930, ch. 497, title III, §319, 46 Stat. 696; May 17, 1932, ch. 190, 47 Stat. 158.)

#### Statutory Notes and Related Subsidiaries

CHANGE OF NAME

''Puerto Rico'' substituted in text for ''Porto Rico'' pursuant to act May 17, 1932, which is classified to section 731a of Title 48, Territories and Insular Possessions.

ACTIONS UNDER CARIBBEAN BASIN ECONOMIC RECOVERY PROGRAM NOT TO AFFECT PUERTO RICAN DUTIES ON IMPORTED COFFEE

Pub. L. 98–67, title II, §214(e), Aug. 5, 1983, 97 Stat. 393, provided that: ''No action pursuant to this title [19 U.S.C. 2701 et seq.] may affect any tariff duty imposed by the Legislature of Puerto Rico pursuant to section 319 of the Tariff Act of 1930 (19 U.S.C. 1319) on coffee imported into Puerto Rico.''

### § 1319a. Duty on coffee; ratification of duties imposed by Legislature of Puerto Rico

The taxes and duties imposed by the Legislature of Puerto Rico by Joint Resolution Numbered 59 approved by the Governor of Puerto Rico May 5, 1930, and by Act Numbered 77 approved by the Governor of Puerto Rico May 5, 1931, as amended by Act Numbered 7 approved by the Governor April 9, 1934, including therein such taxes and duties on coffee brought into Puerto Rico from any State or Territory or district or possession of the United States, or other place subject to the jurisdiction of the United States, are legalized and ratified, and the collection of all such taxes and duties made under or by authority of either of said acts of the Puerto Rican Legislature, including such taxes and duties on coffee brought into Puerto Rico from any State, Territory, district, or possession of the United States, or other place subject to the jurisdiction of the United States, is legalized, ratified, and confirmed as fully to all intents and

purposes as if the same had, by prior Act of Congress, been specifically authorized and directed.

(June 18, 1934, ch. 604, 48 Stat. 1017; Aug. 20, 1935, ch. 578, 49 Stat. 665.)

#### Editorial Notes

CODIFICATION

Section was not enacted as part of Tariff Act of 1930 which constitutes this chapter.

AMENDMENTS

1935—Act Aug. 20, 1935, amended section generally.

### § 1320. Repealed. Aug. 8, 1953, ch. 397, § 6(b), 67 Stat. 510

Section, act June 17, 1930, ch. 497, title III, §320, 46 Stat. 696, related to reciprocal agreements covering advertising matter.

#### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF REPEAL; SAVINGS PROVISION

Repeal effective on and after thirtieth day following Aug. 8, 1953, and savings provision, see notes set out under section 1304 of this title.

### § 1321. Administrative exemptions

### (a) Disregard of minor discrepancies in collection of taxes and duties; admission of articles free of duty or tax; limit on amount of exemption

The Secretary of the Treasury, in order to avoid expense and inconvenience to the Government disproportionate to the amount of revenue that would otherwise be collected, is authorized, under such regulations as he shall prescribe, to—

(1) disregard a difference of an amount specified by the Secretary by regulation, but not less than $20, between the total estimated duties, fees, and taxes deposited, or the total duties, fees, and taxes tentatively assessed, with respect to any entry of merchandise and the total amount of duties, fees, taxes, and interest actually accruing thereon;

(2) admit articles free of duty and of any tax imposed on or by reason of importation, but the aggregate fair retail value in the country of shipment of articles imported by one person on one day and exempted from the payment of duty shall not exceed an amount specified by the Secretary by regulation, but not less than—

(A) $100 in the case of articles sent as bona fide gifts from persons in foreign countries to persons in the United States ($200 in the case of articles sent as bona fide gifts from persons in the Virgin Islands, Guam, and American Samoa), or

(B) $200 in the case of articles accompanying, and for the personal or household use of, persons arriving in the United States who are not entitled to any exemption from duty under subheading 9804.00.30, 9804.00.65, or 9804.00.70 of title I of this Act,[1] or

(C) $800 in any other case.

The privilege of this subdivision (2) shall not be granted in any case in which merchandise

---

[1] See References in Text note below.

(e) *Correcting submitted license information.* Users will need to correct licenses themselves if they determine that there was an error submitted. To access a previously issued license, a user must log on with his username and identify the license number and the volume (quantity in kilograms) for the first product shown on the license. The information on the license should match the information presented in the entry summary data as closely as possible. This includes the value and quantity of the shipment, the expected date of importation, and the Customs port of entry.

(f) *Low-value licenses.* There is one exception to the requirement for obtaining a unique license for each Customs entry. If the total value of the covered aluminum portion of an entry is less than $5,000, applicants may apply to Commerce for a low-value license that can be used in lieu of a single-entry license for low-value entries.

[85 FR 83814, Dec. 23, 2020, as amended at 86 FR 27518, May 21, 2021]

### § 361.104 Aluminum import monitoring.

(a) Commerce will maintain an import monitoring system on the public AIM system website that will report certain aggregate information on imports of aluminum products obtained from the aluminum licenses and, where available, from publicly available U.S. import statistics. Aggregate data will be reported, as appropriate, on a monthly basis by country of origin, country of smelt, country of last cast, relevant aluminum product grouping, etc., and will include import quantity (metric tons), import Customs value (U.S. $), and average unit value ($/metric ton). The website will also contain certain aggregate data at the 6-digit Harmonized Tariff Schedule level and will also present a range of historical data for comparison purposes. Provision of aggregate data on the website may be revisited should concerns arise over the possible release of proprietary data.

(b) Reported monthly import data will be refreshed each week, as appropriate, with new data on licenses issued during the previous week. This data will also be adjusted periodically for cancelled or unused aluminum import licenses, as appropriate. Additionally, outdated license data will be replaced, where available, with publicly available U.S. import statistics.

### § 361.105 [Reserved]

### § 361.106 Fees.

No fees will be charged for obtaining a username, issuing an aluminum import license or accessing the aluminum import monitoring system.

### § 361.107 Hours of operation.

The automatic licensing system will generally be accessible 24 hours a day, 7 days a week but may be unavailable at selected times for server maintenance. If the system is unavailable for an extended period of time, parties will be able to obtain licenses from Commerce directly via email (*aluminum.license@trade.gov*) during regular business hours. Should the system be inaccessible for an extended period of time, Commerce would advise CBP to consider this as part of mitigation on any liquidated damage claims that may be issued.

### § 361.108 Loss of electronic licensing privileges.

Should Commerce determine that a filer consistently files inaccurate licensing information or otherwise abuses the licensing system, Commerce may revoke its electronic licensing privileges without prior notice. The filer will then only be able to obtain a license directly from Commerce. Because of the additional time needed to review such forms, Commerce may require up to 10 working days to process such forms. Delays in filing caused by the removal of a filer's electronic filing privilege will not be considered a mitigating factor by CBP.

## PART 362—PROCEDURES COVERING SUSPENSION OF LIQUIDATION, DUTIES AND ESTIMATED DUTIES IN ACCORD WITH PRESIDENTIAL PROCLAMATION 10414

Sec.
362.101 Scope.
362.102 Definitions.

417

362.103 Actions being taken pursuant to Presidential Proclamation 10414 and Section 318(a) of the Act.
362.104 Certifications.

AUTHORITY: 19 U.S.C. 1318; Proc. 10414, 87 FR 35067.

SOURCE: 87 FR 56866, Sept. 16, 2022, unless otherwise noted.

§ 362.101 Scope.

This part sets forth the actions the Secretary is taking to respond to the emergency declared in Presidential Proclamation 10414.

§ 362.102 Definitions.

For purposes of this part:

*Act* means the Tariff Act of 1930, as amended (19 U.S.C. 1202 *et seq.*).

*Applicable Entries* means the entries of Southeast Asian-Completed Cells and Modules that are entered into the United States, or withdrawn from warehouse, for consumption before the Date of Termination and, for entries that enter after November 15, 2022, are used in the United States by the Utilization Expiration Date.

*CBP* means U.S. Customs and Border Protection of the United States Department of Homeland Security.

*Certain Solar Orders* means Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order; and Certain Crystalline Silicon Photovoltaic Products from Taiwan: Antidumping Duty Order.

*Date of Termination* means June 6, 2024, or the date the emergency described in Presidential Proclamation 10414 has been terminated, whichever occurs first.

*Secretary* means the Secretary of Commerce or a designee.

*Solar Circumvention Inquiries* means some or all of the inquiries at issue in Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Circumvention In-

quiry on the Antidumping Duty and Countervailing Duty Orders.

*Southeast Asian-Completed Cells and Modules* means crystalline silicon photovoltaic cells, whether or not assembled into modules (solar cells and modules), which are completed in the Kingdom of Cambodia, Malaysia, the Kingdom of Thailand, or the Socialist Republic of Vietnam using parts and components manufactured in the People's Republic of China, and subsequently exported from Cambodia, Malaysia, Thailand or Vietnam to the United States. These are cells and modules subject to the Solar Circumvention Inquiries. Southeast Asian-Completed Cells and Modules does not mean solar cells and modules that, on June 6, 2022, the date Proclamation 10414 was signed, were already subject to Certain Solar Orders.

*Utilization* and *utilized* means the Southeast Asian-Completed Cells and Modules will be used or installed in the United States. Merchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions.

*Utilization Expiration Date* means the date 180 days after the Date of Termination.

§ 362.103 Actions being taken pursuant to Presidential Proclamation 10414 and Section 318(a) of the Act.

(a) *Importation of applicable entries free of duties and estimated duties.* The Secretary will permit the importation of Applicable Entries free of the collection of antidumping and countervailing duties and estimated duties under sections 701, 731, 751 and 781 of the Act until the Date of Termination. Part 358 of this chapter shall not apply to these imports.

(b) *Suspension of liquidation and collection of cash deposits.* (1) To facilitate the importation of certain Southeast Asian-Completed Cells and Modules without regard to estimated antidumping and countervailing duties, notwithstanding § 351.226(l) of this chapter, the Secretary shall do the following with respect to estimated duties:

418

(i) The Secretary shall instruct CBP to discontinue the suspension of liquidation of entries and collection of cash deposits for any Southeast Asian-Completed Cells and Modules that were suspended pursuant to § 351.226(l) of this chapter. If at the time instructions are conveyed to CBP the entries at issue are suspended and cash deposits collected only on the basis of the circumvention inquiries, then the Secretary will direct CBP to liquidate the entries without regard to antidumping and countervailing duties and to refund cash deposits collected on that basis.

(ii) In the event of an affirmative preliminary or final determination of circumvention in the Solar Circumvention Inquiries before the Date of Termination, the Secretary will not, at that time, direct CBP to suspend liquidation of Applicable Entries and collect cash deposits of estimated duties on those Applicable Entries.

(iii) In the event of an affirmative preliminary or final determination of circumvention in the Solar Circumvention Inquiries, the Secretary will direct CBP to suspend liquidation of entries of, and collect cash deposits of estimated duties on, imports of Southeast Asian-Completed Cells and Modules that are not Applicable Entries.

(2) In the event that the Secretary makes an affirmative preliminary or final determination of circumvention in the Solar Circumvention Inquiries, as applicable, and the emergency described in Presidential Proclamation 10414 is terminated before June 6, 2024, notwithstanding § 351.226(l) of this chapter, upon notification of the termination of the emergency the Secretary will thereafter issue instructions to CBP informing it of the Date of Termination and directing it to begin suspension of liquidation and require a cash deposit of estimated antidumping and countervailing duties, at the applicable rate for each unliquidated entry of Southeast Asian-Completed Cells and Modules that is entered, or withdrawn from warehouse, for consumption on or after an appropriate date that is on or after the Date of Termination. For purposes of this paragraph, Applicable Entries may also include certain entries of Southeast Asian-Completed Cells and Modules that are entered on or after the Date of Termination, as appropriate.

(3) In the event that the Secretary makes an affirmative preliminary or final determination of circumvention in the Solar Circumvention Inquiries, as applicable, and the Date of Termination is June 6, 2024, notwithstanding § 351.226(l) of this chapter, the Secretary will issue instructions to CBP informing it that the Date of Termination is June 6, 2024, and will direct CBP to begin suspension of liquidation and require a cash deposit of estimated antidumping and countervailing duties, at the applicable rate, for each unliquidated entry of Southeast Asian-Completed Cells and Modules that is entered, or withdrawn from warehouse, for consumption on or after the Date of Termination.

(c) *Waiver of assessment of duties.* In the event the Secretary issues an affirmative final determination of circumvention in the Solar Circumvention Inquiries and thereafter, in accordance with other segments of the proceedings, pursuant to section 751 of the Act and § 351.212(b) of this chapter, issues liquidation instructions to CBP, the Secretary will direct CBP to liquidate Applicable Entries without regard to antidumping and countervailing duties that would otherwise apply pursuant to an affirmative final determination of circumvention.

### § 362.104 Certifications.

Nothing in this section shall preclude the Secretary from requiring certifications for Southeast Asian-Completed Cells and Modules pursuant to § 351.228 of this chapter in the event of an affirmative preliminary or final determination in the Solar Circumvention Inquiries.

### PARTS 363–399 [RESERVED]



**Federal Register**

Vol. 87, No. 111

Thursday, June 9, 2022

## Presidential Documents

Title 3—

The President

Proclamation 10414 of June 6, 2022

## Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules From Southeast Asia

**By the President of the United States of America**

**A Proclamation**

Electricity is an essential part of modern life that powers homes, business, and industry. It is critical to the function of major sectors of the economy, including hospitals, schools, public transportation systems, and the defense industrial base. Even isolated interruptions in electric service can have catastrophic health and economic consequences. A robust and reliable electric power system is therefore not only a basic human necessity, but is also critical to national security and national defense.

Multiple factors are threatening the ability of the United States to provide sufficient electricity generation to serve expected customer demand. These factors include disruptions to energy markets caused by Russia's invasion of Ukraine and extreme weather events exacerbated by climate change. For example, in parts of the country, drought conditions coupled with heatwaves are simultaneously causing projected electricity supply shortfalls and record electricity demand. As a result, the Federal Energy Regulatory Commission and the North American Electric Reliability Corporation have both warned of near-term electricity reliability concerns in their recent summer reliability assessments.

In order to ensure electric resource adequacy, utilities and grid operators must engage in advance planning to build new capacity now to serve expected customer demand. Solar energy is among the fastest growing sources of new electric generation in the United States. Utilities and grid operators are increasingly relying on new solar installations to ensure that there are sufficient resources on the grid to maintain reliable service. Additions of solar capacity and batteries were expected to account for over half of new electric sector capacity in 2022 and 2023. The unavailability of solar cells and modules jeopardizes those planned additions, which in turn threatens the availability of sufficient electricity generation capacity to serve expected customer demand. Electricity produced through solar energy is also critical to reducing our dependence on electricity produced by the burning of fossil fuels, which drives climate change. The Department of Defense has recognized climate change as a threat to our national security.

In recent years, the vast majority of solar modules installed in the United States were imported, with those from Southeast Asia making up approximately three-quarters of imported modules in 2020. Recently, however, the United States has been unable to import solar modules in sufficient quantities to ensure solar capacity additions necessary to achieve our climate and clean energy goals, ensure electricity grid resource adequacy, and help combat rising energy prices. This acute shortage of solar modules and module components has abruptly put at risk near-term solar capacity additions that could otherwise have the potential to help ensure the sufficiency of electricity generation to meet customer demand. Roughly half of the domestic deploy-

ment of solar modules that had been anticipated over the next year is currently in jeopardy as a result of insufficient supply. Across the country, solar projects are being postponed or canceled.

The Federal Government is working with the private sector to promote the expansion of domestic solar manufacturing capacity, including our capacity to manufacture modules and other inputs in the solar supply chain, but building that capacity will take time. Immediate action is needed to ensure in the interim that the United States has access to a sufficient supply of solar modules to assist in meeting our electricity generation needs.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including by section 318(a) of the Tariff Act of 1930, as amended, 19 U.S.C. 1318(a), do hereby declare an emergency to exist with respect to the threats to the availability of sufficient electricity generation capacity to meet expected customer demand. Pursuant to this declaration, I hereby direct as follows:

**Section 1**. *Emergency Authority.* (a) To provide additional authority to the Secretary of Commerce (Secretary) to respond to the emergency herein declared, the authority under section 1318(a) of title 19, United States Code, is invoked and made available, according to its terms, to the Secretary.

(b) To provide relief from the emergency, the Secretary shall consider taking appropriate action under section 1318(a) of title 19, United States Code, to permit, until 24 months after the date of this proclamation or until the emergency declared herein has terminated, whichever occurs first, under such regulations and under such conditions as the Secretary may prescribe, the importation, free of the collection of duties and estimated duties, if applicable, under sections 1671, 1673, 1675, and 1677j of title 19, United States Code, of certain solar cells and modules, exported from the Kingdom of Cambodia, Malaysia, the Kingdom of Thailand, and the Socialist Republic of Vietnam, and that are not already subject to an antidumping or countervailing duty order as of the date of this proclamation, and to temporarily extend during the course of the emergency the time therein prescribed for the performance of any act related to such imports.

(c) The Secretary shall consult with the Secretary of the Treasury and the Secretary of Homeland Security, or their designees, before exercising, as invoked and made available under this proclamation, any of the authorities set forth in section 1318(a) of title 19, United States Code.

**Sec. 2.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this sixth day of June, in the year of our Lord two thousand twenty-two, and of the Independence of the United States of America the two hundred and forty-sixth.

[FR Doc. 2022–12578
Filed 6–8–22; 8:45 am]
Billing code 3395–F2–P

# ADDENDUM
(Pursuant to Fed. Cir. R. 28(c))

Slip Op. 24-58

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AUXIN SOLAR, INC., AND CONCEPT CLEAN ENERGY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES; UNITED STATES DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, SECRETARY OF COMMERCE; UNITED STATES CUSTOMS AND BORDER PROTECTION; AND TROY A. MILLER, UNITED STATES CUSTOMS AND BORDER PROTECTION ACTING COMMISSIONER, <br><br> Defendants. | Before: Timothy M. Reif, Judge <br><br> Court No. 23-00274 |

## OPINION AND ORDER

[Denying Defendants' Motion to Dismiss, granting the Joint Stipulation of Plaintiffs and Defendants, granting Proposed Defendant-Intervenors' Motions to Intervene and granting the Supplemental Protective Order of Defendant-Intervenors.]

Dated: May 9, 2024

Thomas M. Beline, Chase J. Dunn, James E. Ransdell, IV, Roop K. Bhatti, Sydney C. Reed, Cassidy Levy Kent (USA) LLP, of Washington D.C., for Plaintiffs Auxin Solar, Inc. and Concept Clean Energy, Inc.

Douglas G. Edelschick, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for the Defendants. With him on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director. Of counsel on the brief were Spencer Neff, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington D.C., and Emma L. Tiner, Attorney, Office of the Assistant Chief Counsel, U.S. Customs and Border Protection, of Washington D.C.

Appx28

Jeffrey S. Grimson, Bryan P. Cenko, Clemence D. Kim, Evan P. Drake, Kristin H. Mowry, Mowry & Grimson, PLLC, of Washington, D.C., for Defendant-Intervenors American Clean Power Association, JA Solar USA, Inc., JA Solar Vietnam Co. Ltd., JA Solar Malaysia Sdn. Bhd. and JA Solar International Limited.

Jonathan T. Stoel, Michael G. Jacobson, Nicholas R. Sparks, Lindsay K. Brown, Hogan Lovells US LLP, of Washington D.C., for Defendant-Intervenors Canadian Solar (USA) Inc. and Canadian Solar International Limited.

Matthew R. Nicely, Daniel M. Witkowski, James E. Tysse, Julia K. Eppard, Sydney L. Stringer, Yujin K. McNamara, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington, D.C., for Defendant-Intervenors Solar Energy Industries Association and NextEra Energy, Inc.

Craig A. Lewis, Nicholas W. Laneville, I, Gregory M.A. Hawkins, Hogan Lovells US LLP, of Washington D.C., for Defendant-Intervenors BYD (H.K.) Co., Ltd. and BYD America LLC.

John B. Brew, Alexander H. Schaefer, Amanda S. Berman, Robert L. LaFrankie, II, Weronika Bukowski, Crowell & Moring, LLP, of Washington D.C., for Defendant-Intervenors Invenergy Renewables LLC and Invenergy Solar Equipment Management LLC.

Jonathan M. Freed, Doris Di, Kenneth N. Hammer, MacKensie R. Sugama, Robert G. Gosselink, Trade Pacific PLLC, of Washington, D.C., for Defendant-Intervenors Trina Solar (U.S.) Inc., Trina Solar (Vietnam) Science & Technology Co., Ltd., Trina Solar Energy Development Company Limited, Trina Solar Science & Technology (Thailand) Ltd.

Gregory S. Menegaz, Alexandra H. Salzman, James K. Horgan, Vivien J. Wang, deKieffer & Horgan, PLLC, of Washington, D.C., for Defendant-Intervenor Risen Solar Technology Sdn. Bhd.

* * *

Reif, Judge:  Before the court are: (1) the motions to dismiss under U.S. Court of International Trade ("USCIT" or the "Court") Rule 12(b)(1) of defendants the United States ("the government"), U.S. Department of Commerce ("Commerce"), Secretary of Commerce Gina M. Raimondo, U.S. Customs and Border Protection ("Customs") and

Court No. 23-00274                                                           Page 3

Acting Customs Commissioner Troy A. Miller (collectively, "defendants"); (2) the

motions to intervene of nine proposed defendant-intervenors[1] under Rule 24; (3) a

supplemental protective order filed by proposed defendant-intervenors; and (4) the Joint

Stipulation in lieu of preliminary injunction proposed by plaintiffs, Auxin Solar Inc.

("Auxin Solar") and Concept Clean Energy, Inc. ("CCE") (together, "plaintiffs"), and

defendants.  Plaintiffs invoke the Court's subject matter jurisdiction under 28 U.S.C. §

1581(i)(1)(B) and (D).[2]  *See* Compl. (Dec. 29, 2023), ECF No. 2.  Plaintiffs state that

their cause of action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §

706(2), and they seek relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §

---

[1] Proposed defendant-intervenors include the American Clean Energy Power Association ("ACP"); the Solar Energy Industries Association ("SEIA"); Canadian Solar (USA) Inc. and Canadian Solar International Limited (collectively, "Canadian Solar"); JA Solar USA, Inc., JA Solar Vietnam Company Limited, JA Solar Malaysia Sdn. Bhd., and JA Solar International Limited (collectively, "JA Solar"); NextEra Energy, Inc. ("NextEra"); BYD (H.K.) Co., Ltd. ("BYD HK") and BYD America LLC ("BYD America") (collectively, "BYD"); Invenergy Renewables LLC and its affiliates, including Invenergy Solar Equipment Management LLC (collectively, "Invenergy"); Trina Solar (U.S.), Inc. ("TUS"), Trina Solar Science & Technology (Thailand) Ltd. ("TTL"), Trina Solar Energy Development Company Limited ("TEDC"), and Trina Solar (Vietnam) Science & Technology Co., Ltd. ("TVN") (collectively, "Trina"); and Risen Solar Technology Sdn. Bhd. ("Risen").  *See* ACP Mot. to Intervene (Jan. 26, 2024) ("ACP Br."), ECF No. 21; SEIA Mot. to Intervene (Jan. 26, 2024) ("SEIA Br."), ECF No. 24; Canadian Solar Mot. to Intervene (Jan. 26, 2024) ("Canadian Br."), ECF No. 25; JA Solar Mot. to Intervene (Jan. 26, 2024) ("JA Solar Br."), ECF No. 28; NextEra Mot. to Intervene (Jan. 26, 2024) ("NextEra Br."), ECF No. 29; BYD Mot. to Intervene (Jan. 26, 2024) ("BYD Br."), ECF No. 35; Invenergy Mot. to Intervene (Jan. 29, 2024) ("Invenergy Br."), ECF No. 44; Trina Mot. to Intervene (Jan. 29, 2024) ("Trina Br."), ECF No. 45-1; Risen Mot. to Intervene (Jan. 31, 2024) ("Risen Br."), ECF No. 50 (together collectively, "proposed defendant-intervenors").

[2] Further references to the U.S. Code are to the 2018 edition.

2201(a), alleging that defendants failed to collect antidumping and countervailing duty cash deposits and failed to suspend liquidation on products circumventing the antidumping and countervailing duty orders concerning CSPV cells and modules from China.  *See id* ¶¶ 19, 100, 116.  Defendants filed a motion to dismiss for lack of subject matter jurisdiction, arguing that plaintiffs' invocation of residual jurisdiction pursuant to 28 U.S.C. § 1581(i) is not available because jurisdiction is, or could have been, available under 28 U.S.C. § 1581(c).  Defs.' Mot. to Dismiss, ECF No. 16 ("Defs. Mot. Dismiss"); Defs.' Reply Supp. Mot. Dismiss ("Defs. Reply Mot. Dismiss"), ECF No. 69. Plaintiffs and defendants filed a Joint Stipulation in Lieu of plaintiffs' Preliminary Injunction, stipulating to the Court's authority to grant reliquidation as a form of relief. Joint Stipulation in Lieu of Prelim. Inj. ("Joint Stipulation"), ECF No. 19.

Nine proposed defendant-intervenors filed motions to intervene in the instant action, arguing that they are importers who would be liable for the duties, which have been suspended pursuant to the rule suspending liquidation and collection of tariffs and duties issued by Commerce.  *See supra* note 1.  For the following reasons, the court denies defendants' motion to dismiss, and grants the joint stipulation of plaintiffs and defendants, the motions to intervene of proposed defendant-intervenors and the protective order filed by proposed defendant-intervenors.

Court No. 23-00274                                                                      Page 5

## BACKGROUND[3]

### I.    Factual background

On January 17, 2024, plaintiffs filed a complaint before the Court challenging the rulemaking, determinations and instructions issued by Commerce concerning the preliminary and final determinations in the circumvention inquiries covering Crystalline Silicon Photovoltaic ("CSPV") cells whether or not assembled into modules ("cells") imported from Cambodia, Malaysia, Thailand and Vietnam using parts and components from the People's Republic of China ("China").  *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord with Presidential Proclamation 10414* ("*Duty Suspension Rule*"), 87 Fed. Reg. 56,868 (Dep't of Commerce Sept. 16, 2022);[4] Compl. ¶¶ 51-55, 65-71.

---

[3] Certain facts addressed in this section are taken from the Complaint.  Such facts constitute allegations at this stage of this matter notwithstanding that defendants and proposed defendant-intervenors admit certain of these facts in their proposed motions to dismiss.  Nothing in this Opinion and Order shall be construed as the court accepting plaintiff's factual allegations as true or making any finding of fact where such facts are or may be disputed.  *See, e.g., GreenFirst Forest Prods. v. United States*, 46 CIT __, __, 577 F. Supp. 3d 1349, 1351 n.3 (2022).

[4] Specifically, the *Duty Suspension Rule* provides the procedures governing the suspension of liquidation and estimated duties in accordance with Presidential Proclamation 10414:

Commerce shall instruct U.S. Customs and Border Protection [Customs] to discontinue the suspension of liquidation and collection of cash deposits for any SA-Completed Cells and Modules that were suspended, in connection with initiation of the circumvention inquiries, pursuant to § 351.226(l)(1).  If, at the time Commerce issues instructions to [Customs], the entries are suspended only for purposes of the circumvention inquiries, Commerce will direct [Customs] to liquidate those entries without regard to AD/CVD duties

Since 2012, Commerce has applied antidumping and countervailing duty orders covering CSPV cells and modules from China.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic*

_____

and refund those cash deposits collected pursuant to the circumvention inquiries.

*Duty Suspension Rule,* 87 Fed. Reg. at 56,868.  The *Duty Suspension Rule* went into effect on November 15, 2022, as described *infra* n.6.

19 C.F.R. § 362.103 specifies procedural aspects related to liquidation:

> (a) *Importation of applicable entries free of duties and estimated duties.*  The Secretary will permit the importation of Applicable Entries free of the collection of antidumping and countervailing duties and estimated duties under sections 701, 731, 751 and 781 of the Act until the Date of Termination.  Part 358 of this chapter shall not apply to these imports.
> (b) *Suspension of liquidation and collection of cash deposits.* (1) To facilitate the importation of certain Southeast Asian-Completed Cells and Modules without regard to estimated antidumping and countervailing duties, notwithstanding § 351.226(l) of this chapter, the Secretary shall do the following with respect to estimated duties:" (i) "The Secretary shall instruct CBP to discontinue the suspension of liquidation of entries and collection of cash deposits for any Southeast Asian-Completed Cells and Modules that were suspended;" and (ii) "the Secretary will not, at th{e} time {of an affirmative circumvention determination}, direct CBP to suspend liquidation of Applicable Entries and collect cash deposits of estimated duties on those Applicable Entries."
> (c) *Waiver of assessment of duties.* "In the event the Secretary issues an affirmative final determination of circumvention in the Solar Circumvention Inquiries and thereafter, in accordance with other segments of the proceedings, pursuant to section 751 of the Act and § 351.212(b) of this chapter, issues liquidation instructions to CBP, the Secretary will direct CBP to liquidate Applicable Entries without regard to antidumping and countervailing duties that would otherwise apply pursuant to an affirmative final determination of circumvention."

19 C.F.R. § 362.103.

Court No. 23-00274                                          Page 7

*of China: Amended Final Determination of Sales at Less Than Fair Value, and*

*Antidumping Duty Order*, 77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012);

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the*

*People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73,017 (Dep't of

Commerce Dec. 7, 2012).  On June 9, 2022, the president declared an emergency

pursuant to 19 U.S.C. § 1318(a)[5] with respect to threats to the availability of sufficient

electricity generation capacity to meet expected customer demand in the United States.

*Proclamation 10414: Declaration of Emergency and Authorization for Temporary*

*Extensions of Time and Duty-Free Importation of Solar Cells and Modules from*

*Southeast Asia* ("Proclamation 10414"), 87 Fed. Reg. 35,067, 35,068 (June 9, 2022).[6]

---

[5] Section 318 of the Tariff Act of 1930 delineates the trade measures that the president may adopt when a state of emergency exists:

> Whenever the President shall by proclamation declare an emergency to exist by reason of a state of war, or otherwise, he may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act, and may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work.  The Secretary of the Treasury shall report to the Congress any action taken under the provisions of this section.

19 U.S.C. § 1318(a).

[6] President Biden declared that an emergency existed due to the threat that there would be insufficient electricity generation capacity available to meet expected demand. Proclamation 10414.  The proclamation identified multiple factors — including Russia's invasion of Ukraine and extreme weather events exacerbated by climate change — that contributed to the declaration of a state of emergency concerning access to electricity and energy.  *Id*.

Court No. 23-00274                                                                          Page 8

Proclamation 10414 authorized Commerce to take action to permit CSPV cells into the

United States "free of the collection" of antidumping and countervailing duties ("AD/CV

duties").  *Id.*

On August 23, 2023, Commerce issued a final determination concluding that

CSPV cells and modules from Cambodia, Malaysia, Thailand, and Vietnam were

circumventing the AD/CV duty orders on CSPVs from China.  *Antidumping and*

*Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not*

*Assembled Into Modules, From the People's Republic of China: Final Scope*

*Determination and Final Affirmative Determinations of Circumvention With Respect to*

*Cambodia, Malaysia, Thailand, and Vietnam* ("*Final Determinations*")*,* 88 Fed. Reg.

57,419, 57,421-22 (Dep't of Commerce Aug. 23, 2023); *see Antidumping and*

*Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not*

*Assembled Into Modules, from the People's Republic of China: Preliminary Affirmative*

*Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and*

*Vietnam* ("*Preliminary Affirmative Determinations of Circumvention*")*,* 87 Fed. Reg.

75,221, 75,223-26 (Dep't of Commerce Dec. 8, 2022).  Commerce relied on the *Duty*

*Suspension Rule* to exempt from the collection and assessment of AD/CV duties all

"applicable entries"[7] that were certified to be utilized within 180 days after the expiration of the emergency period.  *See Final Determinations*, 88 Fed. Reg. at 57,419.

## II.    Procedural history

Plaintiffs declare unlawful the *Duty Suspension Rule* issued by Commerce along with Commerce's instructions to Customs to exempt CSPV cells from suspension of liquidation and cash deposit requirements, so long as the importers and exporters complied with Commerce's certification regime.  Plaintiffs argue further that Commerce's rulemaking was unlawful and request that the court order vacatur of the *Duty Suspension Rule,* or in the alternative, suspend and remand the *Duty Suspension Rule* for further proceedings and order Customs to suspend liquidation of entries of CSPV cells and collect cash deposits.  Compl. at 63.[8]  According to plaintiffs, the *Duty Suspension Rule* has "precipitated a lawless CSPV cell and module marketplace characterized by a massive and sustained wave of cheap CSPV cells and modules from

---

[7] "Applicable entries" are defined in the *Duty Suspension Rule* as "entries of Southeast Asian-Completed Cells and Modules that are entered into the United States, or withdrawn from warehouse, for consumption before the Date of Termination and, for entries that enter after November 15, 2022, are used in the United States by the Utilization Expiration Date."  19 C.F.R. § 362.102.  The "Utilization Expiration Date" means "180 days after the Date of Termination" on "June 6, 2024, or the date the emergency described in Presidential Proclamation 10414 has been terminated, whichever comes first."  *Id.*

[8] Specifically, plaintiffs ask the court to: (1) hold unlawful Commerce's *Duty Suspension Rule*; (2) vacate Commerce's *Duty Suspension Rule*; (3) direct Commerce to instruct Customs to suspend liquidation and collect cash deposits of AD/CV estimated duties on applicable entries; and (4) direct Customs to suspend liquidation and collect cash deposits of AD/CV estimated duties on applicable entries.  Compl. at 63.

Malaysia, Thailand, Vietnam, and Cambodia that are made from components originating in the People's Republic of China."  *Id.* ¶ 20.

On January 9, 2024, plaintiffs filed a motion for a preliminary injunction, requesting that the court order the suspension of liquidation of entries that would be subject to the Final Determinations.  Pls.' Public Mot. for Prelim. Inj., ECF No. 8; Pls.' Confidential Mot. for Prelim. Inj. (Jan. 17, 2024), ECF No. 15.  On January 22, 2024, defendants filed a motion to dismiss for lack of jurisdiction, stating that jurisdiction was available under 28 U.S.C. § 1581(c).  Defs. Mot. Dismiss.

On January 25, 2024, plaintiffs and defendants filed a Joint Stipulation in Lieu of plaintiffs' motion for a preliminary injunction.  *See* Joint Stipulation.

The court addresses first the threshold jurisdictional issue raised by defendants.  Defs. Mot. Dismiss; Pls.' Resp. Opp'n Mot. to Dismiss. ("Pls. Resp. Opp'n Mot. Dismiss"), ECF No. 55; Defs. Reply Mot. Dismiss; Mots. to Dismiss of Def.-Intervenors ("Mots. Dismiss of Def.-Ints."), ECF Nos. 32, 36, 39, 40, 41, 48, 49 53.  The court addresses next the joint stipulation.  Finally, the court addresses the motions to intervene filed by the nine proposed defendant-intervenors.  *See* ACP Br., SEIA Br., Canadian Br., JA Solar Br., NextEra Br., BYD Br., Invenergy Br., Trina Br., Risen Br.

On January 29, 2024, SEIA, NextEra and ACP filed a consent motion for a supplemental protective order to govern the information submitted by proposed defendant-intervenors in the instant action.  Mot. Supp. Protective Order ("Protective Order"), ECF No. 37.

On February 16, 2024, plaintiffs filed a consolidated response in opposition to the motions to intervene of proposed defendant-intervenors, arguing that they failed to meet the standing requirements, do not qualify for intervention of right and should not be permitted to intervene.  Pls.' Resp. Opp'n Intervention ("Pls. Resp. Opp'n"), ECF No. 56.

On February 26, 2024, BYD, Canadian Solar, JA Solar, Risen and Trina filed a joint reply to plaintiffs' response in opposition to their motions to intervene.  Prop. Def.-Intervenors' Consol. Reply ("Def.-Int. Reply I"), ECF No. 58.  Also on February 26, 2024, ACP, Invenergy, NexEra and SEIA filed a joint reply to plaintiffs' response in opposition to their motions to intervene.  Prop. Def.-Intervenors' Consol. Reply ("Def.-Int. Reply II"), ECF No. 59.

For the reasons set forth below, the court: (1) exercises jurisdiction under the Court's residual jurisdiction statute, 28 U.S.C. § 1581(i), and denies the motion to dismiss of defendants; (2) grants the motions to intervene of proposed defendant-intervenors; (3) grants the consent motion for a supplemental protective order governing the information of defendant-intervenors; and (4) grants plaintiffs' and defendants' Joint Stipulation in Lieu of plaintiffs' Preliminary Injunction.

**JURISDICTION AND STANDARD OF REVIEW**

Plaintiffs bring the action pursuant to 28 U.S.C. § 1581(i)(1)(B), which confers upon the Court exclusive jurisdiction over civil actions commenced against the United States, its agencies, or its officers arising out of any U.S. law providing for "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue."  28 U.S.C. § 1581(i)(1)(B).  In the alternative, plaintiffs state that the

Court has jurisdiction under 28 U.S.C. § 1581(i)(1)(D), which confers on this Court

jurisdiction over disputes arising under the "administration and enforcement with respect

to the matters referred to in subparagraphs (A) through (C) of this paragraph and

subsections (a)-(h) of this section." *Id*. § 1581(i)(1)(D).  Plaintiffs argue that: (1) this

action does not challenge Commerce's affirmative determinations that circumvention is

in fact occurring; (2) plaintiffs' cause of action does not lie under 19 U.S.C. § 1516a; and

(3) 28 U.S.C. § 1581(c)[9] does not provide an alternative jurisdictional basis for this

action.  Compl. ¶ 3.[10]

Section 1581(i) is the Court's "residual" jurisdictional provision.  *Fujitsu Gen. Am.,*

*Inc. v. United States*, 283 F.3d 1364, 1371 (Fed. Cir. 2002) (citing *Conoco, Inc. v.*

*United States Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1584 n.4 (Fed. Cir. 1994)), and

allows the Court to "take jurisdiction over designated causes of action founded on other

provisions of law."  *Norcal/Crosetti Foods, Inc. v. United States*, 963 F.2d 356, 359

(Fed. Cir. 1992) (citing *Nat'l Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1557 (Fed.

Cir. 1988)).  Defendants state that this Court lacks subject matter jurisdiction because

the instant action should have been brought under 28 U.S.C. § 1581(c).  Defs. Mot.

Dismiss at 2.

---

[9] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of
Title 19 of the U.S. Code, 2018 edition.

[10] Plaintiffs challenge the *Duty Suspension Rule* that Commerce applied in four recently
completed circumvention proceedings for which judicial review under 28 U.S.C. §
1581(c) currently is being sought.  The issue is whether the complaint should be
dismissed for lack of jurisdiction under 28 U.S.C. § 1581(i) because jurisdiction is, or
could have been, available under 28 U.S.C. § 1581(c).

Whether a court has subject matter jurisdiction to hear an action is a "threshold" inquiry. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* at 94 (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1869)); *accord Salmon Spawning & Recovery Alliance v. United States*, 33 CIT 515, 519, 626 F. Supp. 2d 1277, 1281 (2009) (citing *Ex parte McCardle*, 74 U.S. at 514). The party "seeking the exercise of jurisdiction . . . ha[s] the burden of establishing that jurisdiction exists." *Bush v. United States*, 717 F.3d 920, 924-25 (Fed. Cir. 2013) (citing *Keener v. United States*, 551 F.3d 1358, 1361 (Fed. Cir. 2009)).

"An inquiry into § 1581(i) jurisdiction thus primarily involves two questions. First, [the court] consider[s] whether jurisdiction under a subsection other than § 1581(i) was available. Second, if jurisdiction was available under a different subsection of § 1581, [the court] examine[s] whether the remedy provided under that subsection is 'manifestly inadequate.'" *Erwin Hymer Grp. N. Am., Inc. v. United States*, 930 F.3d 1370, 1375 (Fed. Cir. 2019) (citing *Ford Motor Co. v. United States*, 688 F.3d 1319, 1323 (Fed. Cir. 2012)). Rule 12(b)(1) provides that "a party may assert . . . by motion" the defense of "lack of subject-matter jurisdiction." USCIT R. 12(b)(1). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." USCIT R. 12(h)(3).

The court considers the questions of intervention in the instant action under USCIT Rule 24 and in accordance with the standard delineated by the U.S. Court of

Appeals for the Federal Circuit ("Federal Circuit").  *See Cal. Steel Indus., Inc. v. United*

*States,* 48 F.4th 1336, 1342 (Fed. Cir. 2022).

## DISCUSSION

I.      **Whether the court has jurisdiction under 28 U.S.C. § 1581(i)**

      A.      **Legal framework**

Under 28 U.S.C. § 1581(i), the USCIT has "exclusive jurisdiction of any civil

action commenced against the United States, its agencies, or officers, that arises out of

any law of the United States providing for . . . [the] administration and enforcement" of

"tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other

than the raising of revenue." 28 U.S.C. § 1581(i)(1)(B), (D).  Section 1581(i) expressly

provides that "[t]his subsection shall not confer jurisdiction over an antidumping or

countervailing duty determination which is reviewable by . . . the Court of International

Trade under section 516A(a) of the Tariff Act of 1930" pursuant to 28 U.S.C. §

1581(c).[11]  *Id*. § 1581(i)(2)(A).

---

[11] 28 U.S.C. § 1581(c) provides jurisdiction to the Court for challenges to Commerce's final determinations in circumvention inquiries, stating that this Court "shall have exclusive jurisdiction of any civil action commenced under" 19 U.S.C. § 1516a.  Actions pursuant to 19 U.S.C. § 1516a provide "[j]udicial review in countervailing duty and antidumping duty proceedings," including final determinations by Commerce. 19 U.S.C. § 1516a(a)(2)(B)(vi).  Judicial review covers "any factual findings or legal conclusions upon which the determination is based" and is available to "an interested party who is a party to the proceeding in connection with which the matter arises[.]"  19 U.S.C. § 1516a(a)(2)(A).  An "interested party" is "a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise," 19 U.S.C. § 1677(9)(A), and a "party to the proceeding" is "any interested party that actively participates, through written submissions of factual information or written argument, in a segment of a proceeding."  19 C.F.R. § 351.102(b)(36).

Residual jurisdiction under § 1581(i) is "strictly limited" and may not be invoked "when jurisdiction under another subsection of § 1581 is or *could have been available*, unless the remedy provided under the other subsection would be manifestly inadequate." *Erwin Hymer Grp. N. America, Inc.*, 930 F.3d at 1374-75 (citations omitted); *Int'l Custom Prods., Inc. v. United States*, 467 F.3d 1324, 1327 (Fed. Cir. 2006) (citations omitted). In assessing jurisdiction under other subsections of § 1581, the court must "'look to the true nature of the action' brought before the CIT under § 1581(i) to determine whether the action could have been brought under another subsection." *Wanxiang Am. Corp. v. United States*, 12 F.4th 1369, 1374-75 (Fed. Cir. 2021); *Hartford Fire Ins. Co. v. United States*, 544 F.3d 1289, 1293 (Fed. Cir. 2008); *cf. Norsk Hydro Can., Inc. v. United States*, 472 F.3d 1347, 1355 (Fed. Cir. 2006) ("[A] party may not expand a court's jurisdiction by creative pleading."); *Sunpreme Inc. v. United States*, 892 F.3d 1186, 1191, 1193-94 (Fed. Cir. 2018) (concluding that the plaintiff's "characterization of its appeal . . . [was] unavailing" in view of the nature of the relief that the plaintiff sought in its complaint and, consequently, that the court lacked jurisdiction under 28 U.S.C. § 1581(i)).

### B.    Positions of parties

Defendants state that "[b]ecause jurisdiction is, or could have been, available pursuant to 28 U.S.C. § 1581(c), this Court cannot exercise its limited residual jurisdiction over the complaint pursuant to section 1581(i)." Defs. Mot. Dismiss at 11. Defendants state that plaintiffs challenge aspects of the final determinations and cite to plaintiffs' "numerous arguments regarding why [plaintiffs] believed that the Duty

Suspension Rule was unlawful and should not [sic] applied to the liquidation instructions in that proceeding." Defs. Mot. Dismiss at 15 (citing *Final Determinations*, Cambodia IDM, Comment 26, at 113-22; Malaysia IDM, Comment 23, at 104-14; Thailand IDM, Comment 21, at 113-22; Vietnam IDM, Comment 24, at 111-20).

Defendants state that plaintiffs may invoke § 1581(i) to challenge Commerce's liquidation instructions only when alleging that the instructions are not consistent with Commerce's underlying final determination. Defs. Mot. Dismiss at 17-18 (quoting *Ugine and ALZ Belgium v. United States* ("*Ugine I*"), 452 F.3d 1289, 1296 (Fed. Cir. 2006) ("[A]n action challenging Commerce's liquidation instructions [as being inconsistent with the final results] is not a challenge to the final results, but a challenge to the 'administration and enforcement' of those final results,' and thus falls squarely within 28 U.S.C. § 1581(i)(4).") (quoting *Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1305 (Fed. Cir. 2004)). Defendants argue that the instant action concerns liquidation instructions that take into account the *Duty Suspension Rule* and therefore does not present the inconsistencies between liquidation instructions and final results of *Ugine* and *Shinyei.* Defs. Mot. Dismiss at 18 (quoting Compl. ¶¶ 18, 86).

Plaintiffs invoke the residual jurisdiction of the court under 28 U.S.C. § 1581(i)(1)(B) or, in the alternative under 28 U.S.C. § 1581(i)(1)(D). Compl. ¶ 2. In October 2023, plaintiffs commenced four actions in this Court challenging various aspects of the final circumvention determinations and invoking this Court's jurisdiction pursuant to 28 U.S.C. § 1581(c). *Auxin Solar, Inc. v. United States*, Court Nos. 23-223, 23-224, 23-225. In those separate actions, unlike in the instant action, plaintiffs

challenge certain aspects of the final determinations, but do not challenge Proclamation 10414 or the *Duty Suspension Rule*.  *Id.*

Plaintiffs state further that the instant action "takes Commerce's affirmative circumvention determinations as-is [sic]."  Pls. Resp. Opp'n Mot. Dismiss at 9.  Plaintiffs "'seek application of those final results,' and challenge Defendants' unlawful failure to enforce the antidumping and countervailing duty laws in reliance on the [*Duty Suspension Rule*]."  *Id.* (quoting *Consol. Bearings Co. v. United States,* 348 F.3d 997, 1002 (Fed. Cir. 2003)).  Further, plaintiffs argue that defendants' reliance on *Ugine I* is "inapposite, as that opinion explicitly declined to 'decide the scope of *Shinyei* in a preliminary injunction context,' 452 F.3d at 1297, and was followed by a subsequent Federal Circuit decision that 'h[e]ld that the Court of International Trade had jurisdiction under 28 U.S.C. § 1581(i)' but which Defendants fail to acknowledge."  *Id.* at 16-17 (quoting *Ugine and ALZ Belgium v. United States* ("*Ugine II*"), 551 F.3d 1339 (Fed. Cir. 2009) (alteration in original) (rehearing and rehearing *en banc* denied)).

C.    **Analysis**

1.    **Whether subject matter jurisdiction "is or could have been available" under 28 U.S.C. § 1581(c)**

The Court does not have and would not have had jurisdiction over the instant action under 28 U.S.C. § 1581(c).  28 U.S.C. § 1581(c) provides the Court with subject matter jurisdiction with respect to "any civil action commenced under [19 U.S.C. § 1516a]."  Further, 19 U.S.C. § 1516a(a)(2)(B)(iii) provides that "[a] final determination . . .

. by [Commerce] . . . under [19 U.S.C. § 1675]" constitutes a "[r]eviewable determination[]" under 28 U.S.C. § 1581(c).  19 U.S.C. § 1516a(a)(2)(B)(iii).

Subject matter jurisdiction for the instant action, which involves plaintiffs' challenge to Commerce's authority to issue and apply the *Duty Suspension Rule* in respect of the administration and enforcement of the Final Determinations, could not have been available under 28 U.S.C. § 1581(c).  That is because the *Duty Suspension Rule* relates to the "administration and enforcement," 28 U.S.C. § 1581(i)(1)(D), of those determinations — in particular, Commerce's cash deposit and liquidation instructions to Customs — rather than the lawfulness of Commerce's Final Determinations themselves.

The Federal Circuit has stated that the Court is to "look to the true nature of the action" to determine whether jurisdiction would be available under another subsection of 28 U.S.C. § 1581.  *Hartford Fire*, 544 F.3d at 1293.  As specified in plaintiffs' complaint, the underlying issue raised by plaintiffs concerns Commerce's *Duty Suspension Rule*, which Commerce issued pursuant to and under the authority of Proclamation 10414.[12] *See* Compl. ¶¶ 101, 108, 116, 127, 134, 138, 145; *see also Wanxiang Am. Corp.*, 12 F.4th at 1374-75 (directing the jurisdictional inquiry to look to the "true nature of the

---

[12] The *Duty Suspension Rule* provides:

> To respond to the emergency declared in the proclamation, and pursuant to the Proclamation and section 318(a) of the Act, in this final rule, Commerce is adding Part 362 to extend the time for, and waive, the actions provided for in 19 C.F.R. 351.226(l)(1) . . . .

87 Fed. Reg. at 56,869.

action").  The *Duty Suspension Rule* by its terms states explicitly that Commerce will direct CBP to take certain actions with respect to the "Applicable Entries" defined in section 362.102 and further states *explicitly* that these directions by Commerce to CBP are *despite* — not in furtherance of — Commerce's initiation of its circumvention inquiries and Commerce's final affirmative circumvention determinations:

> Commerce will direct [Customs] to discontinue the suspension of liquidation and collection of cash deposits that were ordered based on Commerce's initiation of these circumvention inquiries . . . [and] Commerce will not direct CBP to suspend liquidation, and require cash deposits, of estimated ADs and CVDs based on these affirmative determinations of circumvention on any "Applicable Entries."

*Final Determinations,* 88 Fed. Reg. at 57,421.  Further, Commerce's directions to CBP as specified do not alter in any respect Commerce's circumvention findings in those determinations.  *Id*.

19 U.S.C. § 1516a(a)(2)(B) lists under subparagraph (B) the specific types of determinations[13] contestable under that provision.  None of those listed determinations

---

[13] Section 1516a(a)(2)(B) delineates the types of determinations that allow for the invocation of § 1581(c) and judicial review:

> (B) Reviewable determinations
>
> The determinations which may be contested under subparagraph (A) are as follows:
>
> (i) Final affirmative determinations by the administering authority and by the Commission under section 1671d or 1673d of this title, including any negative part of such a determination (other than a part referred to in clause (ii)).
> (ii) A final negative determination by the administering authority or the Commission under section 1671d or 1673d of this title, including, at

Court No. 23-00274                                                      Page 20

describes or encompasses the *Duty Suspension Rule*.  Therefore, none is applicable in

the instant action.  In sum, the instant action does not concern a "reviewable

determination" under 19 U.S.C. § 1516a(a)(2)(B), thereby precluding jurisdiction under

28 U.S.C. § 1581(c).

In contrast, the instant action deals with actions expressly described under 28

U.S.C. § 1581(i)(1): the non-collection of "tariffs, duties, fees, or other taxes on the

importation of merchandise for *reasons other than the raising of revenue*," in this

instance, the president's declared emergency to meet domestic electricity demands as

---

the option of the appellant, any part of a final affirmative determination
which specifically excludes any company or product.
(iii) A final determination, other than a determination reviewable under
paragraph (1), by the administering authority or
the Commission under section 1675 of this title.
(iv) A determination by the administering authority, under section 1671c
or 1673c of this title, to suspend an antidumping duty or a countervailing
duty investigation, including any final determination resulting from a
continued investigation which changes the size of the dumping margin or
net countervailable subsidy calculated, or the reasoning underlying such
calculations, at the time the suspension agreement was concluded.
(v) An injurious effect determination by the Commission under section
1671c(h) or 1673c(h) of this title.
(vi) A determination by the administering authority as to whether a
particular type of merchandise is within the class or kind of merchandise
described in an existing finding of dumping or antidumping or
countervailing duty order.
(vii) A determination by the administering authority or
the Commission under section 3538 of this title concerning
a determination under subtitle IV of this chapter.
(viii) A determination by the Commission under section 1675b(a)(1) of this
title.

19 U.S.C. § 1516A(B).

per § 1581(i)(1)(B) (emphasis supplied) and the "administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section," which include circumvention determinations by Commerce such as the Final Determinations. *See, e.g., NLMK Pa., LLC v. United States*, 46 CIT __, 558 F. Supp. 3d 1401, 1405 (2022) (exercising jurisdiction pursuant `to 28 U.S.C. § 1581(i)(1)(B) and (D)).   As a consequence, the action falls squarely within the terms of § 1581(i).

This Court has stated — and the Federal Circuit has affirmed — that 28 U.S.C. § 1581(i) constitutes "a [c]ongressional fail-safe device" and that "[i]f the circumstances of a case are sufficiently unusual so that one may presume that Congress could not have provided for such a case under the general language of 19 U.S.C. § 1516a . . . 28 U.S.C. § 1581(i) is available to afford a means of vindication of statutory rights." *Hylsa, S.A. de C.V. v. United States*, 21 CIT 222, 227-28, 960 F. Supp. 320, 324 (1997), *aff'd sub nom. Hylsa, S.A. v. Tuberia Nat., S.A.*, 135 F.3d 778 (Fed. Cir. 1998).  One such "unusual" circumstance exists in the instant action.  Commerce took an unprecedented action to issue the *Duty Suspension Rule* under Proclamation 10414, which was issued under separate provision of the U.S. code.  19 U.S.C. § 1318; 19 U.S.C. § 1677j; 19 C.F.R. § 351.225; 19 C.F.R. § 351.226.  The *Duty Suspension Rule* in turn contains express direction to Customs with respect to suspension of liquidation, collection of cash deposits and payment of estimated duties.

In addition, the Federal Circuit has provided a framework to confirm the proper exercise of residual jurisdiction. *Shinyei*, 355 F.3d at 1296-97; [14] *Ugine II*, 551 F.3d at 1339. The *Shinyei* decision addressed the administrative review of an AD order, in which Customs (due to Commerce's erroneous instructions) liquidated certain entries at a rate higher than that set in Commerce's final determination. *Shinyei*, 335 F.3d at 1303. Plaintiff Shinyei invoked jurisdiction pursuant to § 1581(i): (1) arguing that Commerce's instructions violated 19 U.S.C. § 1675(a)(2)(C) (with respect to the antidumping duty margin determination); and (2) seeking reliquidation. *Id.* at 1305-06. The USCIT dismissed Shinyei's action for lack of subject matter jurisdiction. *Id.* at 1304. Plaintiff appealed. Before the Federal Circuit, the government argued that no relief was available under APA § 702 because 19 U.S.C. § 1516a and the protest statute, 19 U.S.C. § 1514, barred the court from granting plaintiff's requested relief — reliquidation. *Id.* at 1306, 1308. The Federal Circuit reversed the USCIT and concluded that § 1516a was not applicable to Shinyei's APA challenge because § 1516a deals with

---

[14] It is notable that the Federal Circuit in *Shinyei* expressly confirmed the authority of the USCIT to exercise residual jurisdiction and order reliquidation. *Shinyei,* 355 F.3d at 1311-12 (stating that "[t]he absence of an express reliquidation provision should not be read as a prohibition of such relief when the statute provides the Court of International Trade with such broad remedial powers"). It is parties' acknowledgement of and intention not to contest this authority to which plaintiffs and defendants stipulate in the Joint Stipulation in Lieu of Plaintiffs' Preliminary Injunction. Joint Stipulation ¶ 2. The Federal Circuit stated that no provision in the Tariff Act "provides that liquidations are final except within the narrow confines of section 1514." *Shinyei*, 355 F.3d at 1311. In *Shinyei*, the Federal Circuit remanded the action to the USCIT directing it to reach the merits of requested relief because the Tariff Act "does not '*impliedly forbid* the [reliquidation] relief which [Shinyei] sought' under the APA. . . ." *Id.* at 1312. In its remand, the Federal Circuit stated that "the requested relief [to grant reliquidation] is easily construed as 'any other form of relief that is appropriate in a civil action.'" *Id.*

Court No. 23-00274                                                          Page 23

"final determinations" of Commerce and not actions or directions related to Commerce's

*implementation* of the final determination.  *Id.* at 1309.  The instant action is analogous

because it relates to Commerce's liquidation instructions and Commerce's failure

therein to order the collection of duties consistent with Commerce's findings in the Final

Determinations.[15]

Defendants argue that the holding in *Shinyei* is inapposite.  Defendants maintain

that plaintiffs in the instant action contest Commerce's failure to instruct Customs to

suspend liquidation and collect duties according to an affirmative finding of

circumvention in the Final Determinations, whereas plaintiff in *Shinyei* challenged its

exclusion from Commerce's liquidation instructions that did not reflect the results of the

administrative review and final determination.  Defs. Reply Mot. Dismiss at 11 (citing

*Shinyei*, 355 F.3d at 1301-04).

Defendants' argument is not persuasive.  Plaintiffs in this action, as in *Shinyei*

and *Ugine II*, were subject to liquidation instructions that did not reflect Commerce's

Final Determinations.  In particular, Commerce's liquidation and collection instructions

to Customs in the instant action as specified in the *Duty Suspension Rule* are

---

[15] The court notes that both plaintiffs and proposed defendant-intervenors have filed actions in this Court challenging the Final Determinations.  *Auxin Solar Inc. v. United States*, Court No. 23-223; *Auxin Solar Inc. v. United States*, Court No. 23-224; *Auxin Solar Inc. v. United States*, Court No. 23-227; *BYD (H.K.) Co., Ltd. v. United States*, Court No. 23-221; *Canadian Solar Int'l Ltd. v. United States*, Court No. 23-222; *Trina Solar Science & Tech. (Thailand) Ltd. v. United States*, Court Nos. 23-227, 23-228; *Red Sun Energy Long An Co. Ltd v. United States*, Court No. 23-229.  In those actions, Auxin Solar and CCE do not contest the *Duty Suspension Rule* and the consequent liquidation instructions that are the subject of this action.

inconsistent with Commerce's affirmative circumvention determinations as set forth in the Final Determinations.[16]  *See Ugine II,* 551 F.3d at 1347 ("If the party challenges the liquidation instructions issued by Commerce to implement a final order, review is available under 28 U.S.C. § 1581(i)[1][B], [D].").[17]  As such, the Federal Circuit's decisions in *Shinyei* and *Ugine II* are on point.  That Commerce chose to incorporate in the same document containing Commerce's Final Determinations of circumvention Commerce's liquidation and collection instructions to Customs is not determinative.

---

[16] Commerce determined that the CPSV cells were circumventing AD/CVD Orders covering certain solar modules:

> As detailed in the Issues and Decision Memoranda for Cambodia, Malaysia, and Vietnam, and in the *Preliminary Determination* for Thailand, with the exception of certain U.S. imports from the exporters identified in Appendix III to this notice, we determine that U.S. imports of inquiry merchandise are circumventing the *Orders* on a countrywide basis. As a result, we determine that this merchandise is covered by the *Orders.*

*Final Determinations*, 88 Fed. Reg. at 57,420.

The *Duty Suspension Rule* is referenced in Commerce's analysis as pertaining to the liquidation and cash deposit instructions: (footnote continued)

> *See* the "Suspension of Liquidation and Cash Deposit Requirements" section below for details regarding suspension of liquidation and cash deposit requirements. *See* the "Certification" and "Certification Requirements" section below for details regarding the use of certifications.

*Id.*

[17] The version of the USCIT's jurisdictional statute at 28 U.S.C. § 1581(i)(2) and (4) analyzed in *Ugine II* corresponds in substance to the current 28 U.S.C. § 1581(i)(1)(B) and (D).  *Compare* 28 U.S.C. § 1581(i)(2) and (4) (2020), *with* current version at 28 U.S.C. § 1581(i)(1)(B) and (D).

Were it to be so, it would elevate form over substance rather than focus on "the true nature of the action" before the court.  *Wanxiang Am. Corp. v. United States*, 12 F.4th at 1374-75; *Hartford Fire*, 544 F.3d at 1292-93.[18][19]

In sum, the court concludes that the instant action could not have been brought under 28 U.S.C. § 1581(c) and falls within the residual jurisdiction of the Court under 28

---

[18] As stated in the Final Determinations, Commerce determined that the subject CSPV cells were circumventing AD/CVD orders on solar cells and modules from China.  *Final Determinations*, 88 Fed. Reg. at 57,419.

[19] Defendants maintain that "a party challenging two different aspects of *one* final determination [should not be required to] file *two separate* lawsuits, one pursuant to § 1581(c) and another pursuant to § 1581(i)."  Defs. Reply Mot. Dismiss at 3.  This argument is contrary to the decisions of this court and the Federal Circuit.  For example, in *Ugine II*, the Federal Circuit expressly recognized that "[u]nfortunately . . . there is no single judicial review method for challenging the imposition of antidumping duties."  551 F.3d at 1347.  The Federal Circuit elaborated:

> If the challenge is to the final order of an administrative review, the determination can be reviewed by the Court of International Trade under 28 U.S.C. § 1581(c) . . . .  On the other hand, if the final order is unclear, 19 C.F.R. § 351.225 makes available a scope review under 28 U.S.C. § 1581(c). . . .  If the party challenges the liquidation instructions issued by Commerce to implement a final order, review is available under 28 U.S.C. § 1581(i). . . .  If the liquidation order is clear, but is being improperly applied by Customs, then Customs' actions can be challenged under 28 U.S.C. § 1581(a). . . .

*Id.* (citations omitted).

As noted, that Commerce chose to embed its instructions to Customs in the same notice containing Commerce's Final Determinations does not change the legal nature of those instructions.  As in other actions decided by this Court and the Federal Circuit, instructions as to the implementation of a final determination are appropriately considered under § 1581(i).

Court No. 23-00274                                                               Page 26

U.S.C. § 1581(i)(1)(D) because it pertains to the "administration and enforcement" of

Commerce's circumvention findings.

>    **2.    Whether the relief provided to plaintiffs would be "manifestly**
>    **inadequate"**

Jurisdiction was not available under 28 U.S.C. § 1581(c).  Accordingly, the court

need not and does not address parties' arguments concerning whether any such relief

under § 1581(c) would have been "manifestly inadequate."

**II.    Whether the Joint Stipulation in Lieu of Plaintiffs' Motion for a Preliminary**
**Injunction should be granted by this court**

Parties may stipulate to certain facts before the court and propose certain

conclusions of law.  *See, e.g., LDA Incorporado v. United States,* 39 CIT __, 79 F.

Supp. 3d 1331 (2015); *United States v. Carnation Creations, Inc.,* 27 CIT 604 (2003).  In

the instant action, plaintiffs and defendants stipulate to the authority of the court to order

reliquidation and direct the United States to reliquidate entries "for which liquidation was

not suspended and cash deposits were not collected pursuant to *Procedures Covering*

*Suspension of Liquidation, Duties and Estimated Duties in Accord with Presidential*

*Proclamation 10414,* 87 Fed. Reg. 56,868 (Sept. 16, 2022)."  Joint Stipulation ¶ 1.

Further, plaintiffs and defendants clarified for the court the purpose of the Joint

Stipulation to support the availability of reliquidation as a remedial power, which

defendants concede in the instant action.  *See* Defs.' Resp. Order re: Joint Stipulation at

2, ECF No. 72; *see* Pls.' Resp. Order re: Joint Stipulation at 2, ECF No. 73 (stating that

"Defendants obtain the benefit of mooting Solar Plaintiffs' Motion and avoiding a court-

imposed injunction"); *Sumecht NA, Inc. v. United States*, 923 F.3d 1340 (Fed. Cir. 2019)

(finding that the government would be judicially estopped from taking a contrary position regarding the USCIT's authority to order reliquidation due to the government's representation that reliquidation was available as a form of relief); *In re Section 301 Cases*, 45 CIT __, __, 524 F. Supp. 3d 1355, 1362-63 (2021).

As such, the court grants the Joint Stipulation proposed by plaintiffs and defendants.

### III.    Whether proposed defendant-intervenors have standing

####    A.    Legal framework

The court addresses first whether proposed defendant-intervenors have standing under Article III of the Constitution. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("[S]tanding is an essential . . . part of the case-or-controversy requirement of Article III."). Article III limits the jurisdiction of federal courts to cases and controversies. U.S. Const. art. III, § 2. A justiciable Article III case or controversy requires a "party invoking federal court jurisdiction" to demonstrate, as "the irreducible constitutional minimum of standing": (1) that it has suffered "an injury in fact," that is, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) a "causal connection between the injury and the conduct complained of"; and (3) "it must be likely that the injury will be redressed by a favorable decision." *Lujan,* 504 U.S. at 560-61 (internal citations and quotations omitted).

The court begins by addressing issues of standing because standing is a threshold jurisdictional question. *California Steel Indus., Inc. v. United States,* 48 F.4th

1336, 1342 (Fed. Cir. 2022) (citing *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 434 (2017)).  "For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right."  *Town of Chester*, 581 U.S. at 434.  This means that, "at the least, an intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests."  *Id.*   Proposed intervenors have "the burden of demonstrating either . . . independent constitutional standing or. . . 'piggyback standing,' i.e., standing based on seeking the same relief sought by an existing party to the case."  *N. Am. Interpipe, Inc. v. United States*, 45 CIT __, __, 519 F. Supp. 3d 1313, 1321-22 (2021).

The Federal Circuit has clarified the rationale for Article III standing of defendant-intervenors, stating that:

> A defendant-intervenor does not fit the same mold as the traditional unwilling defendant.  Rather, a defendant-intervenor actively seeks to participate in the resolution of a case in which the plaintiff did not bring a claim against or request any relief from the proposed intervenor.  Thus, "where a party tries to intervene as another defendant," that defendant-intervenor must "demonstrate Article III standing."

*California Steel*, 48 F.4th at 1343 (quoting *Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 316 (D.C. Cir. 2015)).  "[A]t least one party must demonstrate Article III standing for each claim for relief."  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. __, 140 S. Ct. 2367, 2379 n.6, 207 L.Ed.2d 819 (2020) (citing *Town of Chester*, 581 U.S. at 434).  "Article III standing is not a threshold determination that courts normally make before allowing a defendant to

enter a case.  The standing inquiry is generally 'directed at those who invoke the court's jurisdiction,' and most defendants are pulled into a case unwillingly." *Crossroads Grassroots*, 788 F.3d at 316 (citing *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 233 (D.C. Cir. 2003)).  Where a putative intervenor seeks only the same relief as an existing party to the litigation, the proposed intervenor may "piggyback" on the existing party's standing.  *See Caifornia Steel*, 48 F.4th at 1343; *HiSteel Co., Ltd. v. United States*, 47 CIT __, ___, 592 F.Supp.3d 1339, 1342 (2022).

USCIT Rule 24(c) requires that proposed intervenors state the grounds for their intervention and accompany their motions with "a pleading that sets out the claim or defense for which intervention is sought."  USCIT R. 24(c)(1).

B.    **Positions of parties**

Plaintiffs argue that none of the proposed intervenors has established Article III Standing.  Pls. Resp. Opp'n at 9.  Plaintiffs note that the USCIT "has previously denied motions that 'fail to even address, must less establish, either. . .  independent constitutional standing or . . . piggyback standing as required by Article III.'"  *Id.* (citing *N. Am. Interpipe*, 45 CIT at __, 519 F. Supp. 3d at 1322.  Plaintiffs state that all proposed defendant-intervenors violate USCIT Rule 24(c) for failing to submit an accompanying pleading setting out a prayer for relief and the defense for which intervention is sought.  Pls. Resp. Opp'n at 12 (citing USCIT Rule 24(c)).

All proposed defendant-intervenors address the elements of Article III standing in their initial or reply briefs, stating that "[i]t goes without saying that industry entities that intervene to defend a government rule pursue the same 'relief' as the government: for

Court No. 23-00274                                                      Page 30

that rule to be upheld."  Def.-Int. Reply I at 5; Mot. Leave to File Opp'n to Mot. Int. of

Prop. Def.-Int. ("Def.-Int. Reply II") at 16, ECF No. 59.

### C.      Analysis

The court concludes that proposed defendant-intervenors demonstrate that they

meet Article III piggyback standing requirements as set out by the Supreme Court and

the Federal Circuit to intervene in the instant action because proposed defendant-

intervenors seek the same relief as named defendants and filed their motions to

intervene with sufficient pleadings.  In the following analysis, the court does not address

the issues concerning the independent constitutional standing[20] of proposed defendant-

intervenors because they have demonstrated that they meet the requirements to

establish piggyback standing alongside defendants.

### 1.      Prayers for relief

In their motions to intervene, proposed defendant-intervenors request the same

relief as the defendants named by plaintiffs: the enforcement and judicial upholding of

the *Duty Suspension Rule* contested by plaintiffs in the instant action.  *See* Mots.

Dismiss, ECF Nos. 16, 32, 36, 39, 40, 41, 48, 49 53.  In *California Steel,* the Federal

Circuit held that the proposed intervenors' requested relief was largely identical to the

---

[20] Standing requires that (1) the party invoking federal jurisdiction and asserting standing "shows that it has suffered an injury in fact — an invasion of a legally protected interest which is concrete and particularized," (2) there must be a "causal connection between the injury and the conduct complained of — the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court," and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561 (internal citations and quotations omitted).

government's prayer for relief and that the proposed intervenors therefore established the first element of piggyback standing. *California Steel*, 48 F.4th at 1343. Each of the proposed defendant-intervenors in the instant action shares the same prayer for relief as the government. Consistent with the *California Steel* holding, the court concludes that the proposed defendant-intervenors have demonstrated the first element of Article III piggyback standing because they share the same prayer for relief as the named defendants.

### 2. Pleadings

All proposed defendant-intervenors complied with Rule 24(c)(1) by filing motions to dismiss with their motions to intervene. Mots. Dismiss, ECF Nos. 32, 36, 39, 40, 41, 48, 49, 50, 53. Motions to dismiss for lack of subject matter jurisdiction constitute pleadings satisfying the requirements of Rule 24(c). Further, Rule 12 states that a defense for lack of subject matter jurisdiction "must be made before pleading if a responsive pleading is allowed." USCIT R. 12(b)(1). The court concludes that the motion to dismiss accompanying each motion to intervene of each proposed defendant-intervenor satisfies the pleading requirement of Rule 24. USCIT R. 24(c)(1).[21]

---

[21] Plaintiffs maintain that the *only* pleading that meets the requirement in Rule 24(c) is an Answer to plaintiffs' Complaint. Pls. Resp. Opp'n at 12 (citing USCIT R. 7(a)). The court in this case is called upon to apply Rules 7, 24 and 12, which states that a motion to dismiss "must be made before pleading if a responsive pleading is allowed." USCIT R.12. Rule 24(c) states in relevant part: "The motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." In this case, defendants have not yet filed an Answer. Proposed defendant-intervenors cannot be expected to file an Answer prior to the defendants they seek to join. Further, to effectively preclude proposed defendant-

The shared prayers for relief and attached pleadings of proposed defendant-intervenors demonstrate that the proposed defendant-intervenors meet the threshold standing requirements set forth by this Court for intervention in the instant action.

## IV.   Whether proposed defendant-intervenors are entitled to intervene as a matter of right

### A.   Legal framework

Pursuant to Rule 24(a), intervention as a matter of right is available to anyone who:

> in an action described in section 517(g) of the Tariff Act of 1930 . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

USCIT R. 24(a)(2).

This Court and the Federal Circuit have interpreted the clause of Rule 24(a)(2) that does not pertain to evasion cases under 19 U.S.C. § 1517 to provide for a four-part test:

> (1) [T]he motion must be timely; (2) the moving party must claim an interest in the property or transaction at issue that is "'legally protectable'—merely economic interests will not suffice"; (3) "that interest's relationship to the litigation must be 'of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment,'"; and (4) "the movant must demonstrate that said interest is not adequately addressed by the government's participation."

intervenors from utilizing Rule 24 such that their motions to intervene may be considered would narrow the opportunities for intervention provided under Rule 24.

*N. Am. Interpipe*, 45 CIT __, 519 F. Supp. 3d at 1323 (quoting *Wolfsen Land & Cattle*

*Co. v. Pac. Coast Fed'n of Fishermen's Ass'ns*, 695 F.3d 1310, 1315 (Fed. Cir. 2012)),

*aff'd sub nom. Cal. Steel Indus., Inc. v. United States*, 48 F.4th 1336 (Fed. Cir. 2022);

*California Steel*, 48 F.4th at 1340 (first quoting *N. Am. Interpipe*, 45 CIT at __, 519 F.

Supp. 3d at 1323; then quoting *Wolfsen*, 695 F.3d at 1315).

### B.    Positions of parties

Plaintiffs argue that none of the proposed defendant-intervenors meets any of the

four factors to be weighed by the court in deciding motions to intervene as a matter of

right.  Pls. Resp. Opp'n at 5-6.  All proposed defendant-intervenors except for Risen

Energy argue that they meet the requirements for intervention as of right.

### C.    Analysis

The court concludes that none of the proposed defendant-intervenors meets the

second and third factors of the four-part test, thereby failing to meet the standard for

intervention as of right under USCIT Rule 24(a).  *See Wolfsen*, 695 F.3d at 1315.  In

denying intervention as of right under USCIT Rule 24(a), the court analyzes each of the

four factors contested by plaintiffs.

#### 1.    Timeliness of the motions to intervene

The court concludes that each proposed defendant-intervenor filed its motion to

intervene in the instant action in a timely manner.

The Federal Circuit has established the following test for timeliness under Rule

24(a):

> [T]he following factors must be weighed:
>
> (1) the length of time during which the would-be intervenor actually knew or reasonably should have known of his right to intervene in the case before he applied to intervene;
> (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor by denying intervention. [sic]
> (3) existence of unusual circumstances militating either for or against a determination that the application is timely.

*Sumitomo Metal Indus., Ltd. v. Babcock & Wilcox Co.*, 69 CCPA 75, 81, 669 F.2d 703, 707 (1982) (citations omitted).

The court concludes that the timing of the motions to intervene weighs in favor of proposed defendant-intervenors under the *Sumitomo* standard.  *Id.* Plaintiffs argue that each proposed defendant-intervenor filed a motion to intervene prematurely "because no proposed defendant-intervenor has demonstrated that defendants inadequately represent a legally protectable interest in the subject of this litigation."  Pls. Resp. Opp'n at 33.  The court disagrees.  The first factor for intervention does not depend on the second factor and the court iterates that the timeliness of intervention is considered in the context of the status of litigation of the case.  In the instant action, the motions to intervene were filed within 30 days of the complaint and were accompanied with motions to dismiss for lack of subject matter jurisdiction.  Mots. Dismiss of Def.-Ints.

All proposed defendant-intervenors filed to intervene in the instant action to argue the same position as the government and filed motions to dismiss for

lack of subject matter jurisdiction. *Id.* Rule 12(b)(1) pleadings are proper in the early stages of the adjudication of the instant action. USCIT R. 12(b)(1).

As such, proposed defendant-intervenors meet the first factor required for intervention as a matter of right under Rule 24(a).

### 2.    Legally protectable interests

The court addresses next whether proposed defendant-intervenors have a right to intervene under USCIT Rule 24(a) based on a "legally protectable" interest. *Wolfsen*, 695 F.3d at 1315 (citation omitted). Proposed defendant-intervenors do not explain how their interests in this action are "legally protectable" as opposed to "merely economic." *Id.*

In *California Steel*, the Federal Circuit made the distinction between parties with a "legally protectable interest" and parties that "participat[ed] in adversarial administrative proceedings." *California Steel,* 48 F.4th at 1344 (finding no "legally protectable interest[ ]" on the basis that proposed defendant-intervenors participated in administrative proceedings that could have revoked tariffs in which the proposed defendant-intervenors had an interest); *see Glob. Aluminum Distrib. LLC v. United States*, 45 CIT __, __, 579 F. Supp. 3d 1338, 1341 (2021) (quoting *N. Am. Interpipe*, 45 CIT at __, __, 519 F. Supp. 3d at 1323 (2021) (quoting *Wolfsen,* 695 F.3d at 1315)). Similar to proposed intervenors in *California Steel,* proposed defendant-intervenors in the instant action argue that their participation in the administrative proceedings and the potential effect of the court's ruling concerning the *Duty Suspension Rule* necessarily equate to a legally protectable interest. The court disagrees.

Plaintiffs in the instant action contest the underlying rulemaking procedure by Commerce when issuing the *Duty Suspension Rule*, which exempted the collection of AD/CV duties on the CSPV cells and Commerce's non-collection of AD/CV duties on the CSPV cells. Compl. ¶¶ 3-4. Proposed defendant-intervenors argue that they have "oriented their supply chains, imported subject products, executed legally binding contracts and invested capital in reliance on [the *Duty Suspension Rule*]." Def.-Int. Reply I at 11; Def.-Int. Reply II at 6. Proposed defendant-intervenors may be affected financially by the court's judgment concerning the *Duty Suspension Rule,* but the rulemaking process and the substance of the *Duty Suspension Rule* do not create legally protectable interests beyond "merely economic" ones. *Am. Mar. Transp., Inc. v. United States,* 870 F.2d 1559, 1562 (Fed. Cir. 1989) (citation omitted).

Intervention as a matter of right is not available in the instant action because proposed defendant-intervenors have not sufficiently shown that their financial interests rise above the "merely economic."

### 3. Direct relationship between litigation and proposed defendant-intervenors' interests

Proposed defendant-intervenors argue that whether the *Duty Suspension Rule* is upheld by the court "will have a demonstrable and significant impact" on them because they "stand to face immediate and direct economic harm as a result of this litigation." Def.-Int. Reply I at 2. The court concludes that the economic harm from which proposed defendant-intervenors may suffer does not constitute a legally protectable interest and the question of whether there is a direct relationship between the litigation

and those interests turns on the second factor.  In the instant action, because the court concludes that the second factor is not met, there can be no direct relationship between the litigation and the interests of proposed defendant-intervenors.

### 4.      Adequacy of government's representation

Proposed defendant-intervenors demonstrate that their interests are not adequately protected by the government in the instant action.  The burden of showing inadequacy of representation is "minimal," requiring a showing only that an existing party's representation of interests of proposed defendant-intervenors "may be" inadequate as to some aspect of the case at bar.  *Wolfsen,* 695 F.3d at 1315 (citing *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n.10 (1972) (permitting intervention by a union member notwithstanding participation of the Secretary of Labor because the Secretary's twin duties to represent both the aggrieved member and the public generally might engender an adversity of interest)).  In the instant action, proposed defendant-intervenors have shown that the government will not adequately represent their financial and economic interests.

In sum, and as noted, proposed defendant-intervenors meet two of the four requirements for intervention as of right, but do not meet the second and third requirements.  Accordingly, the court concludes that none of the proposed defendant-intervenors meets the standard for intervention as of right under USCIT Rule 24(a).

**V.      Whether proposed defendant-intervenors should be permitted to intervene**

**A.      Legal framework**

"Subject to the statutory provisions of 28 U.S.C. § 2631(j), permissive

intervention is governed by Rule 24(b) of the Rules of this Court."  *Manuli Autoadesivi,*

*S.p.A. v. United States*, 9 CIT 24, 25, 602 F. Supp. 96, 98 (1985) (citing 28 U.S.C. §

2631(j)(1) ("Any person who would be adversely affected or aggrieved by a decision in a

civil action pending in the Court of International Trade may, by leave of court, intervene

in such action . . . .")).  The court may permit a party to intervene under USCIT Rule

24(b) if such a party "has a claim or defense that shares with the main action a common

question of law or fact."  USCIT R. 24(b)(1)(B).  If proposed intervenors satisfy the

requirements of USCIT Rule 24(b)(1)(B), the court may exercise its discretion to permit

intervention.  USCIT R. 24(b)(3).  "In 28 U.S.C. § 1581(i) cases, intervention is left to the

sound discretion of the court as stated in [USCIT] Rule 24(b) and 28 U.S.C. §

2631(j)."  *Neo Solar Power Corp. v. United States*, Slip Op. 2016-60, 2016 Ct. Int'l.

Trade LEXIS 58, at *2 (CIT June 9, 2016) (citing *Vivitar Corp. v. United States*, 7 CIT

165, 169, 585 F. Supp. 1415, 1419 (1984)).  Further, "[i]n exercising its discretion, the

court must consider whether the intervention will unduly delay or prejudice the

adjudication of the original parties' rights."  USCIT R. 24(b)(3).

**B.      Positions of parties**

Plaintiffs state that proposed defendant-intervenors' motions cannot be treated

as timely because they do not include answers or pleadings with their motions to

intervene.  Pls. Resp. Opp'n at 36.  Plaintiffs state further that proposed defendant-

intervenors reference 28 U.S.C. § 2631(j)(1) as creating a conditional right to intervene for purposes of Rule 24(b)(1)(A), but that none possesses that right because proposed defendant-intervenors need to establish independent Article III standing to support the position that they would be "adversely affected or aggrieved by a decision in this action." *Id.* at 37-39.  Plaintiffs also maintain that proposed defendant-intervenors do not share a defense with the government because they do not demonstrate any defense in the instant action.  *Id.*  at 39-41.  Finally, plaintiffs state that if the court "were to find a proposed intervenor theoretically eligible for intervention under Rule 24(b)(1), it should nevertheless decline to exercise its discretion to permit intervention.  Proposed defendant-intervenors' participation in this action would unduly delay proceedings."  *Id.* at 41-46.  Plaintiffs add that proposed defendant-intervenors attack the Joint Stipulation in lieu of plaintiffs' preliminary injunction and that the many motions to intervene in the instant action have unduly prejudiced parties already.  *Id.* at 42-44.

Proposed defendant-intervenors argue that, to the contrary, they meet each prong of the four-part permissive intervention inquiry.  *See* ACP Br. at 13-15; SEIA Br. at 10-12; Canadian Br. at 7-11; JA Solar Br. at 12-14; NextEra Br. at 9-11; BYD Br. at 6-8; Invenergy Br. at 9-11; Trina Br. at 6-8; Risen Br. at 4-7.  Consolidated Intervenors argue that they would be adversely affected or aggrieved by a decision in this case. Def.-Int. Reply I at 20.

### C.    Analysis

The court considers: (1) whether proposed defendant-intervenors have shown that they would be adversely affected or aggrieved by the outcome of the instant action;

(2) whether proposed defendant-intervenors' defenses and arguments share a common question of law or fact with those of the government; (3) the timeliness of their motions to intervene; and (4) whether permitting intervention would unduly delay or prejudice plaintiffs in the instant action.  The court concludes that proposed defendant-intervenors meet each of the four factors and, therefore, permissive intervention by them in the instant action is warranted.

### 1.    Adversely affected or aggrieved

The court concludes that proposed defendant-intervenors have adequately demonstrated that they would be adversely affected or aggrieved within the meaning of 28 U.S.C. § 2631(j)(1).  Plaintiffs state that proposed defendant-intervenors must demonstrate independent constitutional standing in the instant action to show that they "would be adversely affected or aggrieved by a decision in [the instant] action within the meaning of 28 U.S.C. § 2631(j)(1)."  Pls. Resp. Opp'n at 37.  No such requirement exists.  *Cf. PrimeSource Bldg. Prod., Inc. v. United States*, 45 CIT __, __, 494 F. Supp. 3d 1307, 1329 (2021) (Baker, J., concurring) (stating that "a putative intervenor invoking 28 U.S.C. § 2631(j)(1) must demonstrate "injury in fact," i.e., constitutional standing.").

Further, each proposed defendant-intervenor references both its reliance on the *Duty Suspension Rule* in making business decisions and the potential financial ramifications of the instant action.  ACP Br. at 9 ("ACP's project developers, electric utilities and project financing companies to varying extents bear contractual liability for duties that may be imposed on 'applicable entries' in the event plaintiffs' claims

Appx67

prevail."); SEIA Br. at 7 ("SEIA members imported and purchased CSPV cells and modules from Southeast Asia, based on the understanding that the imported CSPV cells and modules would not be subject to [AD/CV] duties."); Trina Br. at 7 ("[the *Duty Suspension Rule*] shaped Trina's decisions regarding the materials and production assets used to serve the U.S. market.");  Def.-Int. Reply I at 21 ("Plaintiffs admit that potential AD/CVD duty liability arises from the circumvention Final Determinations, which are currently on appeal under Section 1581(c).  And the relief Plaintiffs seek *in this litigation* is the imposition of AD/CV duties."); Def.-Int. Reply II at 13 ("Proposed Intervenors, as importers and users of CSPV modules benefitting from the [*Duty Suspension Rule*], will suffer direct financial consequences if plaintiffs succeed, because the solar products they import and use (including . . . goods previously imported and used) will be subject to significant additional tariffs.").

Finally, this Court has explained that "[t]he phrase 'adversely affected or aggrieved,' which mirrors the language in numerous statutes, including the [APA], 5 U.S.C. § 702, represents a 'congressional intent to cast the [intervention] net broadly — beyond the common-law interests and substantive statutory rights' traditionally known to law."  *Ont. Forest Indus. Assoc. v. United States*, 30 CIT 1117, 1130, 444 F.Supp.2d 1309, 1321-22 (2006) (quoting *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 19 (1998)).

As such, the court concludes that proposed defendant-intervenors have shown that they would be adversely affected or aggrieved by the outcome of the instant action.

### 2.    Common question of law or fact

Proposed defendant-intervenors participated in the underlying administrative proceedings and their defenses share law and facts in common with those of the government.  Proposed defendant-intervenors note that "the primary transaction at issue in this appeal is application of the [*Duty Suspension Rule*] and potential liability for AD/CV duties."  Def.-Int. Reply II at 14.  Proposed defendant-intervenors have shown that their "participation could add some material aspect beyond what is already present."  *Wolfsen*, 695 F.3d at 1318.[22]  Proposed defendant-intervenors represent a segment of the solar industry that is aligned with the position of defendants.  Def.-Int. Reply II at 14.  As such, and based on their filings, the court concludes that proposed defendant-intervenors have demonstrated that they share a common question of law or fact with defendants.  In addition, proposed defendant-intervenors would defend their differentiated interests in this case.  *Id*.

### 3.    Timeliness

The motions to intervene of proposed defendant-intervenors are timely given that they were filed within 30 days of plaintiffs' complaint and include motions to dismiss for lack of subject matter jurisdiction as discussed in Section IV.C.1, *supra*.

---

[22] Although *Wolfsen* considers intervention as of right, the court finds its reasoning — including as set forth by the Ninth Circuit Court of Appeals in *Citizens for Balanced Use v. Mont. Wilderness Ass'n,* 647 F.3d 893, 898 (9th Cir. 2011) — relevant and persuasive in light of the discretionary standard in Rule 24(b)(1).  695 F.3d at 1318.

### 4.    Undue delay or prejudice

The potential for undue delay or prejudice toward parties in the instant action requires particular consideration by the court given the number of proposed defendant-intervenors and the Joint Stipulation in Lieu of the Preliminary Injunction filed by plaintiffs.  *See* Joint Stipulation.  Plaintiffs argue that the sheer number of proposed defendant-intervenors will unduly delay and prejudice plaintiffs in the litigation of the instant action.  Pls. Resp. Opp'n at 41-42.

The court has clarified that motions for intervention must be weighed against the principles of USCIT Rule 1 to promote the "just, speedy and inexpensive determination of every action and proceeding":

> [S]ix plaintiffs have expressed opposition to the Coalition's intervention.  In exercising its discretion under § 2631(j)(2) and Rule 24(b), the court concludes that adding the Coalition as intervenors will burden the plaintiffs in all twelve actions with the need to respond to additional submissions and, unavoidably, also cause delays. These burdens and delays are not justified by broadening this litigation to allow the intervention that is sought here.  In summary, allowing the intervention would not promote the principle expressed in USCIT Rule 1 that this Court's rules be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."

*PrimeSource*, 45 CIT at __, 494 F. Supp. 3d at 1312-13 (2021) (quoting USCIT R. 1). The court weighs the burden presented by nine additional litigants in the instant action under Rule 1 against the effects (including potential reliquidation of entries that remain unliquidated) that the proposed defendant-intervenors may experience if the court decides in plaintiffs' favor.  Joint Stipulation ¶ 3.  These potential effects include that "if plaintiffs ultimately prevail upon the merits, the Court has the power to order

Court No. 23-00274                                                                Page 44

reliquidation of entries that remain unliquidated as of the date that the Court enters an

order upon [the Joint Stipulation]." See *id.*

The reliquidation of entries would affect not only defendants in the instant action,

but also proposed defendant-intervenors.  Weighing plaintiffs' rights under Rule 1 with

the interests and rights of proposed defendant-intervenors and the court's motivation to

receive a full understanding of the legal and factual issues presented and the

perspectives of interested parties, the court determines that the intervention of proposed

defendant-intervenors would not "unduly delay or prejudice the adjudication of the

original parties' rights."  USCIT R. 24(b).  Further, to ensure the most effective

presentation of arguments given the number of proposed defendant-intervenors, the

court orders duplicative arguments to be omitted from the briefs of proposed defendant-

intervenors.  The court notes also that the granting of defendants' and plaintiffs' Joint

Stipulation and plaintiffs' subsequent withdrawal of its motion for a preliminary injunction

will diminish further the chances for any such undue delay.

## CONCLUSION

For the foregoing reasons, the court denies defendants' motions to dismiss for

lack of subject matter jurisdiction and grants the Joint Stipulation of plaintiffs and

defendants.  The court grants the motions to intervene under Rule 24(b) of proposed

defendant-intervenors.  In consideration of the large number of defendant-intervenors

and the potential that their participation will "unduly delay or prejudice the rights of the

original parties," the court orders defendant-intervenors to omit duplicative arguments in

all future submissions.  Finally, the court grants the Supplemental Protective Order.

Court No. 23-00274                                                     Page 45

Accordingly, it is hereby

    **ORDERED** that the Motions to Dismiss of defendants and proposed defendant-intervenors are **DENIED**; it is further

    **ORDERED** that the Motions to Intervene of proposed defendant-intervenors are granted; it is further

    **ORDERED** that the Supplemental Protective Order is granted; it is further

    **ORDERED** that the Joint Stipulation of plaintiffs and defendants is granted; and it is further

    **ORDERED** that parties file a Joint Proposed Briefing Schedule within 14 days of this opinion and order.

    **SO ORDERED.**

                                        /s/     Timothy M. Reif
                                        Timothy M. Reif, Judge

Dated:        May 9, 2024
          New York, New York

Slip Op. 25-111

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **AUXIN SOLAR, INC., AND CONCEPT CLEAN ENERGY, INC.**, | |
| Plaintiffs, | |
| v. | **Before: Timothy M. Reif, Judge** |
| **UNITED STATES, et al.,** | |
| Defendants, | **Court No. 23-00274** |
| and | **PUBLIC VERSION** |
| **AMERICAN CLEAN POWER ASSOCIATION, et al.,** | |
| Defendant-Intervenors. | |

## <u>OPINION AND ORDER</u>

[Granting Plaintiffs' Motion for Judgment on the Agency Record.]

Dated: August 22, 2025

<u>Thomas M. Beline</u> and <u>James E. Ransdell</u>, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for Plaintiffs Auxin Solar, Inc. and Concept Clean Energy, Inc.  With them on the briefs were <u>Roop K. Bhatti</u>, <u>Chase J. Dunn</u>, and <u>Sydney C. Reed</u>.

<u>Douglas G. Edelschick</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., <u>Spencer Neff</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C., and <u>Alexandra Khrebtukova</u>, Senior Attorney (Trade & Finance), U.S. Customs and Border Protection, of Washington, D.C., argued for Defendants.  With them on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Tara K. Hogan</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C.  Of counsel on the brief were <u>Elio Gonzalez</u>, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C., and <u>Emma L. Tiner</u>, Attorney, Office of the Assistant Chief Counsel, U.S. Customs and Border Protection, of Washington, D.C.

Appx73

Jeffrey S. Grimson and Kristin H. Mowry, Mowry & Grimson, PLLC, of Washington, D.C., argued for Defendant-Intervenors American Clean Power Association, JA Solar USA, Inc., JA Solar Vietnam Co. Ltd., JA Solar Malaysia Sdn. Bhd., and JA Solar International Ltd.  With them on the brief were Bryan P. Cenko, Clemence D. Kim, and Evan P. Drake.

Jonathan T. Stoel, Craig A. Lewis, and Gregory M.A. Hawkins, Hogan Lovells US LLP, of Washington, D.C., argued for Defendant-Intervenors Canadian Solar (USA) Inc., Canadian Solar International Ltd., BYD (H.K.) Co., Ltd., and BYD America LLC.  With them on the brief were Michael G. Jacobson, Nicholas R. Sparks, Lindsay K. Brown, and Nicholas W. Laneville.

Matthew R. Nicely and Daniel M. Witkowski, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington, D.C., argued for Defendant-Intervenors Solar Energy Industries Association and NextEra Energy, Inc.  With them on the brief was Julia K. Eppard.

Weronika Bukowski and Robert L. LaFrankie, II, Crowell & Moring, LLP, of Washington, D.C., argued for Defendant-Intervenors Invenergy Renewables LLC and Invenergy Solar Equipment Management LLC.  With them on the brief were John B. Brew, Alexander H. Schaefer, and Amanda S. Berman.

Gregory S. Menegaz, The Inter-Global Trade Law Group, PLLC, of Washington, D.C., argued for Defendant-Intervenor Risen Solar Technology Sdn. Bhd.

David M. Morrell, Jones Day, of Washington, D.C., argued for Defendant-Intervenors Boviet Solar Technology Co., Ltd. and Boviet Solar USA., Ltd.

Jonathan M. Freed, Kenneth N. Hammer, and MacKensie R. Sugama, Trade Pacific PLLC, of Washington, D.C., for Defendant-Intervenors Trina Solar (U.S.) Inc., Trina Solar (Vietnam) Science & Technology Co., Ltd., Trina Solar Energy Development Company Ltd., and Trina Solar Science & Technology (Thailand) Ltd.

Ned H. Marshak and Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP, of New York, NY, for Defendant-Intervenors Jinko Solar (U.S.) Industries Inc., JinkoSolar (U.S.) Inc., Jinko Solar Technology Sdn. Bhd., Jinko Solar (Malaysia) Sdn. Bhd., JinkoSolar (Vietnam) Co., Ltd., JinkoSolar Holding Co., Ltd., Jinkosolar Middle East DMCC, JINKOSOLAR INVESTMENT LIMITED (f/k/a Jinkosolar Technology Limited), and Jinkosolar (Vietnam) Industries Co., Ltd.

* * *

Reif, Judge:  Before the court is the motion for judgment on the agency record by

plaintiffs Auxin Solar, Inc. ("Auxin Solar") and Concept Clean Energy, Inc. ("CCE")

(together, "plaintiffs").[1]  Plaintiffs invoke this Court's subject matter jurisdiction under 28 U.S.C. § 1581(i) and seek vacatur of the final rule of the Department of Commerce ("Commerce") published as *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414* ("Duty Suspension Rule"), 87 Fed. Reg. 56,868 (Dep't of Commerce Sept. 16, 2022) and codified as 19 C.F.R. pt. 362 (2022), which implemented Proclamation 10414 of June 6, 2022, published as Proclamation No. 10414, *Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia*, 87 Fed. Reg. 35,067 (June 9, 2022).

Plaintiffs allege that the Duty Suspension Rule is unlawful because it violates the statutory authority, 19 U.S.C. § 1318(a), invoked by Proclamation 10414 in declaring an emergency and by Commerce in promulgating the Duty Suspension Rule.  For the reasons discussed below, the court grants plaintiffs' Rule 56.1 Motion for Judgment on the Agency Record.

**BACKGROUND**

I.      **Factual Background**

A.      **AD/CVD and Circumvention Determinations**

Since 2012, Commerce has administered antidumping and countervailing duty orders covering Crystalline Silicon Photovoltaic cells whether or not assembled into modules ("CSPV cells and modules") from the People's Republic of China ("China").  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,*

---

[1] Auxin Solar is a domestic manufacturer of Crystalline Silicon Photovoltaic ("CSPV") modules.  Compl. ¶ 5, ECF No. 2.  CCE is a domestic designer of solar structures that incorporate domestically-manufactured CSPV modules.  *Id.* ¶ 6.

*From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012).

On April 1, 2022, Commerce initiated inquiries to determine whether imports of CSPV cells and modules produced in Cambodia, Malaysia, Thailand and Vietnam (the "subject countries") circumvented the AD/CVD orders by incorporating parts and components from China. *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 Fed. Reg. 75,221-26 (Dep't of Commerce Dec. 8, 2022).

On August 23, 2023, Commerce issued a final determination concluding that CSPV cells and modules from the subject countries were circumventing the AD/CVD orders on CSPV cells and modules from China. *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam* ("Final Determination"), 88 Fed. Reg. 57,419-22 (Dep't of Commerce Aug. 23, 2023).

**PUBLIC VERSION**

### B.    Presidential Proclamation 10414 and the Duty Suspension Rule

On June 9, 2022, President Biden declared an emergency pursuant to 19 U.S.C. § 1318(a)[2] with respect to threats to the availability of sufficient electricity generation capacity to meet expected customer demand in the United States.  Proclamation 10414, 87 Fed. Reg. at 35,067-69.[3]  Proclamation 10414 authorized Commerce to take action under § 1318(a) to permit the importation of CSPV cells and modules from the subject countries into the United States "free of the collection of duties and estimated duties." *Id*. at 35,068.  The declared emergency was set to expire 24 months after the date of proclamation.  *Id.*  On June 6, 2024, the declared emergency expired, at which time

---

[2] Section 318 of the Tariff Act of 1930 provides that:

> Whenever the President shall by proclamation declare an emergency to exist by reason of a state of war, or otherwise, he may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act, and may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, *the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work*.  The Secretary of the Treasury shall report to the Congress any action taken under the provisions of this section.

19 U.S.C. § 1318(a) (emphasis supplied).

[3] President Biden declared that an emergency existed due to the threat that there would be insufficient electricity generation capacity available to meet expected demand. Proclamation No. 10414, *Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia*, 87 Fed. Reg. 35,067, 35,067-69 (June 9, 2022).  The proclamation identified multiple factors — including Russia's invasion of Ukraine and extreme weather events exacerbated by climate change — that contributed to the declaration of a state of emergency concerning access to electricity and energy.  *Id*.  Plaintiffs do not challenge Proclamation 10414 itself and plaintiffs' complaint "assumes *arguendo* that Proclamation 10414 constitutes the declaration of an emergency pursuant to . . . 19 U.S.C. § 1318(a)."  Pls. Mot. for J. on the Agency R. ("Pls. Br.") at 5 n.2, ECF No. 93; *see also* Compl. ¶ 51 n.5, ECF No. 2.

relevant imports of CSPV cells and modules once again became subject to antidumping and countervailing duties.  *See* 19 C.F.R. §§ 362.102, 362.103(a).

On September 16, 2022, Commerce promulgated the final Duty Suspension Rule pursuant to Proclamation 10414.  Duty Suspension Rule, 87 Fed. Reg. at 56,868.  The Duty Suspension Rule, which became effective on November 15, 2022, provides the procedures governing the suspension of liquidation and collection of estimated duties in accordance with Proclamation 10414:

> Commerce shall instruct U.S. Customs and Border Protection ["Customs"] to discontinue the suspension of liquidation and collection of cash deposits for any [Southeast Asian]-Completed Cells and Modules that were suspended, in connection with initiation of the circumvention inquiries, pursuant to § 351.226(l)(1).  If, at the time Commerce issues instructions to [Customs], the entries are suspended only for purposes of the circumvention inquiries, Commerce will direct [Customs] to liquidate those entries without regard to AD/CVD duties and refund those cash deposits collected pursuant to the circumvention inquiries . . . .  If, before the [expiration of the emergency], Commerce issues an affirmative final determination in a circumvention inquiry covering [Southeast Asian]-Completed Cells and Modules, Commerce will not, at that time, direct [Customs] to suspend liquidation and collect cash deposits of estimated AD/CVD duties for entries of that merchandise entered, or withdrawn from warehouse, for consumption before, on, or after the date of initiation of that circumvention inquiry and that are to be utilized in the United States by the Utilization Expiration Date . . . .

*Id.* at 56,869-70.

As noted above, Commerce did issue an affirmative final circumvention determination prior to the expiration of the emergency.  *See* Final Determination, 88 Fed. Reg. at 57,419.  Pursuant to the Duty Suspension Rule, Commerce determined that it would "not direct [Customs] to suspend liquidation, and require cash deposits, of

estimated ADs and CVDs based on these affirmative determinations of circumvention on any 'Applicable Entries.'"[4]  *Id.* at 57,421.

## II.   Procedural History

On December 29, 2023, plaintiffs filed their public complaint contesting Commerce's final Duty Suspension Rule.  *See* Compl., ECF No. 2.  On January 17, 2024, plaintiffs filed both their confidential complaint and their motion for preliminary injunction.  Conf. Compl., ECF No. 14; Pls. Mot. for Prelim. Inj., ECF No. 15.  On January 22, 2024, defendants filed their motion to dismiss the case for lack of jurisdiction.  *See* Defs. Mot. to Dismiss, ECF No. 16.

On May 9, 2024, the court: (1) denied defendants' motion to dismiss and determined that exercise of jurisdiction is appropriate under the Court's residual jurisdiction statute, 28 U.S.C. § 1581(i); (2) granted the motions to intervene of nine defendant-intervenors;[5] and (3) granted defendant-intervenors' consent motion for a

---

[4] "Applicable Entries" are defined in the Duty Suspension Rule as "entries of Southeast Asian-Completed Cells and Modules that are entered into the United States, or withdrawn from warehouse, for consumption before the Date of Termination and, for entries that enter after November 15, 2022, are used in the United States by the Utilization Expiration Date."  19 C.F.R. § 362.102 (2022).  The "Utilization Expiration Date" is defined as "the date 180 days after the Date of Termination" on "June 6, 2024, or the date the emergency described in Presidential Proclamation 10414 has been terminated, whichever occurs first."  *Id*.

[5] These nine defendant-intervenors are: (1) American Clean Power Association ("ACP"); (2) Canadian Solar (USA) Inc. and Canadian Solar International Limited (collectively, "Canadian Solar"); (3) Solar Energy Industries Association ("SEIA"); (4) JA Solar USA, Inc., JA Solar Vietnam Company Limited, JA Solar Malaysia Sdn. Bhd. and JA Solar International Limited (collectively, "JA Solar"); (5) NextEra Energy, Inc. ("NextEra"); (6) BYD (H.K.) Co., Ltd. and BYD America LLC (collectively, "BYD"); (7) Invenergy Renewables LLC. and Invenergy Solar Equipment Management LLC (collectively, "Invenergy"); (8) Trina Solar (U.S.) Inc., Trina Solar (Vietnam) Science and Technology Co., Ltd., Trina Solar Energy Development Company Limited and Trina Solar Science &

Court No. 23-00274                                                                          Page 8

supplemental protective order governing those parties' information. *Auxin Solar, Inc. v. United States* ("*Auxin Solar I*")*, 48 CIT \_\_, 698 F. Supp. 3d 1353, 1364 (2024). The court granted also, in lieu of a preliminary injunction, the parties' Joint Stipulation that the court has the authority to "order reliquidation and direct the United States to reliquidate entries 'for which liquidation was not suspended and cash deposits were not collected pursuant to'" the Duty Suspension Rule. *Id.* at 1364, 1371-72 (quoting Joint Stipulation ¶ 1, ECF No. 19).

On June 11, 2024, the court granted the motions to intervene of two further defendant-intervenors.[6] Order Granting Def.-Intervenor Mot. to Intervene ("DI Order I"), ECF No. 90; Order Granting Def.-Intervenor Mot. to -Intervene ("D-I Order II"), ECF No. 91.

On July 22, 2024, plaintiffs filed their Rule 56.1 Motion for Judgment on the Agency Record requesting the court: (1) hold the Duty Suspension Rule arbitrary, capricious, an abuse of discretion, unlawful *ab initio*, and/or otherwise contrary to the standards set forth in 5 U.S.C. § 706(2); (2) order vacatur of the Duty Suspension Rule; and (3) order defendants to identify all relevant duty-free entries under the Duty

---

Technology (Thailand) Ltd. (collectively, "Trina Solar"); and (9) Risen Solar Technology Sdn. Bhd ("Risen Solar"). *Auxin Solar, Inc. v. United States* ("*Auxin Solar I*")*, 48 CIT \_\_, 698 F. Supp. 3d 1353, 1360 n.1 (2024).

[6] Subsequently approved defendant-intervenors are: (10) Boviet Solar Technology Sdn. Bhd. and Boviet Solar USA., Ltd. (collectively, "Boviet Solar"); and (11) Jinko Solar (U.S.) Industries Inc., JinkoSolar (U.S.) Inc., Jinko Solar Technology Sdn. Bhd., Jinko Solar (Malaysia) Sdn. Bhd., JinkoSolar (Vietnam) Co., Ltd., JinkoSolar Holding Co., Ltd., Jinkosolar Middle East DMCC, JINKOSOLAR INVESTMENT LIMITED (f/k/a Jinkosolar Technology Limited), and Jinkosolar (Vietnam) Industries Company Limited (collectively, "Jinko Solar"). Order Granting Def.-Intervenor. Mot. to Intervene ("DI Order I"), ECF No. 90; Order Granting Def.-Intervenor. Mot. to Intervene ("DI Order II"), ECF No. 91.

Suspension Rule and reliquidate and collect any uncollected antidumping and countervailing duties.  Pls. Mot. for J. on the Agency R. ("Pls. Br.") at 2-3, ECF No. 93.

On October 29, 2024, defendants filed their response.  Defs. Resp. to Pls. Mot. for J. on the Agency R. ("Defs. Br."), ECF No. 95.  On November 19, 2024, defendant-intervenors filed their response in support of defendants.  Def.-Intervenors Resp. to Pls. Mot. for J. on the Agency R. ("D-I Br."), ECF No. 96.  On December 19, 2024, plaintiffs filed their reply to defendants' and defendant-intervenors' responses.  Pls. Rep. Supp. Mot. for J. on the Agency R. ("Pls. Rep. Br."), ECF No. 100.

On June 26, 2025, the court held oral argument.  *See* Oral Arg. Tr., ECF No. 114.

## JURISDICTION AND STANDARD OF REVIEW

Whether a court has subject matter jurisdiction to hear an action is a "threshold" inquiry.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  The Court has subject matter jurisdiction over plaintiffs' action pursuant to 28 U.S.C. § 1581(i)(1)(D).  *See Auxin Solar I*, 48 CIT at __, 698 F. Supp. 3d at 1371 ("[T]he instant action . . . falls within the residual jurisdiction of the Court . . . because it pertains to the 'administration and enforcement' of Commerce's circumvention findings.").  Pursuant to 28 U.S.C. § 2640(e),[7] the court reviews the present matter under the Administrative Procedure Act ("APA"), codified at 5 U.S.C. § 706.  The APA provides in relevant part that "the reviewing court shall decide all relevant questions of law [and] interpret constitutional and statutory provisions."  5 U.S.C. § 706.

---

[7] 28 U.S.C. § 2640(e) reads: "In any civil action not specified in this section, the Court of International Trade shall review the matter as provided in [the Administrative Procedure Act]."

In agency cases, courts will analyze the meaning of statutes using "the traditional tools of statutory construction*." Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024). Because agencies have "no special competence in resolving statutory ambiguities," *id.* at 400–01, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 412. It is "the proper and peculiar province of the courts" to determine independently the best reading of a statute. *Id.* at 385 (quoting The Federalist No. 78, at 525) (Alexander Hamilton) (Jacob Cooke ed., 1961)).

## DISCUSSION

### I.     Whether the Duty Suspension Rule Violates 19 U.S.C. § 1318(a)

The court addresses plaintiffs' challenge to the lawfulness of Commerce's Duty Suspension Rule. Plaintiffs argue that the Duty Suspension Rule violates 19 U.S.C. § 1318(a) in three ways: (1) CSPV cells and modules are not encompassed within the types of goods eligible for duty-free treatment under section 1318(a); (2) Commerce exceeded its authority by extending duty-free treatment to goods imported prior to the declaration of emergency; and (3) Commerce exceeded its authority by granting duty-free treatment to goods based on certifications that the goods would be used within 180 days after the termination of the emergency. *See* Pls. Br. at 8-14.

The court addresses each of these issues in turn.

### A.     Whether § 1318(a) Authorizes the Duty-Free Importation of CSPV Cells and Modules

The court addresses first whether 19 U.S.C. § 1318(a) authorizes the duty-free importation of CSPV cells and modules. For the reasons discussed below, the court

concludes that § 1318(a) does not authorize the duty-free importation of CSPV cells and modules.

Section 1318(a), enacted as part of the Tariff Act of 1930, is found at Subtitle II ("Special Provisions"), Part I ("Miscellaneous"), and is titled "Emergencies."  Section 1318(a) provides that "[w]henever the President shall by proclamation declare an emergency to exist . . . he may authorize the Secretary . . . to permit, under such regulations as the Secretary . . . may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work."

Plaintiffs argue that the plain meaning of § 1318(a) "circumscribes duty-free treatment in two ways": (1) "only the five named types of goods ('food, clothing, and medical, surgical, and other supplies') are eligible for duty-free treatment"; and (2) "goods of an eligible type may only be afforded duty-free treatment if 'use[d] in emergency relief work.'"  Pls. Br. at 18.

As to the first point, plaintiffs contend that "the categories of goods expressly named . . . , in their ordinary, contemporaneous meanings, do not encompass CSPV cells and modules."  *Id.* at 19.  Plaintiffs argue further that the final statutory category, "other supplies," "must resemble medical supplies and surgical supplies and does not encompass CSPV cells and modules."  *Id.* at 21.

As to the second point, plaintiffs assert that the ending clause, "for use in emergency relief work," "is a limitation, not an independent grant of authority[,] . . . [and] cannot reasonably be construed as encompassing any good, whatever the type, capable of relieving a Presidentially declared emergency."  *Id.* at 25.

**PUBLIC VERSION**

Court No. 23-00274                                                                 Page 12

Defendants argue in response that the plain meaning of "other supplies" in §

1318(a) "encompasses any materials dispensed to fill a *need* that are different from the

'medical' . . . and 'surgical' supplies already mentioned."  Defs. Br. at 15.  Defendants

assert therefore that "other supplies" is a "general, catchall term, that provides the

President (and Commerce) with flexibility" to define the term depending on the particular

needs of a specific declared emergency.  *Id.*  Additionally, defendants read together as a

single clause "other supplies for use in emergency relief work" to claim that § 1318(a)

permits duty-free treatment for "any supplies . . . that are needed for work to relieve a

particular emergency declared by the President."  *Id.*

The court notes that this appears to be an issue of first impression and that there

is no prior judicial interpretation of § 1318(a) on which to rely.  Therefore, the court will

apply the traditional tools of statutory construction "at [its] disposal to determine the best

reading of the statute and resolve" any ambiguity.  *Loper Bright*, 603 U.S. at 400, 401

("The very point of the traditional tools of statutory construction — the tools courts use

every day — is to resolve statutory ambiguities.").

> **1.      Whether the Ordinary Meaning of § 1318(a) Permits Duty-Free
>           Treatment of CSPV Cells and Modules**

The Supreme Court has, on numerous occasions, explained that the job of the

courts in interpreting a statutory term is to determine the "ordinary public meaning" of

the term "at the time of its enactment."  *Bostock v. Clayton County, Georgia*, 590 U.S.

644, 654 (2020); *see also Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A

fundamental canon of statutory construction is that, unless otherwise defined, words will

be interpreted as taking their ordinary, contemporary, common meaning.").  Here, none

of the relevant statutory terms of § 1318(a) are defined.  Therefore, the court will begin

by ascertaining the ordinary and contemporary meaning of "food, clothing, and medical, surgical, and other supplies for use in emergency relief work."  19 U.S.C. § 1318(a).

The Supreme Court has held that "the plain meaning of a statute is to be ascertained using standard dictionaries in effect at the time of the statute's enactment." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1353 (Fed. Cir. 2005) (citing *Lamar v. United States*, 241 U.S. 103, 113 (1916)) (ascertaining the meaning of "responsible" using *Webster's Third New International Dictionary of the English Language*).  The parties agree that *Webster's New International Dictionary Unabridged,* Second Edition (1934) ("*Webster's*"), provides definitions that reflect the ordinary and contemporary meaning of terms as understood when Congress enacted § 1318(a) in 1930.  *See* Pls. Br. at 20; Defs. Br. at 15 n.7.  Further, the Supreme Court in 1947 endorsed *Webster's* as one of the "principal standard dictionaries."  *Crane v. Comm'r.*, 331 U.S. 1, 6, 6 n.14 (1947) (ascertaining the meaning of "property" in the Revenue Act of 1938).

As an initial matter, defendants concede that the ordinary and contemporary meanings of "food" and "clothing" do not encompass CSPV cells and modules.  Defs. Br. at 14.  Additionally, defendants do not argue that CSPV cells and modules fall within the ordinary and contemporary meaning of "medical [or] surgical . . . supplies."[8]  *See id.* at 14-15.  Rather, defendants assert that the ordinary meaning of "other supplies" in § 1318(a) "encompasses any materials dispensed to fill a *need* that are different from the 'medical' . . . and 'surgical' supplies already mentioned."  *Id.* at 15.

---

[8] *Webster's* defines "medical" as "[o]f, pert. to, or dealing with, the healing art, or the science of medicine, esp. in the narrower sense; as, the *medical* profession; *medical* services."  *Webster's* at 1527.  *Webster's* defines "surgical" as "[o]f or pertaining to surgeons or surgery; done by, or used in surgery."  *Id.* at 2538.

**PUBLIC VERSION**

Court No. 23-00274                                                                                               Page 14

*Webster's* contains several possible definitions of "other." As an adjective, which is how it functions in the term "other supplies," "other" has two primary definitions: (1) "[b]eing the one of two (or more) distinct from the one already mentioned or understood"; or (2) "[a]dditional; as without *other* resources; in any *other* place . . . . Not the same; different; as, in *other* circumstances; *other* than what he is." *Webster's* at 1729.

Similarly, *Webster's* provides several possible definitions of "supply." As a plural noun, which is how it is found in the term "other supplies," "supply" is defined as "[p]rovisions, clothing, arms, raw materials, etc., set aside to be dispensed at need; stores; as, to lay in *supplies* for the winter; in charge of *supplies* in a factory." *Id.* at 2534.

Therefore, by combining the definitions of "other" and "supply," the court derives the ordinary meaning of the term "other supplies" as follows: provisions or materials dispensed to fill a need, which are distinct from, or additional to, the "medical" or "surgical" supplies already mentioned. This meaning of "other supplies" is, on its face, a very broad one that appears to encompass CSPV cells and modules, as CSPV cells and modules are materials that may be dispensed to fill a need, i.e., energy demand, and are plainly distinct from "medical" or "surgical" supplies. *See* Proclamation No. 10414, 87 Fed. Reg. at 35,067-68.

However, the Supreme Court has held also that the interpretation of a statutory term "does not turn solely on dictionary definitions of its component words." *Yates v. United States*, 574 U.S. 528, 537 (2015). Rather, the meaning of statutory language is "determined not only by reference to the language itself, but as well by the specific

context in which that language is used, and the broader context of the statute as a

whole." *Id.* (citation modified) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341

(1997)). "Ordinarily, a word's usage accords with its dictionary definition," but

sometimes "the same words, placed in different contexts . . . mean different things." *Id.*;

*see also Comm'r. v. National Carbide Corp.*, 167 F.2d 304, 306 (2d Cir. 1948) ("[W]ords

are chameleons, which reflect the color of their environment . . . .").[9]

In *Yates*, the Supreme Court was tasked with ascertaining the meaning of the

term "tangible object" as it appears in § 1519 of the Sarbanes-Oxley Act of 2002. *Yates*,

574 U.S. at 532. The Supreme Court, citing *Webster's Third New International*

*Dictionary*, acknowledged that the ordinary meaning of "an 'object' that is 'tangible,' as

stated in dictionary definitions, is 'a discrete . . . thing.'" *Id.* at 537. The Court noted

also that dictionary definitions of the words "tangible" and "object" suggested a broad

reading of "tangible object" that included any physical evidence, including "fish from the

sea";[10] however, the Court determined that those definitions were not dispositive. *Id.* at

---

[9] In *National Carbide Corp.*, the Second Circuit considered the meaning of "corporation" within the Revenue Act of 1934 in a case concerning whether "a wholly owned subsidiary of a parent corporation shall be treated for purposes of income taxation as a separate taxable person." *Comm'r. v. National Carbide Corp.*, 167 F.2d 304, 305 (2d Cir. 1948). The Second Circuit noted that although such subsidiaries "might be in some contests a 'corporation,' . . . in a tax statute 'corporation' could not have been so intended." *Id.* at 306. Therefore, the Second Circuit held that "corporation," as "Congress must be understood to have used it," could not mean "a jural person created . . . to serve merely as an escape from taxation." *Id.*

[10] The factual background of *Yates* involved a commercial fishing boat captain throwing undersized red grouper overboard in an attempt to conceal the illegally caught fish from a federal agent during an offshore inspection. *Id.* at 531. The captain was then charged with, and convicted of, violating § 1519, which provides for fines or imprisonment for "[w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object." *Id.* The captain challenged

537-38.  Rather, the Supreme Court applied several "[f]amiliar interpretive guides" to aid

its construction of "tangible object," concluding that the context of § 1519 resisted the

more expansive reading of the term proffered by defendants in that case.  *Id.* at 539,

549.

Likewise, in this case, the context of § 1318(a) "tugs strongly in favor of a

narrower reading" of "other supplies."  *Id.* at 539.  The words immediately preceding

"other supplies" in § 1318(a) — "food, clothing, and medical, surgical, and" — "cabin the

contextual meaning of that term."  *Id.* at 543.  The principle of *noscitur a sociis*, which

states that "a word is known by the company it keeps," instructs the court to "avoid

ascribing to one word a meaning so broad that it is inconsistent with its accompanying

words.  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995);[11] *see also Jarecki v. G.D.

Searle & Co.*, 367 U.S. 303, 307 (1961) ("The maxim *noscitur a sociis* . . . is often wisely

applied where a word is capable of many meanings in order to avoid the giving of

unintended breadth to the Acts of Congress.") (emphasis supplied).

*Noscitur a sociis* operates in conjunction with the closely related canon of

*ejusdem generis*, which counsels that "where general words follow specific words in a

statutory enumeration, the general words are construed to embrace only objects similar

---

his conviction, arguing that § 1519's reference to "tangible object" encompasses "objects used to preserve [information]," such as "computers," not fish."  *Id.* at 536.

[11] In *Gustafson*, the Supreme Court interpreted the word "communication" in section 2(10) of the Securities Act of 1933 to refer to a public communication, rather than any communication, because "communication" appeared in a list with other words, namely "prospectus, notice, circular, advertisement [or] letter."  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).  The Court held that from those other words, it was "apparent that the list refer[red] to documents of wide dissemination," even though the list began with the word "any."  *Id.*

**PUBLIC VERSION**

Court No. 23-00274                                                    Page 17

in nature to those objects enumerated by the preceding specific words." *Wash. St. Dept. of Social and Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003) (citation modified) (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001)).

The statutory interpretation question before this court has many parallels with the statutory interpretation question in *Yates*. As in *Yates*, the court is tasked with ascertaining the meaning of a statutory term that: (1) consists of broad component words that suggest a general, catchall meaning; and (2) is found at the end of a list of more specific enumerated terms that cabin its otherwise broad meaning through the application of long-recognized canons of construction.

In *Yates*, the Supreme Court noted that "tangible object" appears last in a list of terms that begins with "any record [or] document." *Yates*, 574 U.S. at 544. Therefore, the Supreme Court, applying *noscitur a sociis*, concluded that the term was "appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects involving records and documents, *i.e.*, objects used to record or preserve information." *Id.* Additionally, the Supreme Court narrowed the meaning of "tangible object" in accordance with the list of actions proscribed by § 1519, namely "*falsif[ying]*, or *mak[ing] a false entry* in any record, document, or tangible object." *Id.* The Court explained that those actions "typically take as grammatical objects records, documents, or things used to record or preserve information, such as logbooks or hard drives." *Id.* Last, the *Yates* Court applied *ejusdem generis*, reasoning that "[h]ad Congress intended 'tangible object' . . . to be interpreted so generically as to capture physical objects as dissimilar as documents and fish, Congress would have had no

reason to refer specifically to 'record' or 'document.'" *Id.* at 546.  The Court added that an "unbounded reading of 'tangible object' would render [record or document] misleading surplusage." *Id.*

Here, the application of *noscitur a sociis* and *ejusdem generis* to § 1318(a) likewise points to a reading of "other supplies" that is narrower than "provisions or materials dispensed to fill a need, which are distinct from, or additional to, 'medical' or 'surgical' supplies."  It is true that "other supplies" does contemplate emergency supplies that are distinct from, or additional to, "medical" or "surgical" supplies.  However, the most natural reading of "other supplies" is not "the entire universe of supplies other than 'medical' or 'surgical' supplies."  Such a reading would be inconsistent with the enumeration of the preceding specific words and would render Congress' choice of those specific words "misleading surplusage." *Id.*  Instead, *noscitur a sociis* and *ejusdem generis* suggest that "other supplies" encompasses those supplies that are similar in nature to, or share common attributes with, "medical" or "surgical" supplies. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) (applying *ejusdem generis* to "interpret a general or collective term at the end of a list of specific items in light of any common attributes shared by the specific items.") (citation modified).

In considering the contemporary definitions of "medical" and "surgical," *see supra* note 8, "other supplies" is most naturally read to encompass items for use in healthcare-related applications that are not for medical or surgical purposes.  It is not difficult to think of any number of items that might potentially fall under this meaning of "other supplies," e.g., pharmaceuticals, physical therapy equipment, nursing supplies or hospital beds.  CSPV cells and modules do not share common attributes with "medical"

or "surgical" supplies and are plainly not for use in healthcare-related applications.

Therefore, the court concludes that the plain meaning of the statute, including the term

"other supplies" in § 1318(a), does not encompass CSPV cells and modules.

In addition, another relatively recent doctrine, the "elephants in mouseholes"

principle, lends further support to a reading of "other supplies" narrower than that

proffered by defendants. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468

(2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in

vague terms or ancillary provisions — it does not . . . hide elephants in mouseholes.").

The *Yates* Court invoked this principle in concluding that it was "highly improbable that

Congress would have buried a general spoliation statute covering objects of any and

every kind in a provision targeting fraud in financial recordkeeping." 574 U.S. at 546.

Finally, the Tariff Act of 1930 (the "Tariff Act") is a lengthy and detailed law,

consisting of nearly 200 pages of specific duty rates on thousands of enumerated

goods. *See* Pub. L. No. 71-361, 46 Stat. 590. Included amongst these enumerated

duty rates is a 35 percent ad valorem rate for "[a]ll articles suitable for producing . . .

electrical energy." *Id*. at § 1(353), 46 Stat. at 618. Section 1318(a) can be found in the

"Miscellaneous" subpart in the subtitle "Special Provisions" — a single paragraph

sandwiched between a provision for duty-free exportation of tobacco products and a

provision empowering the Legislature of Puerto Rico to impose duties upon coffee

imported into Puerto Rico. *See id.* at § 318, 46 Stat. at 696. Defendants' virtually

unbounded reading of "other supplies" in § 1318(a), which would permit potentially the

entirety of Congress' lengthy and intricate tariff scheme to be nullified by the declaration

**PUBLIC VERSION**

of a presidential emergency, would appear inconsistent as well with the provision's context in the Tariff Act.

Therefore, the court will not adopt a reading of "other supplies" that runs contrary to the "elephants in mouseholes" canon as well as *noscitur a sociis* and *ejusdem generis*.

### 2.    Consideration of Legislative History and Historical Use of § 1318(a)

In addition to the traditional textual tools of statutory interpretation, courts may also consider contemporaneous legislative history and executive branch practice as aids in the construction of ambiguous statutory provisions. *See, e.g., Edwards' Lessee v. Darby*, 25 U.S. 206, 210 (1827) ("In the construction of a doubtful and ambiguous law, the co[n]temporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect."). Parties in fact rely on tools of contemporaneous legislative history in their submissions.

However, as explained above, the best meaning of "other supplies" in § 1318(a) is neither "doubtful" nor "ambiguous" when analyzed using the traditional textual tools of statutory interpretation. The Supreme Court has emphasized repeatedly that a court's interpretive inquiry is required to "begin and end . . . with the text." *See, e.g., Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017). Further, the Supreme Court has stressed that clear statutory language and a court's construction of that language's meaning are to control over potentially contrary legislative history and executive branch practice. *See Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history . . . is meant to clear up ambiguity, not create it . . . . When presented, on the one hand, with clear statutory language and, on the other, with

**PUBLIC VERSION**

Court No. 23-00274                                                                Page 21

dueling committee reports, we must choose the language.");[12] *see also S.E.C. v. Sloan*,
436 U.S. 103, 118 (1978) ("[T]he existence of a prior administrative practice, even a
well-explained one, [does not] relieve us of our responsibility to determine whether that
practice is consistent with the agency's statutory authority.").

Here, the court finds itself in a simpler position. Even were the court to have to
take into account legislative history and past executive branch use of § 1318(a), which
the parties have put at issue, neither can be described as contrary to the court's
analysis of the statute's text and structure.

To start, the legislative history of § 1318(a) is limited. The Senate Finance
Committee report is devoid of any mention of § 318 or any similar emergency duty
suspension provision. *See* S. Rep. No. 71-37, at 61-62 (1929) (discussing sections of
H.R. 2667 in numerical order, jumping from § 313 to § 320 with no discussion of § 318).
The House Ways & Means Committee comparative print of H.R. 2667 and the Tariff Act
of 1922 notes only that § 622 of the 1922 Act was "broadened to permit the free
importation of food, clothing and supplies for use in relief work in connection with [a
presidentially declared] emergency" and that this change was embodied as § 318. *See*
H.R. Doc. No. 71-15 at 334 (1929). In sum, this minimal legislative history does not
provide a basis for overcoming the clear statutory language in § 1318(a).

---

[12] The Federal Circuit embodied this approach in a recent case concerning whether
delinquency interest is excluded from distributions under the Continued Dumping and
Subsidy Offset Act ("CDSOA"). *See Adee Honey Farms v. United States*, 107 F.4th
1322, 1334 (Fed. Cir. 2024) ("Because the [statutory] text yields a clear answer, we
need not consider legislative history."). Nevertheless, the Federal Circuit went on to
explain how, even if legislative history were considered, it did not contradict the Court's
interpretation based on the statutory text and structure. *Id.*

Turning to executive branch practice, § 1318(a) has been invoked six prior times, all between 1930 and 1946.  President Roosevelt invoked § 1318(a) five times between 1934 and 1942.  *See* (1) Proclamation No. 2093, *Emergency Due to Drought–Free Importation of Feed for Livestock*, 49 Stat. 3,404 (Aug. 10, 1934); (2) Proclamation No. 2223, *Emergency Due to Flood Conditions—Free Importation of Food, Clothing, and Medical, Surgical, and Other Supplies for Use in Emergency Relief Work*, 2 Fed. Reg. 273 (Feb. 3, 1937); (3) Proclamation No. 2498, *Emergency Due to Drought–Free Importation of Forage for Livestock*, 6 Fed. Reg. 3,715 (July 29, 1941); (4) Proclamation No. 2545, *Free Importation of Jerked Beef,* 7 Fed. Reg. 2,611 (Apr. 7, 1942); and (5) Proclamation No. 2553, *Emergency Due to State of War—Free Importation by the American National Red Cross of Food, Clothing, and Medical, Surgical, and Other Supplies*, 7 Fed. Reg. 3,143 (Apr. 30, 1942).  As their titles reflect, the Roosevelt proclamations limited duty-free treatment to goods that comport with the clear meaning of the statutory text.  Three proclamations were limited to specific categories of foodstuffs for human or animal consumption, i.e. "forage" or "feed" for livestock, and "jerked beef."  *See* Proclamation No. 2093, 49 Stat. at 3,404; Proclamation No. 2498, 6 Fed. Reg. at 3,715; Proclamation No. 2545, 7 Fed. Reg. at 2,611.  The two other Roosevelt proclamations employ the statutory language itself in cabining their application and, from context, contemplate goods for disaster relief.  *See* Proclamation No. 2223, 2 Fed. Reg. at 273 (citing "flood conditions" as the emergency); Proclamation No. 2553, 7 Fed. Reg. at 3,143 (providing for free importation "by the American National Red Cross" issued less than five months after the attack by the Empire of Japan on the

Court No. 23-00274                                                                 Page 23

United States Naval Station Pearl Harbor).  Nothing in the Roosevelt proclamations

provides a basis for overcoming the clear statutory language in § 1318(a).

In 1946, President Truman invoked § 1318(a) for the sixth and final time before

the instant proclamation.  *See* Proclamation No. 2708, *Emergency Due to Housing*

*Shortage—Free Importation of Timber, Lumber, and Lumber Products* ("Proclamation

2708"), 11 Fed. Reg. 12,695 (Oct. 29, 1946) (granting duty-free treatment to lumber

products used in housing construction).  Defendants cite Proclamation 2708 as

evidence that "other supplies" in § 1318(a) can encompass supplies such as lumber

unrelated to healthcare applications.  Defs. Br. at 24-25.

Proclamation 2708 differed from the Roosevelt proclamations in that it referenced

an additional statute, the Veterans' Emergency Housing Act of 1946 ("VEHA"),[13] to

support the proclamation's grant of duty-free treatment to imported lumber.

Proclamation No. 2708, 11 Fed. Reg. at 12,695.  President Truman linked Proclamation

2708 to the VEHA in two ways: (1) the duty-free treatment was set to expire

automatically no later than the expiration date of the VEHA; and (2) the proclamation

empowered the VEHA's Housing Expediter to "designate[] and certif[y]" the goods

eligible for duty-free treatment.  *Id.*  The proclamation's invocation of and reliance on the

---

[13] The Veterans' Emergency Housing Act of 1946 ("VEHA"), Pub. L. 79-388, 60 Stat.
207, was an Act to "expedite the availability of housing for veterans of World War II by
expediting the production and allocation of materials for housing purposes."  The VEHA
cited "an unprecedented emergency shortage of housing, particularly for veterans of
World War II and their families . . . [requiring] a program . . . to overcome the serious
shortages and bottlenecks with respect to building materials."  *Id.*  To do so, the VEHA
created an office of the Housing Expediter to "formulate such plans and programs as
are necessary to provide for an increased supply of housing . . . [and] issue such
orders, regulations, or directives to other executive agencies . . . consistent with the
execution of the aforesaid plans and programs."  *Id.* at 208.

Court No. 23-00274                                                     Page 24

authority granted by the VEHA, as well as the proclamation's sunset provision tied to

the expiration date of the VEHA distinguish this use of § 1318(a) from the instant case,

notwithstanding the inclusion by Proclamation 2708 of goods arguably not

encompassed by § 1318(a).  At a minimum, Proclamation 2708's unique entwining with

the VEHA is sufficient for the court to conclude that Proclamation 2708 does not provide

a sufficient basis for overcoming the court's textual analysis.

In sum, in response to the arguments of the parties, neither the legislative history

nor historical use of § 1318(a) is contrary to the plain meaning of the statute.  The court

concludes that § 1318(a) does not authorize the duty-free importation of CSPV cells and

modules and that the Duty Suspension Rule is ultra vires.

**B.      Whether § 1318(a) Authorizes Commerce to Waive Duties for Entries Made Prior to the Emergency Declaration**

The court turns next to whether the Duty Suspension Rule violates § 1318(a) by

granting duty-free treatment to CSPV cells and modules that entered the United States

prior to the signing of Proclamation 10414.  The Duty Suspension Rule states that

"duties will not be collected on entries of . . . Cells and Modules that entered the United

States both before and after the signing of the Proclamation."  87 Fed. Reg. at 56,870.

Commerce noted that while Proclamation 10414 specified an end-date for duty-free

treatment (June 6, 2024), it did not specify a start date.  *Id.* at 56,878 n.65.  Commerce

therefore found it "appropriate, as well as consistent with the usual operation of our

circumvention proceedings, to treat the goods in a uniform fashion until" the end of the

declared emergency.  *Id.*

Plaintiffs argue that the "plain text of [§] 1318(a) contemplates duty-free

'importation' after an emergency has been declared, not duty-free treatment for any

eligible good liquidated after the start of an emergency, whenever imported." Pls. Br. at 32. Defendants argue that § 1318(a) "does not provide for when a given import may be deemed 'free of duty,'" and instead "delegates this authority" to Commerce. Defs. Br. at 28-29.

The question of whether § 1318(a) allows for duty-free treatment of unliquidated goods that entered the country prior to the declaration of emergency is rendered moot by the court's conclusion in Part I.A of this opinion. Therefore, the court declines to reach the merits of this question. *See NASA v. Nelson*, 562 U.S. 134, 147 n.10 (2011) (holding that certain questions on a drug-use questionnaire did not violate the right to informational privacy without providing "a definitive answer to the question [of] whether there is a constitutional right to informational privacy").[14]

In sum, the court will "decide the case before [it] and leave broader issues for another day." *Id.*

**C.    Whether § 1318(a) Authorizes Commerce's Utilization Requirement**

The court turns next to whether Commerce violated § 1318(a) by providing duty-free treatment to CSPV cells and modules under the condition that they be utilized within 180 days of the expiration of the declared emergency (the "Utilization Requirement"). The Duty Suspension Rule imposed as a requirement for duty-free treatment that imported CSPV cells and modules be "utilized in the United States by the

---

[14] The Chief Justice of the Supreme Court has also endorsed a minimalist approach to deciding cases. *See* The Associated Press, *Chief Justice Says His Goal Is More Consensus on Court*, N.Y. Times (May 22, 2006) https://www.nytimes.com/2006/05/22/washington/22justice.html ("'If it is not necessary to decide more to a case, then in my view it is necessary not to decide more to a case,' Chief Justice Roberts said.").

Utilization Expiration Date, which is 180 days after" the expiration of the declared emergency.  87 Fed. Reg. at 56,869.  The Rule defined "utilization" and "utilized" to mean that the cells and modules "will be used or installed in the United States."  *Id.*

Plaintiffs argue that the Utilization Requirement violates § 1318(a)'s limitation of duty-free importation to products "for use in emergency relief work" in three ways: (1) by "permit[ting] products granted duty-free treatment to be utilized after the conclusion of the purported emergency"; (2) by "unreasonably defin[ing] 'utilization' in emergency relief work in terms that afford no actual relief of the emergency" declared in Proclamation 10414; and (3) by using "unreasonable means of ensuring that duty-free products are used in emergency relief," namely the "preclusion of suspension of liquidation and [an] *ex ante* 'certification' regime."  Pls. Br. at 36-37.

Defendants argue that Commerce reasonably imposed the Utilization Requirement to discourage stockpiling of merchandise and that nothing in § 1318(a) limits the utilization of duty-free emergency supplies to the duration of the emergency. Defs. Br. at 32-37.

For the same reasons as stated above, the question of whether § 1318(a) authorizes Commerce's Utilization Requirement is rendered moot by the court's conclusion in Part I.A of this opinion.  Therefore, the court declines to reach the merits of this question as well.

Having concluded that the Duty Suspension Rule is unlawful, the court concludes further that vacatur of the Rule is appropriate.  *See, e.g., Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1379 (Fed. Cir. 2002) (holding that under the APA a prevailing plaintiff "is entitled to a remedy under the statute, which normally will be a vacatur of the

PUBLIC VERSION

Court No. 23-00274                                                                    Page 27

agency's order"); *Invenergy Renewables LLC v. United States*, 45 CIT __, __, 552 F. Supp. 3d 1382, 1404 (2021) ("[T]he court's conclusion that USTR lacks statutory or delegated authority to withdraw an exclusion requires vacatur . . . .").

## II.    Whether Plaintiffs Are Entitled to Injunctive Relief

Having concluded that plaintiffs prevail on the merits, the court turns now to whether plaintiffs are entitled to their requested relief.  In their briefs, plaintiffs request that the court order "reliquidation of all entries [of CSPV cells and modules] that utilized the [Duty Suspension Rule] with applicable antidumping and countervailing duties."  Pls. Br. at 3-4.

As noted above, the parties have already stipulated that the court has authority to order such reliquidation.[15]  *See* Joint Stipulation; *Auxin Solar I*, 698 F. Supp. 3d at 1364, 1371-72.  However, at oral argument the government stated that it was "not aware of any entries that were properly liquidated without AD or CVD duties, consistent with the [Duty Suspension Rule]."  Oral Arg. Tr. at 8:10-12.[16]  The government explained that

---

[15] Independent of the Joint Stipulation, the Federal Circuit has "expressly confirmed the authority of the USCIT to . . . order reliquidation" in APA cases challenging Commerce's liquidation instructions.  *Auxin Solar I*, 698 F. Supp. 3d at 1369 n.14 (citing *Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1311-12 (Fed. Cir. 2004) ("The absence of an express reliquidation provision should not be read as a prohibition of such relief when [28 U.S.C. § 2643] provides the Court of International Trade with such broad remedial powers.  Here, the requested [reliquidation] is easily construed as 'any other form of relief that is appropriate in a civil action.'")); *see also AM/NS Calvert LLC v. United States*, 47 CIT at __, 654 F. Supp. 3d 1324, 1343 (2023) ("[In] *all* cases properly brought under [the CIT's] residual jurisdiction, equitable relief, including an injunction requiring reliquidation, is available under the CIT's 'broad remedial powers.'") (quoting *Shinyei*, 355 F.3d at 1312).

[16] At oral argument, the government stated that Customs began with "a total universe of approximately 44,000 entries that were made without AD or CVD cash deposits as potentially subject to the Duty Suspension Rule."  Oral Arg. Tr. at 6:22-25.  Out of those

Court No. 23-00274                                                                    Page 28

Customs, under 19 U.S.C. § 1504(b)(1),[17] has continuously extended the liquidation period for each of the approximately 20,400 entries at issue and that each of those entries is "live."[18]  *Id.* at 8:17-25.  Therefore, the government conceded that "the remedies issue is primarily a question of whether liquidation should be ordered, rather than reliquidation, because there are no liquidated entries that have coverage under the [Duty Suspension Rule] that we know of."  *Id.* at 8:12-16.

However, the government acknowledged that due to "ongoing administrative processes, . . . some . . . entries may flip . . . from one category to another over time." *Id.* at 83:23-84:1.  Accordingly, the government requested that should the Court order relief with respect to the unliquidated entries, such relief should "include some additional provision that if Customs determines any liquidated entries fall within . . . the scope of relief, . . . [those entries] should be reliquidated."  *Id.* at 83:15-23.

---

entries, the government explained that Customs determined that roughly 24,000 entries did not "qualify for coverage under the Duty Suspension Rule for one reason or another."  *Id.* at 7:1-18.  Therefore, the government concluded that there are approximately 20,400 entries that remain at issue in this case.  *Id.* at 7:18-19.

[17] 19 U.S.C. § 1504(a) provides that an entry of merchandise "shall be deemed liquidated" if not liquidated by Customs "within 1 year from . . . the date of entry [or warehouse withdrawal] of such merchandise" unless "extended under subsection (b)." Section 1504(b) provides that the one-year period available for liquidation may be extended for up to four years from the date of entry or warehouse withdrawal, i.e. Customs may grant no more than three one-year extensions beyond the standard one-year liquidation period.  *See St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 767 (Fed. Cir. 1993) (citing 19 C.F.R. § 159.12).

[18] The government explained further that Commerce's ability to continue to extend the liquidation period would begin to run out starting April 1, 2026, "because the first entry that would be potentially subject to the [Duty Suspension Rule] started with April 1st of [2022]."  Oral Arg. Tr. at 9:3-7.

Therefore, the court will analyze the appropriateness of a mixed remedy consisting of: (1) an order to defendants to liquidate all applicable entries in accordance with Commerce's affirmative circumvention determination; and (2) an order to defendants to reliquidate any entries liquidated under the Duty Suspension Rule that Customs determines to fall within Commerce's affirmative circumvention determination.

A reliquidation order is an injunctive remedy requiring the court to weigh ordinary equitable principles. *See, e.g.*, Charles H. Koch, Jr. & Richard Murphy, *Administrative Law & Practice* § 8:31 (3d ed. 2020) ("[I]njunctive relief under the APA is controlled by principles of equity . . . ."); *SSAB North American Div. v. Customs*, 32 CIT 795, 799-803, 571 F. Supp. 2d 1347, 1351-55 (2008) (analyzing the appropriateness of reliquidation by balancing equitable factors); *AM/NS Calvert LLC*, 47 CIT at __, 654 F. Supp. 3d at 1343 (Equitable "relief is subject to ordinary equitable principles, no more and no less."). However, this Court has not engaged in the same equitable factors analysis when ordering liquidation. *See, e.g.*, *Timken Co. v. United States*, 18 CIT 1, 6, 852 F. Supp. 1040, 1046 (1994), amended, 18 CIT 164 (1994) (ordering Commerce to "collect the full amount of antidumping duties calculated to be due . . . over all suspended entries of the subject merchandise" without balancing equitable factors); *Cemex, S.A. v. United States*, 27 CIT 1460, 1461 (2003) (ordering that an unliquidated entry be liquidated at the required rate without analyzing equitable principles); *LG Elecs. U.S.A., Inc. v. United States*, 21 CIT 1421, 1424-31, 991 F.Supp. 668, 672-77 (1997) (ordering Customs to liquidate entries without balancing equitable factors).

To buttress the appropriateness of a liquidation order, and because the requested remedy contemplates potential reliquidation, the court will weigh the ordinary equitable

Court No. 23-00274                                                          Page 30

factors here.  For the reasons discussed below, the court concludes that injunctive relief

in the form of liquidation and reliquidation orders is appropriate.

## A.    Legal Framework

"According to well-established principles of equity, a plaintiff seeking [injunctive

relief] must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v.*

*MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  A plaintiff must demonstrate that: (1)

"it has suffered an irreparable injury"; (2) "remedies available at law, such as monetary

damages, are inadequate to compensate for that injury"; (3) considering the balance of

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4)

"the public interest would not be disserved by a permanent injunction."  *Id.*

## B.    Analysis

The court will analyze whether plaintiffs have met their burden with respect to

each equitable factor.

### 1.    Irreparable Injury

An irreparable injury is a "viable threat of serious harm which cannot be undone."

*Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (quoting *S. J.*

*Stile Associates Ltd. v. Snyder*, 646 F.2d 522, 525 (C.C.P.A 1981); *see, e.g., In re*

*Section 301 cases*, 45 CIT __, __, 524 F. Supp. 3d 1355, 1362 (2021).  The Federal

Circuit has recognized that domestic producer plaintiffs have a "strong, continuing,

commercial-competitive stake in assuring that . . . competing importers will not escape

the monetary sanctions deliberately imposed by Congress" and that "[d]efeat of that

strong congressionally recognized competitive interest [constitutes] sufficient irreparable

injury." *Zenith Radio Corp.*, 710 F.2d at 810 (reversing the USCIT's denial of a preliminary injunction).

More recently, this Court has confirmed that domestic producer plaintiffs "derive a direct competitive benefit from the proper administration and enforcement of the antidumping laws, and more specifically, the proper assessment of antidumping duties."[19] *SSAB North American Div.*, 32 CIT at 799, 571 F. Supp. 3d at 1352. Where domestic producer plaintiffs are denied such benefit, the irreparable harm suffered is "apparent." *Id.*

Likewise, plaintiffs here have demonstrated that they suffered irreparable competitive harms resulting from the non-collection of antidumping and countervailing duties on entries of CSPV cells and modules from the subject countries. Plaintiffs have proffered evidence demonstrating that the massive influx of duty-free CSPV cells and modules depressed prices below plaintiffs' raw material costs. *See* Conf. Compl., Ex. 6 ("Rashid Decl.")[20] ¶ 29, ECF No. 14-5 ("Circumventing CSPV modules are being entered at prices . . . that are lower than Auxin's raw material costs, *i.e.*, below Auxin's cost of production . . . ."); Oral Arg. Tr. at 22:5-9 ("[P]rices crashed [from] above 30 cents

---

[19] Language from the Statement of Administrative Action accompanying the Uruguay Round Agreements Act of 1994 supports the view that Congress recognized the competitive benefit that domestic producers derive from the proper enforcement of the antidumping and countervailing duty laws. *See Statement as to How the Uruguay Round Agreements Achieve Congressional Negotiating Objectives in Uruguay Round Agreements Act, Statement of Administrative Action*, H.R. Doc. No. 103-316, vol. 1, at 1137 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4209 ("U.S. dumping and countervailing duty laws will continue to be the most important and most effective U.S. response to unfair trade practices.").

[20] Mamun Rashid is the Chief Executive Officer and co-founder of plaintiff Auxin Solar. *See* Rashid Decl. at ¶ 1.

a watt, which is already squeezing the domestic industry's ability to break even on a sale, down to 14 cents/15 cents a watt."); *see also* Pls. Br., Ex. 1 (showing year-over-year increase in imports of CSPV cells and modules from the subject countries during the period of the emergency). Additionally, plaintiffs have provided evidence of lost business opportunities linked directly to the emergency proclamation. *See* Conf. Compl., Ex. 7, ECF No. 14-5 (showing Auxin customers reducing purchase orders in response to the emergency proclamation).

In sum, plaintiffs have demonstrated that they risk being forced out of the CSPV module production business entirely. *See* Rashid Decl. ¶ 30 ("Given current pricing, the only way for a solar company to break even is if cash deposits and suspension of liquidation requirements are applied to these circumventing CSPV cells and modules. Without this corrective action . . . Auxin will have to exit the CSPV module production business altogether."); Oral Arg. Tr. at 21:16-22 ("[T]he question of injunctive relief . . . is existential. It determines whether Auxin is able to continue in business . . . ."). The Federal Circuit has recognized "price erosion" and "loss of business opportunities" as valid forms of irreparable injury. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

Therefore, the court concludes that plaintiffs have demonstrated that they will suffer an irreparable injury absent injunctive relief.

### 2.    Inadequacy of Remedies Available at Law

It is not disputed that plaintiffs have no remedy at law adequate to address their injuries. *See* Pls. Rep. Br. at 19-20; Defs. Br. at 41. Therefore, the court concludes that this factor weighs in favor of plaintiffs. *See Wirtgen Am., Inc. v. United States*, 44 CIT

__, __, 447 F. Supp. 3d 1359, 1372 (2020) ("Damage to business relationships and the loss of future sales to loyal customers cannot be repaired by money damages available at law.").

### 3.    Balance of Harms

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987)).  "Each party" includes the interests of intervening parties.  *Id.*; *see, e.g.*, *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1306 (Fed. Cir. 2012) (weighing the interests of defendant-intervenor).  As addressed above, plaintiffs' injury claims stem from the lost competitive benefit of properly collected antidumping and countervailing duties.  *See supra* Section II.B.1.

Defendants assert harms stemming from "significant [administrative] complexities associated with determining what the applicable duty rates would be for merchandise that was not previously subject to a suspension of liquidation."  Defs. Br. at 41.  However, this Court has previously held that the harm resulting from domestic producers' loss of competitive benefit "certainly outweighs the administrative inconvenience to Customs caused by reliquidation."  *SSAB North American Div.*, 32 CIT at 801, 571 F. Supp. 2d at 1353.  In *SSAB*, the Court noted that Customs' claims of administrative inconvenience were diminished by the fact that Customs "frequently must reliquidate entries several years after the original liquidations," such as in routine classification cases.  *Id.*  Here, where liquidations, not reliquidations, are likely to form

the bulk of the injunctive relief, defendants' claims of administrative inconvenience are even weaker.

Last, defendant-intervenors assert harms stemming from the "significant liability" that they would face if forced to pay antidumping and countervailing duties on merchandise that they imported in reliance on the Duty Suspension Rule.  D-I Br. at 36.  In *SSAB*, the Court recognized, in the context of reliquidation, importers' interests in the finality of liquidation.  The *SSAB* Court held that importers' interests in the finality of liquidation stood "in equipoise with Plaintiffs' interests in the proper administration of the antidumping laws."  32 CIT at 801, 571 F. Supp. 2d at 1353.  However, given that the government has confirmed to the court that no applicable entries have been liquidated thus far, defendant-intervenors' finality interests are far weaker than if reliquidation were the primary remedy.  *See* Oral Arg. Tr. at 8:10-25.

Last, in evaluating the balance of harms, the Court has held previously that "what most likely tips the balance . . . is how quickly the [moving party] moved to assert their rights once they knew or should have known about the error."  *Home Prods. Int'l, Inc. v. United States*, 43 CIT __, __, 405 F. Supp. 3d 1368, 1374 (2019), *abrogated on other grounds by Target Corp. v. United States*, 134 F.4th 1307 (Fed. Cir. 2025).  The Court has used 180 days, equal to the limit to protest a Customs liquidation decision under 19 U.S.C. § 1514, from the "error's actual or constructive revelation" as the benchmark deadline for trade cases involving reliquidation.  *Id.*

Defendants and defendant-intervenors assert that plaintiffs delayed filing their challenge for "more than 15 months after Commerce published the final Duty Suspension Rule."  Defs. Br. at 43.  Plaintiffs respond that the Duty Suspension Rule

was "a practical nullity *until* Commerce reached affirmative circumvention determinations" and that plaintiffs "reasonably opted to sue after Commerce's affirmative determinations became final, . . . filing four months thereafter." Pls. Rep. Br. at 25. Plaintiffs argue further that they "likely could not have established an Article III case or controversy beforehand." *Id.*

The court declines to determine on what exact date the Duty Suspension Rule became ripe for judicial review, let alone the reasonableness of plaintiffs' legal strategy. However, given the facts before the court, it does not appear that plaintiffs engaged in such delay as to shift the balance of harms in favor of defendants and defendant-intervenors.[21]

With respect to liquidation, the court concludes that plaintiffs' asserted harms outweigh both defendants' claims of administrative inconvenience and defendant-intervenors' finality interests. With respect to any potential reliquidation, the court concludes that plaintiffs' asserted harms outweigh defendants' harms and stand equal with defendant-intervenors' finality interests.

### 4.   Public Interest

The Federal Circuit has held that the "public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *American Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed.

---

[21] Related to their argument that plaintiffs delayed filing this action, defendants and defendant-intervenors asserted at oral argument that January 1, 2024 would be the "most appropriate" cut-off date for injunctive relief, i.e. that entries dated prior to January 1, 2024 should be outside the scope of any injunctive relief. *See* Oral Arg. Tr. at 68:8-11, 84:10-13, 85:21-24. Given that the court concludes that the timing of plaintiffs' action does not alter the balance of harms analysis, the court finds no reason to limit the scope of injunctive relief to after the filing of this action.

Cir. 2010).  Additionally, this Court has held that the public interest is best served by ensuring governmental compliance with the trade laws.  *See, e.g., Ceramica Regiomontana, S.A. v. United States*, 7 CIT 390, 397, 590 F. Supp. 1260, 1265 (1984) ("As for the public interest, there can be no doubt that it is best served by ensuring . . . compli[ance] with the law . . . ."); *SSAB North American Div.*, 32 CIT at 801, 571 F. Supp. 2d at 1354 ("[T]he public interest is served by the proper administration and enforcement of the antidumping laws.").

In this case, compliance with the trade laws was overridden by the government's promulgation of the Duty Suspension Rule.  Therefore, the court concludes that the public interest factor weighs in favor of plaintiffs.

### 5.    The Balance of Equities

Having analyzed each of the four *eBay* factors, the court concludes that the balance of equities favors granting plaintiffs injunctive relief.  With respect to a liquidation order, plaintiff has satisfied each of the four factors.  With respect to a potential reliquidation order, three factors weigh in plaintiffs' favor and one factor weighs equally between plaintiffs and defendant-intervenors.  Considering the totality of the circumstances, the balance of equities warrants reliquidation.  Therefore, the court will grant plaintiffs injunctive relief in the form of a liquidation order and a reliquidation order, should reliquidation of any entries prove necessary.

Court No. 23-00274                                                                                      Page 37

## CONCLUSION

For the foregoing reasons, the court grants plaintiffs' motion for judgment on the agency record.  Accordingly, it is hereby

**ORDERED** that Plaintiffs' Rule 56.1 Motion for Judgment on the Agency Record is **GRANTED**; it is further

**ORDERED** that *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Dep't of Commerce Sept. 16, 2022), is **VACATED**; it is further

**ORDERED** that, within 20 days of the issuance of judgment in this action, Defendants shall publish notice of said vacatur in the Federal Register; it is further

**ORDERED** that Defendants shall promptly liquidate and collect antidumping and countervailing duties on any presently unliquidated entries found to be circumventing the antidumping and countervailing duty orders on CSPV products from China in *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Dep't of Commerce Aug. 23, 2023), for which the now-vacated *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Dep't of Commerce Sept. 16, 2022) were applied; and it is further

**PUBLIC VERSION**

Court No. 23-00274                                                                Page 38

**ORDERED** that, should any of the aforementioned entries be liquidated prior to the

issuance of judgment in this action, Defendants shall promptly identify, collect any

uncollected antidumping and countervailing duties on, and reliquidate all such entries.

**SO ORDERED.**

/s/      Timothy M. Reif
Timothy M. Reif, Judge

Dated: August 22, 2025
New York, New York

Appx110

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| AUXIN SOLAR, INC., AND CONCEPT CLEAN ENERGY, INC., | |
| Plaintiffs, | |
| v. | |
| UNITED STATES, et al., | **Before: Timothy M. Reif, Judge** |
| Defendants, | |
| and | **Court No. 23-00274** |
| AMERICAN CLEAN POWER ASSOCIATION, et al., | |
| Defendant-Intervenors. | |

<u>**JUDGMENT**</u>

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now in conformity with that opinion, it is hereby

**ORDERED** that Plaintiffs' Rule 56.1 Motion for Judgment on the Agency Record is **GRANTED**; it is further

**ORDERED** that *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Dep't of Commerce Sept. 16, 2022), is **VACATED**; it is further

**ORDERED** that, within 20 days of the issuance of judgment in this action, Defendants shall publish notice of said vacatur in the Federal Register; it is further

**ORDERED** that Defendants shall promptly liquidate and collect antidumping and countervailing duties on any currently unliquidated entries found to be circumventing the

Appx111

Court No. 23-00274                                                               Page 2

antidumping and countervailing duty orders on CSPV products from China in

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells,*

*Whether or Not Assembled Into Modules, From the People's Republic of China: Final*

*Scope Determination and Final Affirmative Determinations of Circumvention With*

*Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Dep't of

Commerce Aug. 23, 2023), for which the now-vacated *Procedures Covering*

*Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential*

*Proclamation 10414*, 87 Fed. Reg. 56,868 (Dep't of Commerce Sept. 16, 2022) were

applied; and it is further

   **ORDERED** that, should any of the aforementioned entries be liquidated prior to the

issuance of judgment in this action, Defendants shall promptly identify, collect any

uncollected antidumping and countervailing duties on, and reliquidate all such entries.

/s/     Timothy M. Reif

Timothy M. Reif, Judge

Dated: August 22, 2025
      New York, New York

Appx112

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-2120

**Short Case Caption:** Auxin Solar Inc. v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☐ the filing has been prepared using a proportionally-spaced typeface and includes _____ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☑ the filing contains _____ pages / __17,223__ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __39__).

Date: 03/30/2026

Signature: /s/ Nicholas R. Sparks

Name: Nicholas R. Sparks